## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| EVERETT FINANCIAL, INC. d/b/a SUPREME LENDING | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| PRIMARY RESIDENTIAL MORTGAGE, INC.; BARRY G. JONES, individually; JAMES DURHAM, individually; and SHANNON FORTNER, individually, | § § § § § § § | |
| Defendants. | § § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND
## <u>APPLICATION FOR INJUNCTION</u>

Plaintiff Everett Financial, Inc. d/b/a Supreme Lending hereby complains of Defendants Primary Residential Mortgage, Inc. ("PRMI"), Barry Jones, James Durham, and Shannon Fortner[1] and seeks permanent injunctive relief.

## PRELIMINARY STATEMENT

Supreme Lending is a leading mortgage banker and broker with branches throughout the country. The lifeblood of Supreme Lending's success is the confidential and proprietary information it compiles to ensure its employees are equipped to provide prospective borrowers with options to meet their particular home-financing needs. PRMI, a competitor of Supreme Lending, solicited and conspired with then-employees of Supreme Lending (the Branch Mangers) to plot and execute a corporate raid on Supreme Lending that resulted in the following wrongful acts, among others:

---

[1] "Defendants" refers to Defendants PRMI, Jones, Durham, and Fortner, collectively. "Branch Managers" refers to Defendants Jones, Durham, and Fortner, collectively.

- targeted solicitation of Supreme Lending's southeast division managers leading to a mass exodus of over 100 employees from 13 branches—many of whom are bound by non-solicitation and confidentiality agreements;

- theft of Supreme Lending's confidential and proprietary customer property;

- wrongful solicitation of Supreme Lending's customers;

- diversion of scores of loans in process and other business opportunities;

- PRMI holding Supreme Lending's office equipment and furniture hostage; and

- PRMI's ongoing, persistent disparagement of Supreme Lending to Supreme Lending's employees, clients, and business partners.

As a direct consequence of the Defendants' wrongful acts, Supreme Lending has suffered significant damages, including, without limitation, a precipitous drop in profits and market share and a severe detrimental impact to its cornerstone assets—its goodwill and employee morale.   Accordingly, Supreme Lending seeks redress for the significant and ongoing harm caused by Defendants' wrongful conduct as set forth in detail below.

## PARTIES

1.     Plaintiff Supreme Lending is a Texas corporation with its principal place of business in Dallas, Texas.

2.     Defendant PRMI is a Nevada corporation with its principal place of business in Salt Lake City, Utah.  PRMI is, and at all relevant times was, licensed to do business in the State of Texas.  PRMI may be served through its Texas registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas  75201-3136.

3.     Defendant Jones, is a resident of the State of Alabama and may be served with process at 1655 Covington Ridge, Auburn, Alabama 36830.

4.      Defendant Durham is a resident of the State of Alabama and may be served with process at 3226 Hamilton Road, Opelika, Alabama 36804.

5.      Defendant Fortner is a resident of the State of Alabama and may be served with process at 8725 Pleasant Grove Road, Albertville, Alabama 35950.

## JURISDICTION AND VENUE

6.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and this action is between a citizen of the State of Texas on the one hand, and citizens of foreign states on the other.

7.      Venue is proper in the United States District Court for the Northern District of Texas, Dallas Division under 28 U.S.C. § 1391(b)(3), because there is no district in which an action may otherwise be brought in accordance; also, all Defendants are subject to the exercise of personal jurisdiction by this Court with respect to the subject matter of this lawsuit. Furthermore, under the forum selection clauses contained in several contracts underlying this litigation, venue lies in courts situated in Dallas, Texas.

8.      This Court has personal jurisdiction over Jones because he conducts business in the State of Texas.  Specifically, Jones entered multiple contracts with Supreme Lending—a Texas company—pursuant to which Jones undertook duties or obligations that were to be performed, in whole or in part, in Dallas, Texas.  Furthermore, under a Confidentiality, Inventions, and Non-Solicitation Agreement between Jones and Supreme Lending that forms, in part, the basis of this lawsuit, Jones expressly consented to the exercise of personal jurisdiction of Texas courts, including the United States District Court for the Northern District of Texas, Dallas Division.

9.     This Court has personal jurisdiction over Durham because he conducts business in the State of Texas.   Specifically, Durham entered multiple contracts with Supreme Lending—a Texas company—pursuant to which Durham undertook duties or obligations that were to be performed, in whole or in part, in Dallas, Texas.   Furthermore, under a Confidentiality, Inventions, and Non-Solicitation Agreement between Durham and Supreme Lending that form, in part, the basis of this lawsuit, Durham expressly consented to the exercise of personal jurisdiction of Texas courts, including the United States District Court for the Northern District of Texas, Dallas Division.

10.     This Court has personal jurisdiction over Fortner because he conducts business in the State of Texas.   Specifically, Fortner entered multiple contracts with Supreme Lending— a Texas company—pursuant to which Fortner undertook duties or obligations that were to be performed, in whole or in part, in Dallas, Texas.   Furthermore, under a Confidentiality, Inventions, and Non-Solicitation Agreement between Fortner and Supreme Lending that form, in part, the basis of this lawsuit, Fortner expressly consented to the exercise of personal jurisdiction of Texas courts, including the United States District Court for the Northern District of Texas, Dallas Division.

11.     This Court has personal jurisdiction over PRMI because it is licensed and registered to, and does conduct, business in the State of Texas.   Specifically, PRMI maintains numerous branch offices in the State of Texas, including maintaining at least five branch offices in the Dallas/Fort Worth area alone.

## FACTUAL BACKGROUND

### A.     Supreme Lending is a Market Leader in the Mortgage Banking Industry.

12.     Supreme Lending is a domestic, closely-held company that focuses on originating residential mortgage loans for qualified home-buyers.

13.     Established in Dallas, Texas in 1999, Supreme Lending has enjoyed consistent growth throughout its corporate life by adding satellite branches throughout the United States. To date, Supreme Lending maintains more than 75 branch offices throughout the country. Supreme Lending's branches are managed by branch managers; however, the branches, branch managers, and branch employees all fall under the umbrella of Supreme Lending and report to Supreme Lending's corporate officers, in Dallas, Texas. Supreme Lending's satellite branches are not distinct subsidiary entities.

14.     Supreme Lending is highly regarded in the mortgage banking industry as a result of its reputation for superior commitment to customer service and its employees. For example, Supreme Lending received the highly-coveted "Best Places to Work" designation by both the Dallas Business Journal and the Atlanta Business Chronicle in 2013. Supreme Lending's success is fueled by its "customer for life" principle of doing business. Indeed, the majority of Supreme Lending's business is derived from referrals from previous customers and local real estate professionals.

15.     Supreme Lending further distances itself from its competitors by using state-of-the-art technology that combines the use of the Internet, advanced processing software, and automated underwriting systems to close loans more quickly and at a lower cost than its competitors.

**B.     The Branch Manager Agreements.**

16.     In connection with their employment at Supreme Lending, the Branch Managers entered Producing Branch Manager Agreements that, among other things:

- prohibit the Branch Managers from diverting loans originated with Supreme Lending;

- govern the use of Supreme Lending's proprietary and trade secret information; and

- bind the Branch Managers to safeguard Supreme Lending's confidential property.

17. Jones signed his Producing Branch Manager Agreement (the "Jones BM Agreement") on or about January 13, 2014, pursuant to which he agreed to serve as a producing branch manager for Supreme Lending subject to the terms and conditions of the Jones BM Agreement.[2]

18. Durham signed his Producing Branch Manger Agreement (the "Durham BM Agreement") on or about January 3, 2014, pursuant to which he agreed to serve as a producing branch manager for Supreme Lending subject to the terms and conditions of the Jones BM Agreement.[3]

19. Fortner signed his Producing Branch Manager Agreement (the "Fortner BM Agreement") on or about January 6, 2014, pursuant to which he agreed to serve as a producing branch manager for Supreme Lending subject to the terms and conditions of the Jones BM Agreement.[4]

20. Collectively, the Branch Managers oversaw and managed Supreme Lending's southeast operations. The Jones BM Agreement, Durham BM Agreement, and Fortner BM Agreement (collectively, the "Branch Manager Agreements") are enforceable contracts that contain the following specific terms and conditions:

> RESTRICTIONS: Employee, during the term of his/her employment, shall not engage in any other real estate or mortgage related business without the prior written approval of Supreme and shall devote his/her time, knowledge, skill, and

---

[2] A true and correct copy of the Jones BM Agreement is attached hereto as Exhibit A and fully incorporated herein by reference. Jones entered a substantially similar Producing Branch Manager Agreement at the beginning of his employment at Supreme Lending.

[3] A true and correct copy of the Durham BM Agreement is attached hereto as Exhibit B and fully incorporated herein by reference. Durham entered a substantially a similar identical Producing Branch Manager Agreement at the beginning of his employment at Supreme Lending.

[4] A true and correct copy of the Fortner BM Agreement is attached hereto as Exhibit C and fully incorporated herein by reference. Fortner entered a substantially similar identical Producing Branch Manager Agreement at the beginning of his employment at Supreme Lending.

efforts exclusively to Supreme's operations and affairs. Employee shall not alone, or in concert with others, engage in any pursuit, activity, business or relationship that is, or could be, in competition with Supreme or is adverse to Supreme's or another branch manager's best interest.

COMPLIANCE WITH LAW: Employee represents that he/she is knowledgeable of all laws and regulations applicable to the services to be performed by Employee in the management of his/her branch and in the origination of residential mortgage loans, and agrees to abide by all such laws and regulations. Employee shall at all times comply with, and shall not cause Supreme to fail to comply with, any and all such laws and regulations. . . . Employee also recognizes the importance of maintaining the confidentiality of personal information gathered and maintained in the course of his/her employment and agrees to comply with all federal and state privacy laws including, but not limited to, Title V of the federal Gramm-Leach Bliley Act ("GLBA") and the regulations and guidelines there under and other similar state laws. . . .

CONFIDENTIALITY: Employee agrees that during the term of employment and thereafter, Employee shall not directly or indirectly use, disclose, reveal, make available, or disseminate to any person who is not an authorized employee of Supreme Supreme's Proprietary Information. Proprietary Information includes, but is not limited to: (1) products, services, processes, training, business strategies and philosophies, manuals and reference guides; (2) investor and customer information including their identities, needs, preferences, requirements, expectations, financial or personal information, contract terms, rates and pricing structure; (3) marketing data, information, leads, lead generation and marketing plans; (4) pricing, commission and rate information; and (5) any information protected by federal or state privacy laws . . . .

TERMINATION: Employee expressly acknowledges and agrees that all loans . . . originated and contracts obtained by Employee during Employee's employment with Supreme are the sole and exclusive property of Supreme . . . . Upon Employee's termination, such loans and contracts shall remain the sole and exclusive property of Supreme. Without the express written consent of the Supreme, Employee agrees that Employee shall take no action of any type to place or divert such loans originated, and contracts obtained by Employee, to any competitor or away from Supreme. Further, Employee agrees to provide a written account of any and all open leads, business prospects and/or loans in process as of the date of Employee's termination.

***

Employee agrees to promptly return to Company immediately upon request, at any time, and upon termination of employment, all Company property, including office keys, access cards, any electronic or other equipment provided by the Company, documents, files, correspondence and notes, containing or relating to confidential material and/or Propriety Information, including but not limited to information obtained from the customers and prospective customers contacted

by Employee or other employees located at Employee's branch, and the loans handled by such persons while Employee was employed by Company, without keeping any copies. Employee shall assist Company in securing all original loan files and copies thereof, as requested by Company.

**C.    The Branch Managers Entered Confidentiality and Non-Solicitation Agreements with Supreme Lending.**

21.    As a prerequisite to their employment with Supreme Lending, the Branch Managers also entered Confidentiality, Inventions, and Non-Solicitation Agreements with Supreme Lending under which they agreed to, among other things, refrain from:

- disclosing Supreme Lending's highly-sensitive, proprietary, and confidential company and customer data;

- soliciting co-employees; and

- soliciting customers or prospective customers with whom they dealt with at Supreme Lending.

22.    Jones signed his Confidentiality, Inventions, and Non-Solicitation Agreement with Supreme Lending (the "Jones Confidentiality Agreement") on November 21, 2011.[5] Durham signed his Confidentiality, Inventions, and Non-Solicitation Agreement with Supreme Lending  (the "Durham Confidentiality Agreement") on May 17, 2012.[6]  Fortner signed his Confidentiality, Inventions, and Non-Solicitation Agreement with Supreme Lending (the "Fortner Confidentiality Agreement") on November 21, 2011.[7]

23.    The Jones Confidentiality Agreement, Durham Confidentiality Agreement, and Fortner Confidentiality Agreement (collectively, the "Confidentiality Agreements") are valid,

---

[5] A true and correct copy of the Jones Confidentiality Agreement is attached hereto as Exhibit D and fully incorporated herein by reference.

[6] A true and correct copy of the Durham Confidentiality Agreement is attached hereto as Exhibit E and fully incorporated herein by reference.

[7] A true and correct copy of the Fortner Confidentiality Agreement is attached hereto as Exhibit F and fully incorporated herein by reference.

enforceable contracts that contain the following specific confidentiality covenants, among others:

> Employee recognizes and acknowledges that he or she will have access to confidential information of Employer ("Confidential Information"), including, without limitation, customer information, lists of suppliers and costs, information regarding proposals, designs, concepts, sales figures and other information concerning the business and operations of Employer and other proprietary data or information, that is valuable, special and a unique asset of Employer. In addition, Employee will have access to similar Confidential Information of Employer's customers. Employee agrees not to disclose such Confidential Information, except as may be necessary in the performance of his or her duties, to any person, firm, corporation, association or entity, nor use such Confidential Information in any way, either during the term of his or her employment or at any time thereafter, until he or she has received the written consent of Employer or until such Confidential Information becomes public knowledge through no wrongful act of Employee. Employee shall take such protective measures as are reasonably necessary to preserve the confidentiality of such Confidential Information, and exercise his or her best efforts to prevent unauthorized parties from gaining access thereto.

> Employee understands and agrees that any . . . materials containing any Confidential Information, whether furnished to Employee by Employer or Employer's customers or prepared by Employee in connection with his or her employment, is and shall remain the sole property of Employer (or the customer, as the case may be) and is subject to the obligations of confidentiality and non-use set forth herein, and shall be promptly delivered to Employer upon its request, or upon the termination of employment, together with any and all copies thereof.

The Confidentiality Agreements also contain the following specific non-solicitation covenants:

> **(a)** **Associations with Co-Workers.** Employee agrees that during his or her employment and for two (2) years following the termination of his or her employment for any reason, neither he or she nor his or her affiliates will . . . employ or solicit or attempt to employ or solicit for any employment any of Employer's current employees. Employee and his or her affiliates will not, either directly or indirectly or by acting in concert with others, seek to induce or influence any employee to leave Employer's employment.

> **(b)** **Solicitation of Customers.** Employee agrees that during his or her retention and for two (2) years following the termination of his or her employment for any reason, neither he, she nor his or her affiliates will, by himself or herself or by acting in concert with others, solicit any of Employer's customers or prospective customers existing as of the date of termination that Employee directly serviced, was assigned to, or was responsible for during the twelve (12) month period immediately preceding termination of Employee's

**PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR INJUNCTION**     **PAGE 9**

employment with Employer. Employee further agrees not to take any other action to divert business from Employer or influence any vendor, supplier, customer or potential customer of Employer to cease doing business with Employer.

**D.    Supreme Lending Entrusts the Branch Managers with Access to Its Confidential and Proprietary Information and Business Methods.**

24.    In reliance on the Branch Managers' contractual commitments, Supreme Lending provided the Branch Managers with access to its Confidential Information, perhaps its most valuable asset. By way of example, but without limitation, Supreme Lending provided the Branch Managers with the following types of Confidential Information and proprietary technology and data:

- access to, and information concerning, Supreme Lending's proprietary software platform—Supreme Account Made Ease;

- information and data concerning current and prospective borrowers/clients;

- financial reports and profit & loss statements;

- customer surveys and data and marketing materials compiled from the same;

- marketing materials;

- vendor lists;

- employee lists and related human resource information;

- marketing services agreements and related information concerning Supreme Lending's negotiations and dealings with real estate professionals and contacts;

- databases containing listings of Supreme Lending's loan applications and related confidential customer information;

- confidential lease, contract, and agreement terms; and

- highly-sensitive information concerning Supreme Lending's pricing, expenses, approval system, and lending policies and procedures.

Supreme Lending compiles its Confidential Information and proprietary data at great expense. Training managers and staff to analyze the information and utilize it in conjunction with Supreme Lending's technology systems also comes at great cost to Supreme Lending. Armed with unfettered access to Supreme Lending's proven blueprint for success in the mortgage banking industry, the Branch Managers had all the tools necessary to meet and exceed their performance goals and objectives for Supreme Lending.

**E.    PRMI Conspires with the Branch Managers to Raid and Takeover Supreme Lending's Southeast Regional Offices, Staff, and Customers.**

25.    In the fall of 2013, PRMI embarked upon an aggressive plan to poach the Branch Managers—in violation of their contractual obligations to Supreme Lending—and raid Supreme Lending's Southeast regional offices, staff, and customers.

26.    PRMI initially focused its corporate raid on enticing Jones to sever ties with Supreme Lending and forsake his contractual obligations to Supreme Lending by soliciting Durham and Fortner to also join forces with PRMI. In fact, while recruiting Jones, PRMI referred to Durham and Fortner as Jones's "partners."

27.    On information and belief, at all times during PRMI's recruitment of Jones, PRMI had specific knowledge of Jones's confidentiality obligations to Supreme Lending. Indeed, in October 2013, despite Jones's confidentiality obligations to Supreme Lending, PRMI requested Jones to provide pro forma(s) he had built so PRMI could "accurately depict what [Jones's] business looks like on [PRMI's] platform." Furthermore, in October 2013, Jones and PRMI's Director of Business Development & Implementation, Charles D. Edington, discussed signing and returning a non-disclosure agreement.

28.    On information and belief, in November 2013, while the Branch Mangers were still employed by Supreme Lending, PRMI flew the Branch Managers to its corporate headquarters for what it referred to as a "Discovery Day." Tellingly, PRMI attempted recruit

the Branch Managers in secret by only exchanging e-mails with the Branch Managers through their personal e-mail accounts. However, while planning the Branch Mangers' November 2013 trip to visit PRMI's corporate headquarters, PRMI realized an e-mail had slipped through the cracks to a Supreme Lending e-mail account. PRMI's Business Development Manager, Kenneth Deen, addressed the situation by e-mailing Jones and Durham' via their personal e-mail accounts to tell them the e-mail *accidentally* went to a Supreme Lending e-mail account.

29.     Without notice, and in rapid succession, Fortner resigned from Supreme Lending on January 31, 2014, Jones resigned from Supreme Lending on February 3, 2014, and Durham resigned from Supreme Lending on February 5, 2014. Upon their resignations, the Branch Managers immediately began (officially) working for PRMI. On information and belief, however, the Branch Managers had been unofficially working for PRMI long in advance of their resignations.

30.     Contemporaneously, PRMI also brazenly set its sights on using the Branch Managers to take over Supreme Lending's entire southeast regional network by any means necessary. Indeed, PRMI, through the Branch Managers, coerced Supreme Lending employees to follow the Branch Managers to PRMI by disparaging, and perpetrating lies about, Supreme Lending. Specifically, Defendants attempted to lure Supreme Lending's employees to join PRMI through the following deceitful and/or unlawful means, among others:

- falsely representing to existing Supreme Lending employees that they would be terminated by Supreme Lending following Jones's defection;

- falsely representing to  current Supreme Lending employees that their only hope of having a job would be to follow Jones to PRMI;

- coercing Supreme Lending employees to join PRMI by falsely stating words to the effect of, "if you don't join us at PRMI, Supreme Lending doesn't want you;"

- coercing Supreme Lending employees to go to PRMI by derogatorily stating Supreme Lending's president is "greedy" and "lining his pockets," among other things;

- secretly recording phone calls with Supreme Lending executives to bait them into making statements that could be used to lure other employees to join PRMI;

- working hand-in-hand with Supreme Lending employees who had already committed to join PRMI to recruit Supreme Lending's underwriters;

- falsely representing that Supreme Lending was going out of business and/or closing its doors in the coming months;

- falsely representing that Supreme Lending had gone bankrupt; and

- falsely representing that Supreme Lending had merged and/or would be merging with PRMI.

31.    PRMI's extensive efforts to plan and execute the raid on Supreme Lending paid off, as a mass exodus of Supreme Lending's southeast workforce took place in late January and early February 2014.  When the dust settled, in excess of 130 Supreme Lending employees terminated their business relationships with Supreme Lending and aligned with PRMI.  As a result of the exodus, PRMI took over Supreme Lending's branches in Huntsville, Auburn, Madison, Montgomery, Vestavia Hills, Guntersville, Enterprise, Dothan, Florence, Millbrook, and Alexander City, Alabama, Hinesville Georgia, and Memphis Tennessee (collectively, the "Southeast Offices").  Supreme Lending's operations in the southeast were left as a mere shell.

**F.    Defendants Conspire to Misappropriate Supreme Lending's Confidential Information and Divert Supreme Lending's Business to PRMI.**

32.    PRMI's raid coupled with the Branch Mangers' disregard of their contractual obligations took, and continues to take, a severe toll on Supreme Lending.  The damages were significant and continue to have a rippling effect throughout Supreme Lending's entire organization as it attempts to begin to rebuild its southeast network.

**PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR INJUNCTION**                    **PAGE 13**

      (i)    ***Defendants misappropriate Supreme Lending's confidential and proprietary information.***

33.    On information and belief, prior to and after the mass exodus, the Branch Managers. on PRMI's behalf, misappropriated Supreme Lending's confidential and proprietary information to strengthen the loan origination numbers at PRMI.  As discussed above, by virtue of their positions as producing branch managers at Supreme Lending, the Branch Managers had direct access to Supreme Lending's most valuable assets — its confidential and proprietary information, data, and software, including access to Supreme Lending's databases containing detailed listings of all loan applications submitted to Supreme Lending contained in Supreme Lending's loan-origination software system.

34.    By way of illustration, in an email dated February 5, 2014, Ann Borland Ramsey, a Supreme Lending employee who left Supreme Lending for PRMI on January 31, 2014, asked her former colleague at Supreme Lending, Neva Huddleston, to provide a rate quote for a current Supreme Lending prospect because the prospect wanted "to know what rate [PRMI] could offer before he [would] agree to transfer his file" from Supreme Lending.  Within minutes of the request, Huddleston—who was being wooed by PRMI at the time—asked Ramsey if she was referring to "the new company" and then asked Jones and Durham—who had already defected to PRMI—to give Ramsey a quote.  Again, these Supreme Lending employees covertly communicated with Jones and Durham about transferring Supreme Lending's file to PRMI by using their personal e-mail accounts.

35.    Furthermore, as described above, PRMI specifically requested Jones to provide pro-forma(s) to match his business at Supreme Lending with PRMI's platform.  During the same timeframe, and in connection PRMI's recruitment of Jones, PRMI and Jones also discussed signing a non-disclosure agreement.

**(ii)    *Supreme Lending's Production Plummets As a Result of the Defendants'
Misconduct.***

36.    Supreme Lending began suffering concrete losses as a result of the Defendants'
actions well in advance of the mass exodus that was spearheaded by the Branch Managers in
February 2014.

37.    From December 2013 through the present, Supreme Lending's loan volume and
revenues have dropped precipitously in comparison to its historical track record.  Supreme
Lending's internal records reveal a jarringly-high number of withdrawn loan applications
submitted to its southeast regional branches immediately preceding the mass exodus to PRMI
without explanation.  This amount of withdrawn loans is atypically high based on this Supreme
Lending's normal output for these months.  Many of the loans were already approved, and
others were cleared to close, prior to being withdrawn.  To be sure, the incentive was high for
the Branch Managers and other defecting loan officers to stall and/or divert Supreme
Lending's pending loan applications while they strategized and implemented their plan to join
forces with PRMI.

**(iii)    *PRMI and Jones tortiously interfere with Supreme Lending's Marketing
Services Agreements.***

38.    Supreme Lending generates significant business opportunities through strategic
relationships with local real estate professionals.  Typically, Supreme Lending formalizes these
relationships by entering marketing service agreements ("MSAs").  MSAs provide a means for
real estate professionals to provide their clients with exposure to preferred lenders (like
Supreme Lending), thus creating a mutually-beneficial relationship that provides brand
exposure for the lender and edification for the prospective home-buyer.  Supreme Lending has
numerous MSAs with real estate professionals serving areas that overlap with the southeast
region's territory.

**PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR INJUNCTION                    PAGE 15**

39.    To further its foothold in the southeast region, PRMI and the Branch Managers, on PRMI's behalf, disseminated misrepresentations to local real estate professionals that Supreme Lending went out of business, was bankrupt, and/or had merged into PRMI. These disparaging fallacies were intended to, and did, injure Supreme Lending's relationships, hard-earned goodwill, and business.

### (iv)    PRMI Misappropriates Supreme Lending's Internet Presence.

40.    Supreme Lending markets its services, employees, and culture by maintaining an online presence through Facebook web profiles and branch-specific websites. Supreme Lending's Internet presence benefits its success in the market. Accordingly, Supreme Lending expends significant resources developing its websites and designing, maintaining, and interacting with clients and potential clients via Facebook. In today's business climate, garnering "likes" on Facebook and visits to a company website creates a marketing and advertising buzz that can have an exponential impact.

41.    Defendants misappropriated Supreme Lending's Facebook pages and websites, which created the misimpression with the public that Supreme Lending is the source of, or related to, PRMI's business dealings. Because PRMI's newly-formed offices in the southeast region have used Supreme Lending web pages without change of content, it appears that PRMI has misappropriated the sites for the purpose of diverting potential borrowers from Supreme Lending to PRMI. These actions constitute exploitation of Supreme Lending's goodwill for the purpose of deriving a commercial benefit. The natural and probable consequence of PRMI's conduct has been, and will continue to be, that the public, potential borrowers, and referral sources are likely to be confused, misled, and deceived by PRMI's representations that it is somehow the product of a merger with Supreme Lending or that it has taken over for Supreme

Lending.  Indeed, a potential client may mistakenly have believed that a loan from PRMI would be a loan made by Supreme Lending or its successor.

**G.    Supreme Lending Attempts to Stop the Bleeding.**

42.    PRMI's raid on Supreme Lending came as a result of months of planning and conspiring, both internally and with the Branch Managers.  PRMI did not limit its raid to pilfering Supreme Lending's employees and branches; rather, PRMI  took the next step to make its takeover complete by seeking to assume the leases to Supreme Lending's commercial properties so that its new employees could continue doing business in the same locations.  To mitigate its substantial damages and stop the bleeding caused by PRMI's raid and the Branch Managers' breaches, Supreme Lending agreed to assign its southeast regional office leases to PRMI, including the assignment of its office lease in Auburn, Alabama (the "Auburn Assignment").

43.    Initially, the process of assigning the various office leases for the southeast region went smoothly.  However, Supreme Lending's Auburn, Alabama lease (the "Auburn Lease") contained a no-assignment clause for the benefit of the property owner.  Despite this clause, the property owner agreed to work with Supreme Lending and PRMI to facilitate the transition on the condition that PRMI's provided financial statements to the property owner so that it could evaluate the PRMI's financial ability to assume the commitment.  During the course of discussing the assignment, the property owner provided PRMI with a proposed extension of the lease, but by no means ever informed PRMI that the assignment was contingent upon extending the lease.  PRMI completely failed and refused to ever provide the property owner with financial statements necessary to consummate the assignment.

44.    Subsequently, PRMI refused to honor the Auburn Assignment by falsely claiming Supreme Lending had frustrated the assignment and lease opportunity.  In fact, any

frustration was a direct result of PRMI's own refusal to provide necessary financial statements and work with the property owner. All the while, in June 2013, during his tenure with Supreme Lending, Jones negotiated a separate lease in Auburn, Alabama—purportedly for Supreme Lending's benefit—with a business referral source and moved PRMI's new Auburn staff of former Supreme Lending employees into the lease after the exodus. On information and belief, PRMI drug its feet concerning the negotiations of the Auburn Assignment and ultimately refused to honor its agreement with Supreme Lending because it was holding the separate lease agreement with Jones's referral source in its back pocket and to further harm Supreme Lending.

## H.    PRMI Continues Its Oppressive Conduct by Holding Supreme Lending's Office Equipment and Furniture Hostage.

45.    Due to the suddenness of PRMI's raid, Supreme Lending was unable to secure its office equipment and furniture in advance of PRMI's hostile takeover of the Southeast Branches. Thus, upon PRMI's assumption of the Southeast Branch offices, it possessed and controlled more than $250,000 of Supreme Lending's office furniture, files, computers, routers, VOIP phones, and a variety of other office equipment and furniture.

46.    PRMI initially agreed to allow Supreme Lending to reacquire certain office equipment such as phones, routers, PCs, and laptops and entered negotiations to purchase Supreme Lending's remaining office furniture. It soon became apparent that PRMI was only interested in playing games with Supreme Lending and its property to prevent Supreme Lending from using its own property to reemerge in the market. Indeed, for over a month, PRMI stonewalled Supreme Lending's requests and efforts to reacquire its office furniture and equipment. In fact, Jones, on behalf of PRMI, threatened to call the police when a Supreme Lending employee attempted to pick up a computer that belongs to Supreme Lending and made

multiple disparaging and threatening comments to Supreme Lending concerns its rights to obtain and use its own property.

47.     Because PRMI held Supreme Lending's office equipment and furniture hostage, Supreme Lending's ability to get back on its feet in the southeast region was severely—and purposefully—thwarted while PRMI continued to unjustly benefit from Supreme Lending's property, offices, and former employees.

**I.      The Damage Done.**

48.     PRMI's raid of Supreme Lending extended to Supreme Lending's human resources, office space, confidential and proprietary information, and valuable business property.   As a direct result of Defendants' wrongful conduct, Supreme Lending has been significantly harmed.   Compounding this damage, PRMI has cast false aspersions into the market and to Supreme Lending's employees and business partners that Supreme Lending is going out of business, going bankrupt, or merging with PRMI.   PRMI is now actively flaunting its raid and takeover by distributing advertising materials with pictures of PRMI's new southeast regional employees (Supreme Lending's former employees), including the Branch Managers, that boldly proclaim, "We are now with Primary Residential Mortgage, Inc."   Clearly banking on Supreme Lending's goodwill and equity in the southeast regional communities, the advertisement represents that PRMI's new employees—i.e., Supreme Lending's former employees—are the "same people," offer the "same service," have "better rates," but simply have a "new name."   Combined with PRMI's false allegations concerning a merger with Supreme Lending, these statements are intended to mislead the marketplace and take advantage of current and prospective customers who are familiar with Supreme Lending.

49.   Accordingly, by this action, Supreme Lending seeks monetary damages as compensation for its resulting losses and injunctive relief tailored to prevent Defendants from inflicting further irreparable harm to Supreme Lending and its business.

50.   All conditions precedent to Supreme Lending's recovery and Defendants' liability have been performed, have occurred, or have been waived. *See* FED. R. CIV. P. 9(c).

## CAUSES OF ACTION

### COUNT ONE:  BREACH OF CONTRACT—BRANCH MANAGER AGREEMENT
### (Against Jones, Durham, and Fortner)

51.   Supreme Lending incorporates each of the foregoing paragraphs.

52.   The Branch Manager Agreements are valid, enforceable contracts under which Jones, Durham, and/or Fortner contracted with Supreme Lending to manage certain of Supreme Lending's branch offices.

53.   Supreme Lending performed, tendered performance of, or was excused from performing its contractual obligations under the Branch Manager Agreements.

54.   Pursuant to the terms and conditions of the Branch Manger Agreements, Jones, Durham, and Fortner each undertook certain obligations in their individual capacity, including, among others:

- refraining from engaging in any business activity or pursuit that is or could be in competition with Supreme Lending during the term of employment with Supreme Lending (§3);

- complying with all state and federal privacy laws, as well as all laws and regulations applicable to origination of residential mortgage loans (§4);

- protecting Supreme Lending's confidential and proprietary information (§9);

- agreeing that all loans and contracts originated during the term of their employment with Supreme Lending are the sole and exclusive property of Supreme Lending, and that any such loans or contracts will remain the sole and exclusive property of Supreme Lending after termination of the Branch Manager Agreements (§13);

- refraining from taking any action to place or divert any loans and contracts to a competitor of Supreme Lending if said loans or contracts originated during the term of their employment with Supreme Lending (§13); and

- providing Supreme Lending with a written account of all open leads, business prospects, and/or loans in process at the time of their departure from Supreme Lending. (§13).

55.    On information and belief, the Branch Managers materially breached the Branch Manager Agreements by:

- pursuing and/or engaging in business activities in direct competition with Supreme Lending during the term of their employment including, without limitation, identifying and diverting loan applications originated during their employment term to PRMI;

- obtaining and disclosing to PRMI Supreme Lending existing and potential customer information, including but not limited to such customers' identities, financial or personal information, contract terms, rates, and/or pricing structure;

- retaining and diverting to PRMI loan applications that originated during the term of their employment with Supreme Lending; and

- failing to provide Supreme Lending with a written account of all open leads, business prospects, and loans in process at the time of their departure from Supreme Lending.

56.    As a direct and proximate result of the Branch Managers' material breaches of the Branch Manager Agreements, Supreme Lending has sustained damages in an amount to be determined at trial.

## COUNT TWO:  BREACH OF CONTRACT—CONFIDENTIALITY AGREEMENTS
### (Against Jones, Durham, and Fortner)

57.    Supreme Lending incorporates each of the foregoing paragraphs.

58.    The Confidentiality Agreements are valid, enforceable contracts by and between the Branch Managers and Supreme Lending.

59.    Supreme Lending performed, tendered performance of, or was excused from performing its contractual obligations under the Confidentiality Agreements.

60.    Pursuant to the terms of the Confidentiality Agreements, the Branch Managers undertook certain obligations in their individual capacity including, among others:

- agreeing not to disclose or use Supreme Lending's confidential and proprietary information except as may be necessary in the performance of their duties while employed at Supreme Lending (§1);

- undertaking protective measures reasonably necessary to preserve the confidentiality of Supreme Lending's confidential and proprietary information (§1);

- agreeing that files, records, equipment, and documents (*e.g.*, loan applications) are and will remain the sole property of Supreme Lending (§1);

- refraining from soliciting or attempting to employ, whether directly or indirectly, any of Supreme Lending's current employees for a period of two years (§3(a)); and

- refraining from soliciting any of Supreme Lending's current or prospective customers existing as of the date of the termination of their employment with Supreme Lending for a period of two years (§3(b)).

61.    On information and belief, the Branch Managers materially breached the Confidentiality Agreements by:

- disclosing and/or using Supreme Lending's confidential and proprietary information, including loan applications and client information, in furtherance of their business after joining PRMI;

- taking loan applications and client information with them to PRMI that are the sole property of Supreme Lending after termination of their employment with Supreme Lending;

- soliciting and, at times, coercing Supreme Lending's employees to leave Supreme Lending and follow Jones and/or Durham to PRMI; and

- soliciting Supreme Lending's current and prospective customers to leave Supreme Lending and follow them to PRMI.

62.    As a direct and proximate result of the Branch Managers' material breaches of the Confidentiality Agreements, Supreme Lending has sustained damages in an amount to be determined at trial.

**PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR INJUNCTION**          **PAGE 22**

## COUNT THREE:  TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS
### (Against All Defendants)

63.    Supreme Lending incorporates each of the foregoing paragraphs.

64.    Supreme Lending had numerous loan applications with consumers which constituted valid, enforceable contracts, as well as MSAs with real estate professionals.

65.    On information and belief, Defendants willfully and intentionally interfered with those contracts by, among other things:

- diverting loan applications submitted by customers to Supreme Lending to PRMI while said applications were being processed by Supreme Lending;

- diverting loan applications submitted by customers to Supreme Lending to PRMI after Supreme Lending had approved the loans; and/or

- diverting loan applications submitted by customers to Supreme Lending to PRMI after Supreme Lending had cleared said loans to be closed by its loan officers.

66.    Furthermore, PRMI willfully and intentionally interfered with the Branch Manager Agreements and Confidentiality Agreements by aiding, abetting, encouraging, and facilitating the Branch Managers above-described breaches of contract.

67.    As a direct and proximate result of Defendants' tortious interference, Supreme Lending has sustained damages in an amount to be determined at trial.

68.    Because the tortious acts and conduct of Defendants were intentional, willful, wanton, malicious, and without justification or excuse, Supreme Lending is also entitled to recover exemplary damages from Defendants in an amount to be determined at trial.

## COUNT FOUR:  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (Against All Defendants)

69.    Supreme Lending incorporates each of the foregoing paragraphs.

70.     Supreme Lending had expectancies and economic opportunities arising out of its relationships with prospective home owners identified and contained in Supreme Lending's confidential and proprietary customer lists.

71.     As a result of said individuals' respective interests in pursuing residential mortgage loan opportunities with Supreme Lending, there was a reasonable probability that Supreme Lending would have entered into business dealings with those parties.

72.     Defendants had knowledge of these specific relationships and opportunities, but nevertheless interfered with them and continue to interfere with them.

73.     Defendants' actions in this regard were done knowingly, intentionally, and maliciously, for the purpose of interfering with Supreme Lending's business expectations and opportunities.

74.     The actions and conduct of Defendants were calculated to, and in fact did, interfere with Supreme Lending's existing and future business relationships and opportunities.

75.     But for Defendants' interference, there was a reasonable probability that Supreme Lending would have entered into contractual relations with numerous prospective homeowners identified and contained in Supreme Lending's confidential and proprietary customer lists.

76.     As a direct and proximate result of Defendants' conduct, Supreme Lending has suffered, and continues to suffer substantial injury, for which Supreme Lending now seeks to recover actual, compensatory, and consequential monetary damages in an amount to be determined bat trial.

77.     Because the tortious acts and conduct of Defendants were intentional, willful, wanton, malicious, and without justification or excuse, Supreme Lending is also entitled to recover exemplary damages from Defendants in an amount to be determined at trial.

## COUNT FIVE:  BREACH OF FIDUCIARY DUTY
### (Against Jones, Durham, and Fortner)

78.    Supreme Lending incorporates each of the foregoing paragraphs.

79.    As Producing Branch Managers for Supreme Lending, the Branch Managers owed Supreme Lending fiduciary duties, including duties of loyalty, due care, good faith, candor, and full disclosure.

80.    On information and belief, Jones, Durham, and Fortner breached their fiduciary duties to Supreme Lending by, among other things:

- misappropriating confidential information, property, and opportunities of Supreme Lending for their own benefit and/or the benefit of PRMI;

- intentionally diverting business opportunities for their own benefit and/or the benefit of PRMI;

- acting in competition with Supreme Lending by pursuing business opportunities owned by Supreme Lending; and

- conducting such business while employed by Supreme Lending.

81.    As a direct and proximate result of the Branch Managers' breach of fiduciary duties, Supreme Lending has suffered, and continues to suffer, substantial injury, including a loss of profits from the business opportunities diverted by the Branch Managers for which Supreme Lending now seeks to recover actual, compensatory, and consequential monetary damages in an amount to be determined at trial.

82.    Furthermore, because the Branch Managers breached their fiduciary duties intentionally, willfully, wantonly, maliciously, and without justification or excuse, Supreme Lending is also entitled to recover exemplary damages from the Branch Managers in an amount to be determined at trial.

## COUNT SIX:  CONVERSION
### (Against All Defendants)

83.    Supreme Lending incorporates each of the foregoing paragraphs.

84.    Supreme Lending owns and/or has the right to possess the trade secret and confidential information belonging to Supreme Lending and/or its clients, including, without limitation, loan applications, current and prospective customer identities and contact information, other personal and financial information, contract terms, rates, and pricing structure, which Supreme Lending has the right and obligation to possess such information on behalf of its clients.

85.    Supreme Lending's trade secrets and other confidential and proprietary information, including the loan applications and customer database information, are the personal property of Supreme Lending.

86.    Supreme Lending further had a possessory right to its office furniture and equipment that PRMI wrongfully withheld.

87.    On information and belief, Defendants, individually or through its agents and/or employees, wrongfully exercised dominion and/or control over Supreme Lending's trade secrets and other confidential and proprietary information.  Furthermore, on information and belief, Defendants, individually or through its agents and/or employees, have used and continue to use Supreme Lending's confidential information to divert customers from Supreme Lending to PRMI.  Moreover, despite demand, Defendants wrongfully refused to return Supreme Lending's office furniture and equipment in a timely manner

88.    Because of Defendants' conversion, Supreme Lending has suffered harm, and now seeks to recover its actual, compensatory and consequential monetary damages in an amount to be determined at trial.

89.    Furthermore, because Defendants' conversion was committed willfully, maliciously, wantonly, fraudulently, and/or with gross negligence, Supreme Lending also seeks exemplary or punitive damages in an amount to be determined at trial.

## COUNT SEVEN:  MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

90.     Supreme Lending incorporates each of the foregoing paragraphs.

91.     Supreme Lending is, and has been, engaged in efforts to provide superior mortgage origination services to its customers.

92.     Information at issue in this case was not known to Supreme Lending's competitors, was developed at considerable expense, and constitutes valuable trade secrets that give Supreme Lending a competitive advantage over others in the mortgage industry.

93.     The Branch Managers acquired certain trade secrets of Supreme Lending by virtue of their employment relationship with Supreme Lending.  PRMI acquired certain trade secrets of Supreme Lending pursuant to their business relationship with the Branch Managers.

94.     As Producing Branch Managers at Supreme Lending, Jones, Durham, and Fortner had a duty not to disclose such trade secrets to third parties, such as PRMI, absent Supreme Lending's express permission.   PRMI knew that the Branch Managers were prohibited from misappropriating Supreme Lending's trade secrets and confidential information.

95.     On information and belief, Defendants, however, in violation of confidential, contractual, and fiduciary relationships with Supreme Lending, and/or through other unfair means, have intentionally and wrongfully used and/or disclosed Supreme Lending's trade secrets for their own gain.  Specifically, On information and belief, PRMI has misappropriated Supreme Lending's trade secrets for the purpose of using them to compete with Supreme Lending, and to tortiously interfere with Supreme Lending's contracts, business opportunities, and prospective business relationships.

96.    Because of Defendants' actions, Supreme Lending has suffered harm, and now seeks to recover its actual, compensatory and consequential monetary damages in an amount to be determined at trial.

97.    Because Defendants' misappropriation of Supreme Lending's trade secrets have been done willfully, maliciously, fraudulently, and with gross negligence, Supreme Lending also seeks exemplary or punitive damages in an amount to be determined at trial.

## COUNT EIGHT:  BREACH OF CONTRACT—LEASE ASSIGNMENT
### (Against PRMI)

98.    Supreme Lending incorporates each of the foregoing paragraphs.

99.    The Auburn Lease Assignment is a valid, enforceable contract by and between Supreme Lending and PRMI.

100.    Supreme Lending performed, tendered performance of, or was excused from performing its contractual obligations under the Auburn Lease Assignment.

101.    PRMI failed and refused to assume the Auburn Lease as obligated under the Auburn Lease Assignment and, therefore, breached that contract.

102.    As a direct and proximate result of PRMI's material breach of the Auburn Lease Assignment, Supreme Lending has sustained damages in an amount to be determined at trial.

## COUNT NINE:  PROMISSORY ESTOPPEL
### (Against PRMI)

103.    Supreme Lending incorporates each of the foregoing paragraphs.

104.    PRMI made a promise to Supreme Lending that it would assume the rights and obligations of the Auburn Lease.

105.    Supreme Lending reasonably and substantially relied on PRMI's promise to assume the rights and obligations of the Auburn Lease.  Supreme Lending's reliance on PRMI's promise to assume the Auburn Lease was to Supreme Lending's detriment.

106.    Injustice can only be avoided by enforcing PRMI's promise to assume the Auburn Lease and, therefore, PRMI should be estopped from refusing to accept the assignment of the Auburn Lease.

## COUNT TEN: UNJUST ENRICHMENT
### (Against PRMI)

107.    Supreme Lending each of the foregoing paragraphs.

108.    Defendants have wrongly secured and/or passively received benefits from Supreme Lending that would be unconscionable to retain.    Specifically, Defendants misappropriation of Supreme Lending's confidential information, as well as the diversion of loan applications from Supreme Lending to PRMI, has unjustly enriched Defendants.

109.    Accordingly, Supreme Lending seeks disgorgement of the ill-gotten gains that Defendants obtained as a result of their breaches of contract, fiduciary duties, and/or misappropriation of Supreme Lending's trade secrets.

## COUNT ELEVEN: CONSPIRACY
### (Against All Defendants)

110.    Supreme Lending incorporates each of the foregoing paragraphs.

111.    Defendants conspired to conduct a raid of Supreme Lending employees and customers and to deprive Supreme Lending of the benefit of confidential information, trade secrets, and proprietary information Supreme Lending developed at considerable expense.

112.    Defendants have, either in concert with one another, or individually, agreed to solicit Supreme Lending employees in violation of their contractual obligations to Supreme Lending for the purpose of diverting the benefits of Supreme Lending's time, expense and effort for Defendants.    On information and belief, each of the co-conspirators agreed to a course of conduct whereby together they would appropriate Supreme Lending's confidential information, trade secrets, and business opportunities for the benefit of PRMI and each of the individuals

involved.  On information and belief, Defendants also agreed to, and did, deprive Supreme Lending of the benefit of the agreements it had with employees, business partners, and customers.  Defendants' scheme continues to this day.

113.    As a proximate result of this conspiracy, Supreme Lending has suffered, and will continue to suffer, injuries and will continue to suffer substantial and irreparable harm. Defendants' actions were done intentionally, knowingly, and maliciously, entitling Supreme Lending to exemplary damages.

## COUNT TWELVE—AIDING AND ABETTING
### (Against PRMI)

114.    Supreme Lending incorporates each of the foregoing paragraphs.

115.    As described herein and above, the Branch Managers committed torts against Supreme Lending, including, but not limited to, breach of fiduciary duty, conversion, misappropriation of trade secrets, and tortious interference with prospective business relations. PRMI had knowledge that the Branch Managers' conduct was tortious, intended to assist the Branch Managers in committing such torts, gave the Branch Mangers assistance or encouragement in committing such torts.  PRMI's assistance, encouragement, aiding, and abetting was a substantial factor in the commission and causation of said tortious conduct.

116.    As a proximate result of PRMI's aiding and abetting, Supreme Lending has suffered, and will continue to suffer, injuries and will continue to suffer substantial and irreparable harm.  Defendants' actions were done intentionally, knowingly, and maliciously, entitling Supreme Lending to exemplary damages.

## COUNT THIRTEEN—EXEMPLARY DAMAGES
### (Against All Defendants)

117.    Supreme Lending incorporates each of the foregoing paragraphs.

118.    Defendants committed the tortious actions described herein and above with malice, gross negligence, and/or fraud, as those terms are defined by Chapter 41 of the Texas Civil Practice and Remedies Code. Therefore, Supreme Lending is entitled to, and requests, an award of exemplary damages in an amount the trier of fact finds sufficient.

## REQUEST FOR PERMANENT INUNCTION

119.    Supreme Lending incorporates each of the foregoing paragraphs.

120.    Supreme Lending will suffer imminent harm and irreparable injury unless a permanent injunction is issued for the purposes of preserving Supreme Lending's confidential proprietary information and trade secrets.

121.    As set forth above, on information and belief, Defendants have used Supreme Lending's confidential business and proprietary information, as well as trade secrets, in pursuing business relationships with Supreme Lending's current and prospective customers. Thus, it is evident that, in the absence of the entry of injunctive relief, Defendants will proceed with their unlawful plan.

122.    As established above, Supreme Lending has more than a reasonable likelihood of prevailing on its claims for breach of fiduciary duties, tortious interference, conversion, and misappropriation of trade secrets. Supreme Lending has no adequate remedy at law for the above-described injuries. Therefore, Supreme Lending seeks a permanent injunction prohibiting or restraining Defendants from taking any further action that discloses any of Supreme Lending's confidential information, proprietary data, or trade secrets to any third party, or otherwise using such information, in any way, for their own business purposes; and compelling Defendants to turn over to Supreme Lending, through Supreme Lending's undersigned counsel, any and all property belonging to Supreme Lending, including Supreme Lending's trade secrets and confidential information.

## REQUEST FOR ATTORNEYS' FEES

123.    Supreme Lending incorporates each of the foregoing paragraphs.

124.    Pursuant to Sections 38.001 and 134.001, *et seq.* of the Texas Civil Practice and Remedies Code, the Branch Manager Agreements, and the Confidentiality Agreements, Supreme Lending is entitled to reimbursement of its reasonable attorneys' fees incurred as a result of bringing this action.

## JURY DEMAND

125.    Supreme Lending incorporates each of the foregoing paragraphs.

126.    Supreme Lending requests that a jury be convened to try the factual issues in this case.

## PRAYER

**WHEREFORE,** Supreme Lending Supreme Lending requests that, on final trial, the Court enter judgment for Supreme Lending and against Defendants and award Supreme Lending the following relief:

- actual, compensatory consequential, and exemplary damages;

- disgorgement of the ill-gotten gains that Defendants earned or otherwise obtained as a result of Defendants' unlawful conduct;

- Supreme Lending's reasonable attorneys' fees and costs of court;

- permanent injunctive relief;

- pre-judgment and post-judgment interest at the highest lawful rates; and

- such additional relief, at law and in equity, to which Supreme Lending may be justly entitled.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**


By:    /s/ Mikel J. Bowers
           Mikel J. Bowers
           State Bar No. 02734500
           Kristopher D. Hill
           State Bar No. 24066674

1400 One McKinney Plaza
3232 McKinney Avenue
Dallas, Texas  75204-2429
Tel.:  (214) 740-1400
Fax:  (214) 740-1499

**ATTORNEYS FOR PLAINTIFF EVERETT FINANCIAL, INC. d/b/a SUPREME LENDING**

1632846_1.docx

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Everett Financial, Inc. d/b/a Supreme Lending | Primary Residential Mortgage, Inc.; Barry G. Jones, individually; James Durham, individually; and Shannon Fortner, individually |

**(b)** County of Residence of First Listed Plaintiff  Dallas, Texas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Salt Lake County, Utah
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Mikel J. Bowers, Kristopher D. Hill, 3232 McKinney Ave., Suite 1400, Dallas, Texas 75204; (214) 740-1400

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding   ☐ 2  Removed from State Court   ☐ 3  Remanded from Appellate Court   ☐ 4  Reinstated or Reopened   ☐ 5  Transferred from another district *(specify)*   ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332(a)(2)

Brief description of cause:
Breach of contract; misappropriation of trade secrets; tortious interference; breach of fiduciary duty

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ IN EXCESS OF 75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) PENDING OR CLOSED:

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 03/21/2014 | /s/ Mikel J. Bowers |

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____