# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| EVERETT FINANCIAL, INC. d/b/a SUPREME LENDING, | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| PRIMARY RESIDENTIAL MORTGAGE, INC.; BARRY G. JONES, individually; JAMES DURHAM, individually; and SHANNON FORTNER, individually, | § § § § § | |
| Defendants. | § § § | Civil Action No. 3:14-cv-01028-D |
| BARRY G. JONES, individually; JAMES DURHAM, individually; and SHANNON FORTNER, individually, | § § § § | |
| Counter–Plaintiffs, | § § | |
| EVERETT FINANCIAL, INC. d/b/a SUPREME LENDING and SCOTT EVERETT, individually, | § § § § | |
| Counterclaim Defendants. | § § | |

## DEFENDANTS/COUNTER–PLAINTIFFS BARRY JONES, JAMES DURHAM, AND SHANNON FORTNER'S ORIGINAL ANSWER AND ORIGINAL COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT AND APPLICATION FOR INJUNCTION

Defendants/Counter-Plaintiffs Barry Jones, James Durham and Shannon Fortner (collectively "Defendants") files this their Original Answer (the "Answer") to the Amended Complaint and Application for Injunction [Dkt. No. 7] (the "Amended Complaint") filed by Plaintiff Everett Financial, Inc. d/b/a Supreme Lending ("Supreme Lending") and their Original Counterclaims and, in support, respectfully shows the Court as follows:

## DEFENDANTS' ANSWER

Subject to the affirmative and other defenses asserted herein, and reserving the right to assert additional defenses and/or amend its Answer as additional facts are discovered during this lawsuit, Defendants plead as follows to the allegations contained in the Amended Complaint:

## PRELIMINARY STATEMENT

As to the allegations contained in the first sentence of the Amended Complaint's Preliminary Statement, Defendants admit that Supreme Lending is a "mortgage banker and broker with branches throughout the country"; however, Defendants deny the remaining allegations contained in the first sentence of the Amended Complaint's Preliminary Statement. Defendants deny the allegations contained in the second sentence of the Amended Complaint's Preliminary Statement.  As to the allegations contained in the third sentence of the Amended Complaint's Preliminary Statement, Defendants admit that PRMI is a competitor of Supreme Lending; however, Defendants deny the remaining allegations contained in the third sentence of the Amended Complaint's Preliminary Statement, including each of the bullet point allegations listed thereafter.  Defendants deny the allegations contained in the fourth sentence of the Amended Complaint's Preliminary Statement.  As for the allegations contained in the fifth sentence of the Amended Complaint's Preliminary Statement, Defendants admit that Supreme Lending filed this lawsuit seeking redress; however, Defendants deny the remaining allegations contained in the fifth sentence of the Amended Complaint's Preliminary Statement.  As explained more fully in this Answer and the below set forth counterclaims, Defendants did not engage in any wrongful conduct. Defendants further deny any and all remaining allegations contained in the Amended Complaint's Preliminary Statement that are not expressly admitted in this Answer.

## PARTIES

1.      Defendants admit the allegations contained in Paragraph 1 of the Amended Complaint

2.      Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 2 of the Amended Complaint.

3.      Defendant Jones admits the allegations contained in Paragraph 3 of the Amended Complaint.

4.      Defendant Durham admits he is an Alabama citizen whose domicile address is as alleged in Paragraph 4 of the Amended Complaint; however, his zip code is 36804.

5.      Defendant Fortner admits the allegations contained in Paragraph 5 of the Amended Complaint.

## JURISDICTION AND VENUE

6.      Defendants admit the allegations contained in Paragraph 6 of the Amended Complaint.

7.      The allegations contained in Paragraph 7 of the Amended Complaint state legal conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendants deny all such allegations.   Pleading further, Defendants admit that the three (3) "Confidentiality, Inventions and Non-Solicitation Agreement[s]" that are attached to the Amended Complaint contain governing law and venue clauses; however, Defendants plead that such contracts and/or certain of their terms are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective, in whole or in part, because of Supreme Lending's conduct and/or later agreements.   Defendants further plead that the contracts referenced in Paragraph 7 of the Amended Complaint speak for

themselves, and Defendants deny each and every allegation contained in Paragraph 7 of the Amended Complaint that is inconsistent with or contrary to the terms of such contracts. Defendants further deny any and all remaining allegations contained in Paragraph 7 of the Amended Complaint that are not expressly admitted in this Answer.

8.      As to the allegations contained in the first sentence of Paragraph 8 of the Amended Complaint that "[t]his Court has personal jurisdiction over Jones because he conducts business in the State of Texas[,]" such allegations state legal conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendant Jones states that his contacts with the State of Texas are insufficient to establish personal jurisdiction; therefore, Defendant Jones denies such allegations.  Defendant Jones denies the allegations contained in the second sentence of Paragraph 8 of the Amended Complaint.   As to the allegations contained in the third sentence of Paragraph 8 of the Amended Complaint, Defendant Jones admits that the "Confidentiality, Inventions, and Non-Solicitation Agreement" between Supreme Lending and Defendant Jones that is attached to the Amended Complaint contains a governing law and venue clause.   Defendant Jones further pleads that any contracts referenced in Paragraph 8 of the Amended Complaint speak for themselves, and Defendant Jones denies each and every allegation contained in Paragraph 8 of the Amended Complaint that is inconsistent with or contrary to the terms of such contracts. Defendant Jones further denies any and all remaining allegations contained in Paragraph 8 of the Amended Complaint that are not expressly admitted in this Answer.

9.      As to the allegations contained in the first sentence of Paragraph 9 of the Amended Complaint that "[t]his Court has personal jurisdiction over Durham because he conducts business in the State of Texas[,]" such allegations state legal conclusions to which no

responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendant Durham states his contacts with the State of Texas are insufficient to establish personal jurisdiction; therefore, Defendant Durham denies such allegations.  Defendant Durham denies the allegations contained in the second sentence of Paragraph 9 of the Amended Complaint.  As to the allegations contained in the third sentence of Paragraph 9 of the Amended Complaint, Defendant Durham admits that the "Confidentiality, Inventions, and Non-Solicitation Agreement" between Supreme Lending and Defendant Durham that is attached to the Amended Complaint contains a governing law and venue clause.  Defendant Durham further pleads that the contracts referenced in Paragraph 9 of the Amended Complaint speak for themselves, and Defendant Durham denies each and every allegation contained in Paragraph 9 of the Amended Complaint that is inconsistent with or contrary to the terms of such contracts.  Defendant Durham further denies any and all remaining allegations contained in Paragraph 9 of the Amended Complaint that are not expressly admitted in this Answer.

10.     As to the allegations contained in the first sentence of Paragraph 10 of the Amended Complaint that "[t]his Court has personal jurisdiction over Fortner because he conducts business in the State of Texas[,]" such allegations state legal conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendant Fortner states that his contacts with the State of Texas are insufficient to establish personal jurisdiction; therefore, Defendant Fortner denies such allegations.  Defendant Fortner further denies the allegations contained in the second sentence of Paragraph 10 of the Amended Complaint.  As to the allegations contained in the third sentence of Paragraph 10 of the Amended Complaint, Defendant Fortner admits that the "Confidentiality, Inventions, and Non-Solicitation Agreement" between Supreme Lending and Defendant Fortner that is attached to the

Amended Complaint contains a governing law and venue clause.  Defendant Fortner further pleads that the contracts referenced in Paragraph 10 of the Amended Complaint speak for themselves, and Defendant Fortner denies each and every allegation contained in Paragraph 10 of the Amended Complaint that is inconsistent with or contrary to the terms of such contracts. Defendant Fortner further denies any and all remaining allegations contained in Paragraph 10 of the Amended Complaint that are not expressly admitted in this Answer.

11.     Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 11 of the Amended Complaint.

**FACTUAL BACKGROUND**

12.     Defendants admit the allegations contained in Paragraph 12 of the Amended Complaint.

13.     Defendants are without knowledge or information sufficient to admit or deny the allegations contained in the first two sentences of Paragraph 13 of the Amended Complaint; therefore, such allegations are denied.  Defendants are without sufficient knowledge to admit or deny the allegations contained in the third sentence of Paragraph 13, except Defendants admit that they were Producing Branch Managers for Supreme Lending and worked with certain Supreme Lending employees in Dallas.  As to the allegation in the fourth sentence of Paragraph 13 of the Amended Complaint, such allegation states a legal conclusion to which no responsive pleading is required.

14.     Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 14 of the Amended Complaint; therefore, such allegations are denied.

15.     Defendants deny the allegations contained in Paragraph 15 of the Amended Complaint.

16.     As to the allegations contained in Paragraph 16 of the Amended Complaint, Defendants admit that Supreme Lending attached to the Amended Complaint three (3) "Producing Branch Manager Agreement[s]", but Defendants deny the allegations contained in Paragraph 16 of the Amended Complaint to the extent Supreme Lending is asserting that any of the Defendants breached or otherwise violated any of the "Producing Branch Manager Agreement[s]" and Defendants plead that such agreements and/or certain of their terms are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective, in whole or in part, because of Supreme Lending's conduct and/or later agreements.  Defendants further plead that the "Producing Branch Manager Agreement[s]" speak for themselves, and therefore deny each and every allegation contained in Paragraph 16 of the Amended Complaint that is inconsistent with or contrary to the terms of the "Producing Branch Manager Agreement[s]". Defendants further deny any and all remaining allegations contained in Paragraph 16 of the Amended Complaint that are not expressly admitted in this Answer.

17.     Defendant Jones admits that the "Producing Branch Manager Agreement" between Supreme Lending and Defendant Jones that is attached to the Amended Complaint contains Jones' electronic signature.   Defendant Jones further pleads that the Jones BM Agreement speaks for itself, and Defendant Jones denies each and every allegation contained in Paragraph 17 of the Amended Complaint that is inconsistent with or contrary to the terms of the Jones BM Agreement.  Defendant Jones is without knowledge or information sufficient to admit or deny the allegations contained in footnote 2 of the Amended Complaint; therefore, such allegations are denied.  Defendant Jones denies the allegations contained in Paragraph 17 of the

Amended Complaint that "pursuant to [the Jones BM Agreement] he agreed to serve as a producing branch manager for Supreme Lending subject to the terms and conditions of the Jones BM Agreement" because Defendant Jones pleads that the Jones BM Agreement and/or certain of its terms are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective, in whole or in part, because of Supreme Lending's conduct and/or later agreements. Defendant Jones further denies any and all remaining allegations contained in Paragraph 17 of the Amended Complaint that are not expressly admitted in this Answer.

18.     Defendant Durham admits that the "Producing Branch Manager Agreement" between Supreme Lending and Defendant Durham that is attached to the Amended Complaint contains Durham's electronic signature.  Defendant Durham further pleads that the Durham BM Agreement speaks for itself, and Defendant Durham denies each and every allegation contained in Paragraph 18 of the Amended Complaint that is inconsistent with or contrary to the terms of the Durham BM Agreement.  Defendant Durham is without knowledge or information sufficient to admit or deny the allegations contained in footnote 3 of the Amended Complaint; therefore, such allegations are denied.  Defendant Durham denies the allegations contained in Paragraph 18 of the Amended Complaint that "pursuant to [the Durham BM Agreement] he agreed to serve as a producing branch manager for Supreme Lending subject to the terms and conditions of the [Durham] BM Agreement" because Defendant Durham pleads that the Durham BM Agreement and/or certain of its terms are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective, in whole or in part, because of Supreme Lending's conduct and/or later agreements.  Defendant Durham further denies any and all remaining allegations contained in Paragraph 18 of the Amended Complaint that are not expressly admitted in this Answer.

19.     Defendant Fortner admits that the "Producing Branch Manager Agreement" between Supreme Lending and Defendant Fortner that is attached to the Amended Complaint contains Fortner's electronic signature.  Defendant Fortner further pleads that the Fortner BM Agreement speaks for itself, and Defendant Fortner denies each and every allegation contained in Paragraph 19 of the Amended Complaint that is inconsistent with or contrary to the terms of the [Fortner] BM Agreement.  Defendant Fortner is without knowledge or information sufficient to admit or deny the allegations contained in footnote 4 of the Amended Complaint; therefore, such allegations are denied.  Defendant Fortner denies the allegations contained in Paragraph 19 of the Amended Complaint that "pursuant to [the Fortner BM Agreement] he agreed to serve as a producing branch manager for Supreme Lending subject to the terms and conditions of the Fortner BM Agreement" because Defendant Fortner pleads that the Fortner BM Agreement and/or certain of its terms are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective, in whole or in part, because of Supreme Lending's conduct and/or later agreements.  Defendant Fortner further denies any and all remaining allegations contained in Paragraph 19 of the Amended Complaint that are not expressly admitted in this Answer.

20.     Defendants admit the allegations contained in the first sentence of Paragraph 20 the Amended Complaint.  As to the allegations contained in the second sentence of Paragraph 20 of the Amended Complaint that "[t]he Jones BM Agreement, Durham BM Agreement, and Fortner BM Agreement (collectively, the 'Branch Manager Agreements') are enforceable contracts[,]" such allegations state legal conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendants deny the allegations and Defendants plead that the Branch Manager Agreements and/or certain of their terms are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective, in whole

or in part, because of Supreme Lending's conduct and/or later agreements.  With that said, Defendants admit that Paragraph 20 of the Amended Complaint accurately quotes language from the "Producing Branch Manager Agreement[s]" that are attached to the Amended Complaint. Defendants deny any and all remaining allegations contained in Paragraph 20 of the Amended Complaint that are not expressly admitted in this Answer.

21.     As to the allegation contained in Paragraph 21 of the Amended Complaint that "the Branch Managers also entered Confidentiality, Inventions, and Non-Solicitation Agreements with Supreme Lending[,]" Defendants admit that Supreme Lending attached to the Amended Complaint three (3) "Confidentiality, Inventions, and Non-Solicitation Agreement[s]", but Defendants deny the allegations in Paragraph 21 of the Amended Complaint to the extent Supreme Lending is asserting that any of the Branch Managers breached or otherwise violated any of the "Confidentiality, Inventions, and Non-Solicitation Agreement[s]" and Defendants plead that such agreements and/or certain of their terms are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective, in whole or in part, because of Supreme Lending's conduct and/or later agreements.  Defendants deny the allegation contained in Paragraph 21 of the Amended Complaint that the Confidentiality, Inventions, and Non-Solicitation Agreements were a "prerequisite to [the Branch Managers'] employment with Supreme Lending".  Defendants further plead that the "Confidentiality, Inventions, and Non-Solicitation Agreement[s]" speak for themselves, and Defendants deny each and every allegation contained in Paragraph 21 of the Amended Complaint that is inconsistent with or contrary to the terms of the "Confidentiality, Inventions, and Non-Solicitation Agreement[s]".  Defendants further deny any and all remaining allegations contained in Paragraph 21 of the Amended Complaint that are not expressly admitted in this Answer.

22.     Defendants admit the allegations contained in Paragraph 22 of the Amended Complaint.

23.     The allegations contained in Paragraph 23 of the Amended Complaint that "[t]he Jones Confidentiality Agreement, Durham Confidentiality Agreement, and Fortner Confidentiality Agreement (collectively, the 'Confidentiality Agreements') are valid, enforceable contracts" state legal conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendants deny such allegations and Defendants plead that the Confidentiality Agreements and/or certain of their terms are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective, in whole or in part, because of Supreme Lending's conduct and/or later agreements.  With that said, Defendants admit that Paragraph 23 of the Amended Complaint accurately quotes language from the "Confidentiality, Inventions and Non-Solicitation Agreement[s]" that are attached to the Amended Complaint; however, Defendant Fortner further pleads that the "Confidentiality, Inventions and Non-Solicitation Agreement" between Supreme Lending and Defendant Fortner that is attached to the Amended Complaint has the following quoted language crossed out with Defendant Fortner's initials beside the stricken language:

**(a)     Associations with Co-Workers.** Employee agrees that during his or her employment and for two (2) years following the termination of his or her employment for any reason, neither he or she nor his or her affiliates will . . . employ or solicit or attempt to employ or solicit for any employment any of Employer's current employees. Employee and his or her affiliates will not, either directly or indirectly or by acting in concert with others, seek to induce or influence any employee to leave Employer's employment.

**(b)     Solicitation of Customers.** Employee agrees that during his or her retention and for two (2) years following the termination of his or her employment for any reason, neither he, she nor his or her affiliates will, by himself or herself or by acting in concert with others, solicit any of Employer's customers or prospective customers existing as of the date of termination that Employee directly serviced, was assigned to, or was responsible for during the twelve (12) month period immediately preceding termination of Employee's

> employment with Employer. Employee further agrees not to take any other action to divert business from Employer or influence any vendor, supplier, customer or potential customer of Employer to cease doing business with Employer.

Defendants further deny any and all remaining allegations contained in Paragraph 23 of the Amended Complaint that are not expressly admitted in this Answer.

24.     Defendants deny the allegations contained in the first two sentences of Paragraph 24 of the Amended Complaint including each of the bullet point allegations listed after the second sentence of Paragraph 24 of the Amended Complaint.   Defendants are without knowledge or information sufficient to admit or deny the allegations contained in third and fourth sentences of Paragraph 24 of the Amended Complaint; therefore, such allegations are denied.  Defendants deny the allegations contained in the fifth sentence of paragraph 24 of the Amended Complaint.

25.     Defendants deny the allegations contained in Paragraph 25 of the Amended Complaint.

26.     Defendants deny the allegations contained in Paragraph 26 of the Amended Complaint.

27.     Defendants deny the allegations contained in Paragraph 27 of the Amended Complaint, except it is admitted that in October 2013, PRMI's Director of Business Development & Implementation, Charles D. Edington, and Jones discussed signing a non-disclosure agreement.

28.     Defendants deny the allegations contained in Paragraph 28 of the Amended Complaint, except it is admitted that, while employed by Supreme Lending in November 2013, Defendants visited PRMI headquarters.

29.     Defendants deny the allegations stated in the first sentence of Paragraph 29 the Amended Complaint, except Defendants admit that they informed Supreme Lending of their

decision to leave Supreme Lending on January 31, 2014.  Defendants deny the allegations contained in the second and third sentences of Paragraph 29 the Amended Complaint.

30.     Defendants deny the allegations contained in Paragraph 30 of the Amended Complaint.

31.     Defendants deny the allegations contained in Paragraph 31 of the Amended Complaint, except Defendants admit that PRMI and Supreme Lending negotiated and executed an Assignment and Assumption of Interest in Commercial Lease relating to leases that Supreme Lending had entered into in (i) Huntsville Alabama, (ii) Auburn, Alabama, (iii) Madison, Alabama, (iv) Montgomery, Alabama, (v) Vestavia Hills, Alabama, (vi) Guntersville, Alabama, (vii) Enterprise, Alabama, (viii) Dothan, Alabama, (ix) Florence, Alabama, (x) Millbrook, Alabama, (xi) Alexander City, Alabama, (xii) Hinesville, Georgia, and (xiii) Memphis, Tennessee.

32.     Defendants deny the allegations contained in Paragraph 32 of the Amended Complaint.

33.     Defendants deny the allegations contained Paragraph 33 of the Amended Complaint.

34.     Defendants are without knowledge or information sufficient to admit or deny the allegations contained in the first sentence referenced at paragraph 34 of the Amended Complaint; therefore, such allegations are denied.  Defendants deny the allegations contained in the second and third sentences of Paragraph 34 of the Amended Complaint.

35.     Defendants deny the allegations contained in Paragraph 35 of the Amended Complaint, except it is admitted that in October 2013, PRMI's Director of Business Development & Implementation, Charles D. Edington, and Jones discussed signing a non-

disclosure agreement.

36.     Defendants deny the allegations contained in Paragraph 36 of the Amended Complaint.

37.     Defendants deny the allegations contained in Paragraph 37 of the Amended Complaint.

38.     Defendants are without knowledge or information sufficient to admit or deny the allegations contained in the first sentence of Paragraph 38 of the Amended Complaint; therefore, such allegations are denied.  Defendants admit the allegations contained in the second and third sentences of Paragraph 38 of the Amended Complaint.  Defendants are without knowledge or information sufficient to admit or deny the allegations contained in the fourth sentence of Paragraph 38 of the Amended Complaint; therefore, such allegations are denied.

39.     Defendants deny the allegations contained in Paragraph 39 of the Amended Complaint.

40.     Defendants deny the allegations contained in Paragraph 40 of the Amended Complaint.

41.     Defendants deny the allegations contained in Paragraph 41 of the Amended Complaint.

42.     Defendants deny the allegations contained in Paragraph 42 of the Amended Complaint, except it is admitted that PRMI and Supreme Lending negotiated and executed an Assignment and Assumption of Interest in Commercial Lease relating to leases that Supreme Lending had entered into in (i) Huntsville Alabama, (ii) Auburn, Alabama, (iii) Madison, Alabama, (iv) Montgomery, Alabama, (v) Vestavia Hills, Alabama, (vi) Guntersville, Alabama, (vii) Enterprise, Alabama, (viii) Dothan, Alabama, (ix) Florence, Alabama, (x) Millbrook,

Alabama, (xi) Alexander City, Alabama, (xii) Hinesville, Georgia, and (xiii) Memphis, Tennessee.

43.     Defendants deny the allegations contained in Paragraph 43 of the Amended Complaint, except it is admitted that Supreme Lending's Auburn, Alabama lease (the "<u>Auburn Lease</u>") contains a clause that prohibits the Auburn Lease from being assigned without the written consent of the property owner.

44.     Defendants deny the allegations contained in Paragraph 44 of the Amended Complaint, except it is admitted that Jones negotiated a separate lease in Auburn, Alabama on Supreme Lending's behalf.

45.     Defendants deny the allegations contained in Paragraph 45 of the Amended Complaint.

46.     Defendants deny the allegations contained in Paragraph 46 of the Amended Complaint, except it is admitted that Defendants agreed to, and did in fact, return to Supreme Lending in a reasonable amount of time all of the office equipment, including, without limitation, phones, routers, PCs, and laptops that Supreme Lending claimed belonged to it.

47.     Defendants deny the allegations contained in Paragraph 47 of the Amended Complaint.

48.     Defendants deny the allegations contained in Paragraph 48 of the Amended Complaint.

49.     The allegations contained in Paragraph 49 of the Amended Complaint state legal conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendants deny all such allegations.

50.     The allegations contained in Paragraph 50 of the Amended Complaint state legal

conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendants deny all such allegations.

## CAUSES OF ACTION
## COUNT ONE: BREACH OF CONTRACT—BRANCH MANAGER AGREEMENT
### (Against Jones, Durham, and Fortner)

51.     Defendants admit that Paragraph 51 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

52.     Defendants deny the allegations contained in Paragraph 52 of the Amended Complaint, except it is admitted Defendants managed branch offices.

53.     Defendants deny the allegations contained in Paragraph 53 of the Amended Complaint.

54.     As to the allegations contained in Paragraph 54 of the Amended Complaint, Defendants admit that Supreme Lending attached to the Amended Complaint three (3) "Producing Branch Manager Agreement[s]", but Defendants deny the allegations contained in Paragraph 54 of the Amended Complaint to the extent Supreme Lending is asserting that any of the Branch Managers breached or otherwise violated any of the "Producing Branch Manager Agreement[s]" and Defendants plead that such agreements and/or certain of their terms are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective, in whole or in part, because of Supreme Lending's conduct and/or later agreements.  Defendants further plead that the "Producing Branch Manager Agreement[s]" speak for themselves, and therefore deny each and every allegation contained in Paragraph 54 of the Amended Complaint that is inconsistent with or contrary to the terms of the "Producing Branch Manager Agreement[s]". Defendants further deny any and all remaining allegations contained in Paragraph 54 of the Amended Complaint that are not expressly admitted in this Answer.

55.     Defendants deny the allegations contained in Paragraph 55 of the Amended Complaint.

56.     Defendants deny the allegations contained in Paragraph 56 of the Amended Complaint.

## COUNT TWO: BREACH OF CONTRACT—CONFIDENTIALITY AGREEMENTS
### (Against Jones, Durham, and Fortner)

57.     Defendants admit that Paragraph 57 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

58.     Defendants deny the allegations contained in Paragraph 58 of the Amended Complaint.

59.     Defendants deny the allegations contained in Paragraph 59 of the Amended Complaint.

60.     As to the allegations contained in Paragraph 60 of the Amended Complaint, Defendants admit that Supreme Lending attached to the Amended Complaint three (3) "Confidentiality, Inventions, and Non-Solicitation Agreement[s]", but Defendants deny the allegations contained in Paragraph 60 of the Amended Complaint to the extent Supreme Lending is asserting that any of the Branch Managers breached or otherwise violated any of the "Confidentiality, Inventions, and Non-Solicitation Agreement[s]" and Defendants plead that such agreements and/or certain of their terms are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective, in whole or in part, because of Supreme Lending's conduct and/or later agreements.  Defendants further plead that the "Confidentiality, Inventions, and Non-Solicitation Agreement[s]" speak for themselves, and therefore deny each and every allegation contained in Paragraph 60 of the Amended Complaint that is inconsistent with or contrary to the terms of the "Confidentiality, Inventions, and Non-Solicitation Agreement[s]".  Defendants further deny any and all remaining allegations contained in

Paragraph 60 of the Amended Complaint that are not expressly admitted in this Answer.

61.     Defendants deny the allegations contained in Paragraph 61 of the Amended Complaint.

62.     Defendants deny the allegations contained in Paragraph 62 of the Amended Complaint.

## COUNT THREE: TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS
### (Against All Defendants)

63.     Defendants admit that Paragraph 63 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

64.     Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 64 of the Amended Complaint; therefore, such allegations are denied.

65.     Defendants deny the allegations contained in Paragraph 65 of the Amended Complaint.

66.     Defendants deny the allegations contained in Paragraph 66 of the Amended Complaint.

67.     Defendants deny the allegations contained in Paragraph 67 of the Amended Complaint.

68.     Defendants deny the allegations contained in Paragraph 68 of the Amended Complaint.

## COUNT FOUR: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (Against All Defendants)

69.     Defendants admit that Paragraph 69 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

70.     Defendants deny the allegations contained in Paragraph 70 of the Amended Complaint.

71.     Defendants deny the allegations contained in Paragraph 71 of the Amended Complaint.

72.     Defendants deny the allegations contained in Paragraph 72 of the Amended Complaint.

73.     Defendants deny the allegations contained in Paragraph 73 of the Amended Complaint.

74.     Defendants deny the allegations contained in Paragraph 74 of the Amended Complaint.

75.     Defendants deny the allegations contained in Paragraph 75 of the Amended Complaint.

76.     Defendants deny the allegations contained in Paragraph 76 of the Amended Complaint.

77.     Defendants deny the allegations contained in Paragraph 77 of the Amended Complaint.

### COUNT FIVE: BREACH OF FIDUCIARY DUTY
### (Against Jones, Durham, and Fortner)

78.     Defendants admit that Paragraph 78 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

79.     The allegations contained in Paragraph 79 of the Amended Complaint state legal conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendants deny all such allegations.

80.     Defendants deny the allegations contained in Paragraph 80 of the Amended Complaint.

81.     Defendants deny the allegations contained in Paragraph 81 of the Amended Complaint.

82.     Defendants deny the allegations contained in Paragraph 82 of the Amended Complaint.

## COUNT SIX: CONVERSION
### (Against All Defendants)

83.     Defendants admit that Paragraph 83 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

84.     The allegations contained in Paragraph 84 of the Amended Complaint state legal conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendants deny all such allegations.

85.     The allegations contained in Paragraph 85 of the Amended Complaint state legal conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendants deny all such allegations.

86.     As to the allegation contained in Paragraph 86 of the Amended Complaint that "Supreme Lending further had a possessory right to its office furniture and equipment[,]" such allegation states a legal conclusion to which no responsive pleading is required, but to the extent such allegation nonetheless requires a response, Defendants deny such allegation. As to the allegation contained in Paragraph 86 of the Amended Complaint that "Defendants wrongfully withheld" Supreme Lending's "office furniture and equipment[,]", Defendants deny such allegation.

87.     Defendants deny the allegations contained in Paragraph 87 of the Amended Complaint.

88.     Defendants deny the allegations contained in Paragraph 88 of the Amended Complaint.

89.     Defendants deny the allegations contained in Paragraph 89 of the Amended Complaint.

## COUNT SEVEN: MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

90.     Defendants admit that Paragraph 90 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

91.     Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 91 of the Amended Complaint; therefore, such allegations are denied.

92.     Defendants deny the allegations contained in Paragraph 92 of the Amended Complaint.

93.     Defendants deny the allegations contained in Paragraph 93 of the Amended Complaint.

94.     As to the allegation contained in the first sentence of Paragraph 94 of the Amended Complaint, such allegation states a legal conclusion to which no responsive pleading is required, but to the extent such allegation nonetheless requires a response, Defendants deny that any purported trade secrets were disclosed to third parties.   Defendants are without knowledge or information sufficient to admit or deny the allegations contained in the second sentence of Paragraph 94 of the Amended Complaint; therefore such allegation is denied.

95.     Defendants deny the allegations contained in Paragraph 95 of the Amended Complaint.

96.     Defendants deny the allegations contained in Paragraph 96 of the Amended

Complaint.

97.     Defendants deny the allegations contained in Paragraph 97 of the Amended Complaint.

### COUNT EIGHT: BREACH OF CONTRACT—LEASE ASSIGNMENT
### (Against PRMI)

98.     Defendants admit that Paragraph 98 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

99.     Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 99 of the Amended Complaint; therefore such allegations are denied.

100.    Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 100 of the Amended Complaint; therefore such allegations are denied.

101.    Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 101 of the Amended Complaint; therefore such allegations are denied.

102.    Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 102 of the Amended Complaint.

### COUNT NINE: PROMISSORY ESTOPPEL
### (Against PRMI)

103.    Defendants admit that Paragraph 103 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

104.    Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 104 of the Amended Complaint; therefore such allegations are denied.

105.     Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 105 of the Amended Complaint; therefore such allegations are denied.

106.     Defendants are without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 106 of the Amended Complaint; therefore such allegations are denied.

## COUNT TEN: UNJUST ENRICHMENT
### (Against PRMI)

107.     Defendants admit that Paragraph 107 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

108.     Defendants deny the allegations contained in Paragraph 108 of the Amended Complaint.

109.     The allegations contained in Paragraph 109 of the Amended Complaint state legal conclusions to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendants deny such allegations. Moreover, Defendants expressly deny that they breached any contract with Supreme Lending, breached any fiduciary duty owed to Supreme Lending and misappropriated any of Supreme Lending's trade secrets and/or confidential information and/or proprietary information.

## COUNT ELEVEN: CONSPIRACY
### (Against All Defendants)

110.     Defendants admit that Paragraph 110 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

111.     Defendants deny the allegations contained in Paragraph 111 of the Amended Complaint.

112.     Defendants deny the allegations contained in Paragraph 112 of the Amended

Complaint.

113.    Defendants deny the allegations contained in Paragraph 113 of the Amended Complaint.

## COUNT TWELVE—AIDING AND ABETTING
### (Against PRMI)

114.    Defendants admit that Paragraph 114 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

115.    Defendants deny the allegations contained in Paragraph 115 of the Amended Complaint.

116.    Defendants deny the allegations contained in Paragraph 116 of the Amended Complaint.

## COUNT THIRTEEN—EXEMPLARY DAMAGES
### (Against All Defendants)

117.    Defendants admit that Paragraph 117 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

118.    Defendants deny the allegations contained in Paragraph 118 of the Amended Complaint.

## REQUEST FOR PERMANENT INJUNCTION

119.    Defendants admit that Paragraph 119 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

120.    Defendants deny the allegations contained in Paragraph 120 of the Amended Complaint.

121.    Defendants deny the allegations contained in Paragraph 121 of the Amended Complaint.

122.    Defendants deny the allegations contained in the first and second sentences of

Paragraph 122 of the Amended Complaint. As to the allegations contained in the third sentence of Paragraph 122 of the Amended Complaint, such allegations contain Supreme Lending's request for relief to which no responsive pleading is required, but to the extent such allegations nonetheless require a response, Defendants deny all such allegations and Defendants expressly deny that Supreme Lending is entitled to recover any of its requested relief in Paragraph 122 of the Amended Complaint, including, without limitation, a permanent injunction against Defendants. Defendants further deny any and all remaining allegations contained in Paragraph 122 of the Amended Complaint that are not expressly admitted in this Answer.

## REQUEST FOR ATTORNEYS' FEES

123.    Defendants admit that Paragraph 123 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

124.    Defendants deny the allegations contained in Paragraph 124 of the Amended Complaint.

## JURY DEMAND

125.    Defendants admit that Paragraph 125 of the Amended Complaint purports to incorporate the Amended Complaint's foregoing paragraphs.

126.    Defendants admit that Supreme Lending has requested a jury trial for this matter.

## PRAYER

Defendants deny that Supreme Lending is entitled to any of the relief requested in the Amended Complaint.  Further, Defendants deny any and all remaining allegations contained in the Amended Complaint that are not expressly admitted above.

## DEMAND FOR JURY TRIAL

Defendants request a jury trial on all claims and issues so triable.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof that it would not otherwise have, Defendants plead the following affirmative defenses and reserve the right to amend this Answer, or any amendment or supplement hereto, to include additional defenses as additional information becomes available.

### FIRST AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by its own mistakes and the doctrine of unclean hands.

### SECOND AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by the doctrines of equitable estoppel, promissory estoppel, and/or quasi estoppel.

### THIRD AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by the doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by the doctrine of waiver.

### FIFTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by the doctrine of ratification.

### SIXTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by the doctrine of modification.

### SEVENTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by the doctrine of release.

### EIGHTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by the statute of frauds.

### NINTH AFFIRMATIVE DEFENSE

Defendants specifically deny that they wrongfully interfered with any of Supreme Lending's contracts or relationships. However, to the extent the Court or jury somehow concludes otherwise, any such interference was legally justified and/or privileged.

### TENTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by its own fraudulent conduct.

### ELEVENTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by its own negligent and/or fraudulent misrepresentations.

### TWELFTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by its own failure to perform its obligations.

### THIRTEENTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by Supreme Lending's failure to mitigate its damages, if any.

### FOURTEENTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by the doctrines of contributory negligence, comparative fault, and proportional responsibility. Supreme Lending's own acts or omissions caused or contributed to Supreme Lending's injury, if any.

### FIFTEENTH AFFIRMATIVE DEFENSE

To the extent Defendants possessed any of Supreme Lending's property, if at all,

Defendants did so at all times in good faith and with the legal right to such possession.

## SIXTEENTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, because Supreme Lending's claimed trade secrets and/or confidential and/or proprietary information, if any, were generally known in Supreme Lending's industry and were/are not secret.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, because Supreme Lending did not take reasonable efforts to maintain the secrecy of its claimed trade secrets and/or confidential and/or proprietary information, if any.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, because it expressly and/or impliedly consented and/or acquiesced to the disclosure and/or use of its claimed trade secrets and/or confidential and/or proprietary information, if any, and Supreme Lending waived any right to claim otherwise.

## NINETEENTH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by the doctrine of independent development.

## TWENTIETH AFFIRMATIVE DEFENSE

Supreme Lending's claims are barred, in whole or in part, by its failure to enforce its rights, if any, as to its claimed trade secrets and/or confidential and/or proprietary information, its covenant not to compete agreements with its employees, and/or loans in process at Supreme Lending.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

To the extent any of the agreements at issue are enforceable, if at all, Supreme Lending's claims are barred, in whole or in part, because they are based on unenforceable covenant not to compete agreements. The purported agreements Supreme Lending relies on are, among other things, unreasonable, lack adequate consideration, are not ancillary to an otherwise enforceable agreement, are overbroad, are not sufficiently limited as to time, geographic area, and/or the scope of the activity to be restrained, and impose a greater restraint than is/was necessary to protect Supreme Lending's interest, if any.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

To the extent any of the agreements at issue are enforceable, Supreme Lending's claims are barred, in whole or in part, by the doctrine of anticipatory breach because of Supreme Lending's prior material breaches of the agreements at issue.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

To the extent any of the agreements at issue are enforceable, Supreme Lending's claims are barred, in whole or in part, by the doctrine of material breach, discharge and/or repudiation.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

To the extent any of the agreements at issue are enforceable, Supreme Lending's claims are barred, in whole or in part, by the doctrine of lack of consideration and/or failure of consideration.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

To the extent any of the agreements at issue are enforceable, Supreme Lending's claims are barred, in whole or in part, by the doctrine of novation.

## **TWENTY-SIXTH AFFIRMATIVE DEFENSE**

Supreme Lending's claims are barred, in whole or in part, by the doctrine of assumption of the risk.

## **TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

Supreme Lending's claims are barred, in whole or in part, by its failure(s) to state a claim upon which relief may be granted.

## **COUNTER–PLAINTIFFS' COUNTERCLAIMS**

1.      Defendant/Counter–Plaintiffs Barry Jones ("Jones"), James Durham ("Durham") and Shannon Fortner ("Fortner"; collectively with Jones and Durham, the "Branch Managers") bring suit against Everett Financial, Inc. d/b/a Supreme Lending ("Supreme Lending") and, pursuant to Rule 20 of the Federal Rules of Civil Procedure, Scott Everett ("Everett"), and in support, respectfully show the Court as follows:

## **PARTIES**

2.       Counter–Plaintiff Barry Jones is a citizen of and domiciled in the State of Alabama.

3.      Counter–Plaintiff James Durham is a citizen of and domiciled in the State of Alabama.

4.      Counter–Plaintiff Shannon Fortner is a citizen of and domiciled in the State of Alabama.

5.      Counter–Defendant Everett Financial, Inc. d/b/a Supreme Lending is a Texas corporation with its principal place of business in Dallas, Texas.

6.      Defendant Scott Everett is a citizen of and domiciled in the State of Texas. Everett is the President and founder of Supreme Lending.  He can be served at 14801 Quorum Drive, Suite 300, Dallas, Texas 75254.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this lawsuit under 28 U.S.C. § 1332(a)(1) because (i) the Branch Managers are citizens of the State of Alabama, (ii) Counter–Defendant Supreme Lending and Defendant Everett are citizens of the State of Texas, and (iii) the amount in controversy, exclusive of interests and costs, exceeds the sum of Seventy-Five Thousand and 00/100 Dollars ($75,000.00).

8.      Venue is proper in this Court under 28 U.S.C. § 1391, because Supreme Lending and Everett reside, for purposes of venue, in the Northern District of Texas, Dallas Division, and because a substantial part of the events or omissions giving rise to the Branch Managers' claims occurred in the Northern District of Texas, Dallas Division.

## FACTUAL BACKGROUND[1]

### A.      Independent Mortgage Banks Generally

9.      Primary Residential Mortgage, Inc. ("PRMI") and Supreme Lending are independent mortgage banks, which market and underwrite mortgages to potential and existing homeowners.  These mortgage products are marketed through mortgage originators throughout the country, such as Jones, Fortner and Durham, who have developed relationships and contacts with their business partners and clients over the course of their careers in the mortgage business, typically while working for many different companies that underwrite and manufacture the products they sell.  Over time, these mortgage originators build a pipeline of repeat and new business partners and clients.

---

[1] Whenever this Counterclaim alleges that Supreme Lending committed any act or omission, it is meant that one or more Supreme Lending officers, directors, vice-principals, agents, servants, or employees committed such act or omission. Moreover, whenever this Counterclaim alleges that Supreme Lending or any specific Supreme Lending officer, director, vice-principal, agent, servant, employee, or other representative committed an act or omission, it is meant that, at the time such act or omission was committed, it was done with the full authorization, ratification, or approval of Supreme Lending and/or was done in the routine normal course and scope of the officer, director, vice-principal, agent, servant, employee, or representative's employment with Supreme Lending.

10.     The success of independent mortgage banks, which receive only a small portion of the revenue for each loan that is closed at their branches, largely depends on the ability of those banks to attract and retain high quality mortgage originators who have large books of business. For this reason, to maintain any level of success in this business, independent mortgage banks must treat their originators with fairness, mutual respect and as valued employees.  When the mortgage banks fail to maintain a culture of fairness and mutual respect and/or fail to provide competitive services and products, mortgage originators routinely move from one independent mortgage bank to another with little-to-no restriction. For example, the Branch Managers have collectively worked for approximately eighteen (18) mortgage banks during their careers.

11.     Because of the fluid nature of the industry and to prevent disruption to consumer loans, when mortgage originators and their divisions/branches move to other employers, the independent mortgage banks generally work together to facilitate a smooth transition, understanding that they have been, and will in the future be, on the other side of similar transitions. As part of these types of transitions, it is customary that (i) the branches take all of their employees and client/contact lists with them, since it is understood that those relationships are developed by the branches, not the mortgage bank, over many years and with many different companies, (ii) the departed mortgage bank transfers some or all of the loans in progress to the new mortgage bank to prevent harm to customers, and (iii) the departed mortgage bank transfers, assigns, or sells at book value the branches' leases, equipment, Internet, phone, and other utility services to the new mortgage bank so that the employees can continue to close existing loans, originate new loans, and in order to transfer these expenses and remove them from the prior mortgage bank's profit and loss statement ("P&L").

**B.      The Branch Managers**

12.      The Branch Managers have been working in the independent mortgage banking industry for, collectively, over five (5) decades.  Each is a self-made man, coming from humble beginnings as an entry-level employee in his profession.  Through decades of hard work and sacrifice, the Branch Managers built sizeable books of business, developed their skills, and, ultimately, achieved the American dream of moving up the ranks to run their own businesses.

**C.      The Branch Managers' Negotiations and Due Diligence With Supreme Lending**

13.      By 2011, Jones and Fortner had built substantial books of business and were collectively managing four (4) branches for W.R. Starkey Mortgage ("Starkey").  Durham had likewise built a sizable business and was managing two (2) branches for a company headquartered in Atlanta, called Primary Capital Mortgage ("Primary Capital").

14.      Sometime in 2011, the Branch Managers decided it would be in their best interests to combine their efforts and jointly market their services to a new independent mortgage bank that would help them grow their respective businesses on a larger platform.  After an extensive search, they began discussions with Supreme Lending, a Dallas based mortgage bank run by Scott Everett, its founder and President.

15.      During the course of due diligence and negotiations with Supreme Lending, Everett represented that he would "partner" with the Branch Managers and support them in growing the Branch Managers' business.  To induce the Branch Managers to move to Supreme Lending, Everett told the Branch Managers that if they ever became dissatisfied with Supreme Lending or decided to partner with a different mortgage bank, Supreme Lending would do everything in its power to provide a smooth transition for the Branch Managers' business.  Everett made it clear, in no uncertain terms, that if they decided to move to another mortgage bank, (i) all employees in the Branch Managers' division/offices would and could move with

them, (ii) all actual and potential clients that the Branch Managers and their employees had developed or would develop would and could move with them, and (iii) their respective division businesses would and could move with them (offices, equipment, etc.). These representations were not surprising…why?  Because they were consistent with general practices and customs in the independent mortgage banking industry, were a critical part of why the Branch Managers were comfortable joining Supreme Lending, and were likewise consistent with the Branch Managers' previous experiences in the industry.   In fact, Everett even structured the Branch Managers' compensation based on those representations.

16.     Consistent with these representations, Everett informed the Branch Managers that Supreme Lending's software was compatible with a third-party software company called Media Center, represented that the software would and could house all of their client information and client/contact lists that they developed prior to and during their employment with Supreme Lending, and told the Branch Managers that, because Media Center was a third-party provider, it would allow each of them to easily take that information with them and use it if they chose to leave the company.

17.     Over the course of discussions, Supreme Lending and the Branch Managers conducted an extensive due diligence to assess whether they would be a good fit in Supreme Lending's organization.  During the due diligence and negotiation process, Everett made it clear that he would expect the Branch Managers to bring all of their existing business and clients from Starkey and Primary Capital with them to Supreme Lending, would expect all "in-process" loans to be transferred to Supreme Lending, would expect the vast majority, if not all, of the employees from their branches to resign and come to work for Supreme Lending, and that he

was open to acquiring each of their branches' equipment and leases to the extent it made financial sense to do so.

18.   At no time did Supreme Lending or Everett ever indicate or suggest that this information and these business opportunities were somehow confidential property or otherwise owned by the Branch Managers' prior employers or that it was somehow improper to take the information, loans or business of Starkey or Primary Capital.  In short, Everett and Supreme Lending considered all of this information to be the Branch Managers' property and not the confidential or proprietary information of the mortgage banks.  For this reason, Everett and Supreme Lending required the Branch Managers to provide pro forma projections of their businesses, all of which included assumptions that they would (i) bring all of their existing and potential client information developed over their careers at different mortgage banks with them to Supreme Lending, (ii) bring all of the "in-process" loans and total numbers of historical and projected loan originations to Supreme Lending, (iii) solicit and hire the employees of their divisions from Starkey and Primary Capital, and (iv) transfer all of their leases and equipment to Supreme Lending. As a result of this due diligence, and in reliance on Supreme Lending's representations, the Branch Managers accepted Supreme Lending's offers of employment.

**D.    The Branch Managers Move Their Businesses to Supreme Lending**

19.   After the Branch Managers accepted Supreme Lending's offer of employment, each was provided certain employment agreements to sign, including a so-called Confidentiality, Inventions and Non-Solicitation Agreement.   At that time, Everett repeated his previous representations by telling the Branch Managers that the non-solicitation provisions in those agreements did not apply to employees in the Branch Managers' division/offices, but rather that the provisions only prohibited soliciting Supreme Lending's employees outside of the Branch

Managers' division/offices.  In reliance on these representations, the Branch Managers' executed the agreements.

20.    In short, Everett gave his word to Jones, Durham, and Fortner that if they left Supreme Lending, they could take whomever they wanted and he would not interfere.

21.    As contemplated during the negotiation and due diligence process, when the Branch Managers came to work for Supreme Lending, they were allowed to bring their client and contacts lists, as well as their respective division employees, from their prior employers in order to capture their market share and not lose any traction in their respective markets. Supreme Lending also bought certain equipment and negotiated assignments of certain leases from Starkey.  In fact, as part of the transition from Starkey to Supreme Lending, Supreme Lending set up computers in a conference room adjacent to the Starkey branch location, so the new Supreme Lending employees could quickly move between their former Starkey space and Supreme Lending's temporary conference room.  Supreme Lending sent approximately four (4) trainers to the location to assist its new employees in transitioning their Starkey client information, customer databases, and loans in process to Supreme Lending's computers.

22.    Similarly, in reliance on Everett's representations regarding Media Center described in paragraph 16, and that he repeated to the Branch Managers and their employees after they moved to Supreme Lending, the Branch Managers and numerous of their employees signed up for and began paying to use Media Center.  Once signed up, at Supreme Lending's request, the Branch Managers and their employees provided Supreme Lending a copy of their client information and client/contact lists that they had developed at their prior employers, so the information could be input and saved into the Media Center software.  Thereafter, the Branch Managers continued to pay for the service throughout their employment with Supreme Lending,

and information regarding clients they developed was automatically saved into the Media Center software.

## F.     The Branch Managers' Compensation

23.     During the due diligence and negotiation process, Everett also told the Branch Managers that they would be paid based on the performance of "their" P&Ls for their respective branches.  Specifically, the Branch Managers' salaries would be routinely adjusted based on the performance of the P&Ls.  Further, Everett represented that, if the Branch Managers ever decided to leave Supreme Lending, they would and could be paid the amount of any positive balance on their division P&L. The Branch Managers, who ran successful businesses, found Everett's proposed compensation structure appealing and agreed to the offer.

24.     Additionally, Everett's offer also required the Branch Managers to set up a reserve account for their division.  When explaining the requirement, Everett represented to the Branch Managers that they would own the money in the reserve account, because it would otherwise have been immediately credited to their division P&L.  Further, he stated that, if they ever left Supreme Lending, the entire amount of the reserve account would be credited to their division P&L and he would write them a check to cover the resulting positive balance.  Relying on his representations, the Branch Managers agreed. Accordingly, from the beginning of their employment with Supreme Lending, for each and every loan that closed in their division, the Branch Managers' placed $200 into the reserve account until it reached a minimum required balance.  The minimum changed over time, but eventually the balance reached at least $500,000.

25.     Ultimately, Supreme Lending expensed lease security deposits, lease rents, and equipment to the P&Ls of the Branch Managers' division, which resulted in deductions from the Branch Managers' possible compensation.  Due to those deductions, Everett later represented (as described below) that the Branch Managers could take those expensed items with them.

26.     Further, from time to time, the Branch Managers and Supreme Lending faced compensation issues separate from the Branch Managers' base salary. For example, in January 2014, Everett informed the Branch Managers that he was reassigning the Branch Managers' Orange Beach, Alabama and Daphne, Alabama branches to another Supreme Lending regional manager, in exchange for giving the Branch Managers a credit on their division P&L. The Branch Managers had invested substantial time, capital, and goodwill in developing the lucrative branches, so they opposed the sale.  Nevertheless, Everett reassigned the branches despite their opposition and told them that he would credit their division P&L $165,000.

27.     To date, the Branch Managers have not received their compensation that would have resulted from a credit to their division P&L for the value of their reserve account or the $165,000 Everett promised for unilaterally reassigning the Branch Managers' Orange Beach, Alabama and Daphne, Alabama branches.

## G.     The Branch Managers' Decision to Leave Supreme Lending

28.     Unfortunately, Supreme Lending was not the employer Everett represented it to be. In particular, Supreme Lending eventually began failing to provide the Branch Managers with the tools necessary for their businesses to grow, and put their businesses at risk through inflated charges and interest rates charged to their customers.  Over many months, the Branch Managers raised these issues with several executives at Supreme Lending, and specifically with Everett. Each time, Everett bombarded them with tirades riddled with foul language, but nonetheless on multiple occasions repeated his earlier representations by stating that (i) if they felt that another mortgage bank had built a "better mousetrap" they should leave Supreme Lending—that is, as explained by Everett, if the Branch Managers did not like how Supreme Lending did business, they should find another bank to go to, (ii) he would make the transition to another company as smooth as possible, (iii) the Branch Managers had the right to take with them to another

company all of the employees in the Branch Managers' division/offices, their corporate underwriters, all of the information that the Branch Managers and their employees had developed, including actual and potential clients, and the leases and equipment that had been deducted from the Branch Managers' compensation through their division P&Ls, and (iv) the Branch Managers had the right to and would be paid the amount of any positive balance on their division P&L.

## H.    The Branch Managers Apply for Employment with PRMI

29.    Frustrated by Everett's continued verbal abuse and refusal to provide the necessary products, support, pricing, and fee structure to keep their businesses competitive, the Branch Managers decided to pursue what Everett had suggested—i.e., they began to look for other mortgage banks with a "better mouse trap."  As the result of its attractive brand and because culture, integrity, and trust were even more important considerations to the Branch Managers, they reached out to PRMI, an independent mortgage bank headquartered in Salt Lake City, Utah, to see if it would be interested in their businesses.

30.    PRMI was impressed with the Branch Managers' credentials and reputation in the industry, and the parties engaged in a short series of communications whereby PRMI educated the Branch Managers regarding its company, including its warehouse line, terms, and regulatory involvement.  PRMI also invited the Branch Managers to visit PRMI's corporate offices.  The Branch Managers accepted PRMI's invitation and met with PRMI employees who further educated them about PRMI's approach.  The in-person visit also provided the opportunity to assess PRMI's culture.

31.    Ultimately, and in reliance on Everett's representations, the Branch Managers elected to accept Everett's offer and resign from Supreme Lending to move to a bank better

suited to the Branch Managers' vision, goals and business values.  As a result, in early February 2014, the Branch Managers began working at PRMI.

## I.      The Division Employees

32.    Based on Everett's previous offers and representations, the Branch Managers informed their division employees and corporate underwriters that they had accepted employment with PRMI.  Because of the relationships the Branch Managers had developed with their division employees over the years, and the impact they had made in each other's lives, the vast majority of the employees in the Branch Managers' divisions at Supreme Lending applied for employment with PRMI.  Relying on Everett's representations that they could take whomever they wanted from their division, the Branch Managers never informed PRMI of any purported non-solicitation agreements with Supreme Lending, nor did they believe any of these agreements restricted them from recommending employment for the division employees and the underwriters that Everett referred to as part of the Branch Managers' family. As a result, PRMI accepted all of the employees' applications for employment.

## J.      The Branch Managers' Resignation from Supreme Lending and Supreme Lending's Promise of a "Smooth Transition"

33.    After many months of trying to convince Supreme Lending to change its ways, the Branch Managers resigned from Supreme Lending on January 31, 2014.  Immediately following their resignations, Everett repeated the representations that he had made before and throughout the Branch Managers' employment with Supreme Lending by stating:

- Supreme Lending would support them in every way and provide a smooth transition;

- the Branch Managers were not only free to take their division employees and corporate underwriters with them, but could and should do so—in fact, not only did Supreme Lending consent to the employees and corporate underwriters going with the Branch Managers to PRMI, Everett said he would try to talk them into doing so if they expressed a desire to stay at Supreme Lending;

- the non-solicitation provisions in the Branch Managers' agreement with Supreme Lending only applied to Supreme Lending's employees outside of the Branch Managers' division/offices and their corporate underwriters;

- the Branch Managers could take the leases and equipment in their division branches that had been deducted from their compensation through their P&Ls;

- Supreme Lending desired to transfer multiple leases to the Branch Managers/PRMI;

- Fortner would work with Supreme Lending's COO, in part to determine which loan applications that were in process would be transferred to PRMI;

- Supreme Lending would compensate the Branch Managers for any positive balance on their division P&L, including for loans that were closed for Supreme Lending and not transferred during the transition; and

- Supreme Lending would not miss any closings on loans that remained at Supreme Lending and would provide the same support, service, and attention to those loans as it had prior to the Branch Managers' resignation.

34.     Further, rather than objecting to any of the Branch Managers' actions, Everett gave every indication that he approved of the very conduct about which he now complains, including by (i) giving the Branch Managers advice on how to complete the transition and offering to talk through a specific strategy, (ii) inquiring on numerous occasions whether the Branch Managers still wanted to accompany him on an upcoming trip that they had previously planned, (iii) stating that the Branch Managers were always welcome back at Supreme Lending, and (iv) congratulating the Branch Managers on selecting PRMI, a company Everett acknowledged to be a good choice.

35.     Everett later sent an email to the Branch Managers, copying multiple Supreme Lending employees, in which he did not object to any of the actions that the Branch Managers had informed him that they were going to take. Instead, the email stated, in pertinent part:

> I believe that many of the PC's, furniture, etc. are owned by the Alabama region. It is our intention to make this a seamless and smooth transition for everyone involved and hope we can work together to ensure that happens. . . . There will be

other issues that arise and please let's keep the lines of communication open so that the transition is smooth.

36.    Within the next day or so, at Everett's request, Fortner spoke with Rick Hogle, Supreme Lending's COO, to discuss the transfer of loans in process to PRMI.  Hogle indicated that Supreme Lending would not have the capacity to close the loans in process, and it wanted to make sure the customers' interests were considered the priority.  As part of Supreme Lending's commitment to a smooth transition, Hogle left to the Branch Managers the decision on which loans and loans in progress would be transferred to PRMI and which would be closed at Supreme Lending and credited to the P&Ls for the Branch Managers' division.  As is customary in the industry, the Branch Managers generally made decisions regarding which loans to transition to PRMI based upon the amount of time left before closing dates.  As part of the Branch Managers' reciprocal commitment to a smooth transition, the Branch Managers agreed that certain of their employees would delay their transition to PRMI and continue working for Supreme Lending to close the loans that were not transferred to PRMI, after which they could be transitioned to PRMI in the most timely and efficient manner possible.

37.    Consistent with industry custom, PRMI agreed to assume leases for certain of the branches that were transitioning with the Branch Managers.  Upon receiving verification of the amount Supreme Lending paid for security deposits and February rent for those lease sites, PRMI reimbursed Supreme Lending.  Supreme Lending had previously expensed the security deposits and rents to the P&Ls for the Branch Managers' division. Yet, to date, the Branch Managers have not been compensated for this deduction in their compensation.

**K.    Everett and Supreme Lending Break Their Promises**

38.    Notwithstanding Everett's representations and promises, Everett's tone began to change shortly after the Branch Managers began working at PRMI.  Indeed, it quickly became

clear that Supreme Lending had no intention of providing a smooth transition for the Branch Managers and their employees—despite Everett's promises before, during, and after their employment with Supreme Lending.  Instead, Supreme Lending began to thwart and obstruct the transition.

### (i)  Branch Equipment

39.  Despite initially repeating his representations that the Branch Managers could take the computers and other branch equipment that had been deducted from the Branch Managers' compensation through the P&Ls for their division, not long after the Branch Managers began their employment with PRMI, Everett did a complete about-face and took the position that the Branch Managers could not take this equipment.   This new position crippled the Branch Managers' business because Supreme Lending began locking the Branch Managers and their employees out of the computers that they relied on to complete their employment responsibilities.   Left without a choice, PRMI purchased new equipment for the Branch Managers and their employees so they could begin working again.  Further, to try to facilitate the transition, the Branch Managers decided to return to Supreme Lending the equipment that had been deducted from their compensation.   When the Branch Managers informed Supreme Lending of this decision, they set forth the amounts that Supreme Lending needed to credit back to the P&Ls for their division.  Nevertheless, to date, Supreme Lending has not paid them for the amounts that were deducted from their compensation for those items.

### (ii)  Internet and Phones

40.  While Everett was back-peddling on his commitment to allow the Branch Managers to take their computers with them, within one (1) week of the Branch Managers' resignations, Supreme Lending began shutting off Internet and phone systems and services at the branches, in contravention of industry practice and custom.  Supreme Lending initially refused to

even provide PRMI information regarding its service providers for the branches and, after finally providing the information, refused to assign its Internet service and lines to PRMI.  Ultimately, Supreme Lending's actions resulted in Internet and/or phone service outages at each branch for anywhere from one (1) to two (2) weeks while PRMI diligently worked to have new service and lines installed, all in an effort to disrupt the closing of loans for the very customers Supreme Lending had committed to protect.

41.     During the Internet and phone outages and while the Branch Managers and their employees were locked out of their computers, not only were they not able to develop new clients and originate new loans, they were not able to continue to process and close loans that were already in progress—including loans that stayed at Supreme Lending. As would be expected, customers became frustrated and the reputations of the Branch Managers and their employees with clients and referral source partners were harmed.

**(iii)     Supreme Lending Improperly Accesses Durham's Computer**

42.     After beginning his employment with PRMI, Durham continued to use his computer that he thought he owned both by virtue of Everett's representations and the fact that it was deducted from his compensation at Supreme Lending. One day, he left the computer on at his home while he went to work.  Upon returning home that evening, Durham discovered that someone was remotely accessing the computer. In fact, Durham witnessed the remote user actively controlling the computer's cursor and, in order to cease the remote user's activity, Durham was forced to disconnect the computer from the Internet.

43.     After breaking the remote user's connection, Durham immediately began assessing what the remote user had done to his computer.  Durham discovered that the remote user had deleted nearly all of the files from his desktop, the location where he saved the majority of his

computer files. Durham then discovered that the remote user had also deleted all the files from the computer's recycle bin as well.

44.     Upon information and belief, Supreme Lending was the remote user who accessed Durham's Computer.  Not surprisingly given Everett's prior conduct, the Branch Managers have learned that Supreme Lending somehow obtained knowledge of emails from their PRMI and personal email accounts.

### (iv)     Supreme Lending's Failure to Pay Amounts Owed to the Branch Managers

45.     To date, Supreme Lending has also refused to compensate the Branch Managers for various amounts owed to them and/or their division, including without limitation:

- The $165,000 Everett promised for ignoring the Branch Managers' opposition and unilaterally reassigning the Branch Managers' Orange Beach, Alabama and Daphne, Alabama branches to another Supreme Lending regional manager;

- The balance in the Branch Managers' reserve account of at least $500,000;

- Security deposits and February rents that PRMI reimbursed Supreme Lending for, but that Supreme Lending nonetheless expensed to the P&Ls for the Branch Managers' division;

- The deductions from the Branch Managers' compensation that resulted from Supreme Lending expensing computers and other branch equipment to the P&Ls for the Branch Managers' division;

- Commissions for loans that were not credited to the P&Ls for the Branch Managers' division in January 2014, but were nonetheless closed in those branches during that month, and loans that were closed in those branches in February 2014 by employees that delayed their transition;

- Commissions for loans that were not properly credited to the P&Ls for the Branch Managers' division; and

- The rental value of the furniture and other equipment that the Branch Managers brought with them from Starkey and/or otherwise purchased.

### (v)     Supreme Lending Filed this Lawsuit

46.     Eventually, Supreme Lending filed this lawsuit against the Branch Managers, asserting that their actions in the transition violated the agreements between the parties and other law, despite Everett's representations otherwise before, during, and after their employment with Supreme Lending.  Moreover, through this lawsuit and otherwise, Supreme Lending has taken the positions that the Branch Managers did not have the right to recommend the employees in their division and their corporate underwriters at Supreme Lending for employment with PRMI, and that the Branch Managers and their employees did not have the right to take or use the client information that they paid to have stored in the Media Center software while at Supreme Lending.

## CONDITIONS PRECEDENT

47.     All conditions precedent to the Branch Managers' recovery, Supreme Lending's liability and Everett's liability have been performed, have occurred, and/or have been waived. *See* Fed. R. Civ. P. 9(c).

## FIRST COUNTERCLAIM FOR RELIEF
### FRAUDULENT INDUCEMENT
### (AGAINST SUPREME LENDING AND EVERETT)

48.     The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 47 and incorporate them by reference as though fully set forth herein.

49.     Prior to the Branch Managers signing their employment agreements with Supreme Lending, including a so-called Confidentiality, Inventions and Non-Solicitation Agreement, in October 2011 and early November 2011 during meetings in Dallas, Texas and in verbal conversations leading up to these dates, Everett represented to the Branch Managers that if they ever decided to leave Supreme Lending, (i) all employees in the Branch Managers' division/offices would and could move with them, (ii) all actual and potential clients that the Branch Managers and their employees had developed or would develop would and could move

with them, (iii) their respective division businesses would and could move with them (offices, equipment, etc.), and (iv) the Branch Managers would and could be paid the amount of any positive balance on their division P&L.  Moreover, Everett and those acting on his behalf and at his direction further made material representations to the Branch Managers and their employees that, if they signed up for, paid to use, and entered their client information that they developed prior to and during their employment with Supreme Lending into a third-party client-relations-management software program called Media Center, they could take that information with them and use it if they chose to leave the company.

50.     These material representations were false and/or materially misleading and Everett made them knowing he intended to take different positions should the Branch Managers leave Supreme Lending, and/or recklessly, as positive assertions, and without knowledge of their truth, and with the intent to convince the Branch Managers to rely and act on the misrepresentations by accepting employment with Supreme Lending, executing employment agreements, including a so-called Confidentiality, Inventions and Non-Solicitation Agreement, and signing up for, paying for, and continuing to use Media Center.  As Everett expected, the Branch Managers reasonably relied on and took those actions based on his misrepresentations.

51.     As detailed in paragraphs 38 through 46 above, which are incorporated herein by reference, the Branch Managers' reliance on the misrepresentations (i) impaired their sales, compensation, and ability to transition their books of business in a profitable manner, (ii) interfered with their relationships with each other, their employees, PRMI, and existing and potential clients, (iii) harmed their reputation in the independent mortgage banking industry, (iv) hindered their ability to use Media Center and made it more difficult to access their own information because Supreme Lending has taken actions to prevent them from using that

information, and (v) resulted in them not receiving the compensation owed to them by Supreme Lending.

52.     Accordingly, the misrepresentations and the Branch Managers' reliance thereon directly and proximately caused the Branch Managers to suffer and continue to suffer actual damages in an amount to be decided by the trier of fact. Further, the misrepresentations were made intentionally, willfully, wantonly, maliciously, and without justification or excuse, so the Branch Managers are entitled to recover exemplary damages from Supreme Lending and Everett in an amount to be decided by the trier of fact.

<u>**SECOND COUNTERCLAIM FOR RELIEF**</u>
**FRAUD**
**(AGAINST SUPREME LENDING AND EVERETT)**

53.     The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 52 and incorporate them by reference as though fully set forth herein.

54.     On multiple occasions throughout the Branch Managers' employment with Supreme Lending, including during meetings held in Dallas between December 2 and 4, 2013 and again during a telephone conversation on January 17, 2014, Everett made material representations to the Branch Managers that (i) if they felt that another mortgage bank had built a "better mousetrap" they should leave Supreme Lending—that is, as explained by Everett, if the Branch Managers did not like how Supreme Lending did business, they should find another bank to go to, (ii) he would make the transition to another company as smooth as possible, (iii) the Branch Managers had the right to use and/or take with them to their new company all of the employees in the Branch Managers' division/offices, their corporate underwriters, all of the information that the Branch Managers and their employees had developed regarding actual and potential clients, current loans in process, and the leases and equipment that had been deducted

from the Branch Managers' compensation through the P&Ls for their division, and (iv) they had the right to and would be paid the amount of any positive balance on their division P&L. Moreover, Everett and those acting on his behalf and at his direction, further made material representations to the Branch Managers and their employees that, if they signed up for, paid to use, and entered their client information that they developed prior to and during their employment with Supreme Lending into Media Center, they could take that information with them and use it if they chose to leave the company.

55.     These material representations were false and/or materially misleading and Everett made them knowing he intended to take different positions should the Branch Managers leave Supreme Lending and/or recklessly, as positive assertions, and without knowledge of their truth, and with the intent to convince the Branch Managers to rely and act on the misrepresentations. The Branch Managers reasonably relied on those misrepresentations by resigning from Supreme Lending, accepting employment with PRMI and, during that employment, recommending their division employees and corporate underwriters at Supreme Lending for employment, using client information they saved in Media Center while at Supreme Lending, transitioning loans in progress from Supreme Lending where it benefited the customer, and using equipment that had been deducted from their compensation at Supreme Lending through the P&Ls for their division.

56.     As detailed in paragraphs 38 through 46 above, which are incorporated herein by reference, the Branch Managers' reliance on the misrepresentations (i) impaired their sales, compensation, and ability to transition their books of business in a profitable manner, (ii) interfered with their relationships with each other, their employees, PRMI, and existing and potential clients, (iii) harmed their reputation in the independent mortgage banking industry, (iv) hindered their ability to use Media Center and made it more difficult to access their own

information because Supreme Lending has taken actions to prevent them from using that information, and (v) resulted in them not receiving the compensation owed to them by Supreme Lending.

57.     Accordingly, the misrepresentations and the Branch Managers' reliance thereon directly and proximately caused the Branch Managers to suffer and continue to suffer actual damages in an amount to be decided by the trier of fact. Further, the misrepresentations were made intentionally, willfully, wantonly, maliciously, and without justification or excuse, so the Branch Managers are entitled to recover exemplary damages from Supreme Lending and Everett in an amount to be decided by the trier of fact.

**THIRD COUNTERCLAIM FOR RELIEF**
**IN THE ALTERNATIVE, NEGLIGENT MISREPRESENTATION**
**(AGAINST SUPREME LENDING AND EVERETT)**

58.     The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 57 and incorporate them by reference as though fully set forth herein.

59.     Prior to the Branch Managers signing their employment agreements with Supreme Lending, including a so-called Confidentiality, Inventions and Non-Solicitation Agreements, Everett represented that if the Branch Managers ever decided to leave Supreme Lending, (i) all employees in the Branch Managers' division/offices would and could move with them, (ii) all actual and potential clients that the Branch Managers and their employees had developed and would develop would and could move with them, (iii) their respective division businesses would and could move with them (offices, equipment, etc.), and (iv) the Branch Managers would and could be paid the amount of any positive balance on their division P&L.  Further, on multiple occasions throughout the Branch Managers' employment with Supreme Lending, Everett made material representations to the Branch Managers that (i) if they felt that another mortgage bank

had built a "better mousetrap" they should leave Supreme Lending—that is, as explained by Everett, if the Branch Managers did not like how Supreme Lending did business, they should find another bank to go to, (ii) he would make the transition to another company as smooth as possible, (iii) the Branch Managers had the right to use and/or take with them to their new company all of the employees in the Branch Managers' division/offices, their corporate underwriters, all of the information that the Branch Managers and their employees had developed regarding actual and potential clients, and the leases and equipment that had been deducted from the Branch Managers' compensation through the P&Ls for their division, and (iv) they had the right to and would be paid the amount of any positive balance on their division P&L.

60.    Moreover, Everett and those acting on his behalf and at his direction, further made material representations to the Branch Managers and their employees that, if they signed up for, paid to use, and entered their client information that they developed prior to and during their employment with Supreme Lending into Media Center, they could take that information with them and use it if they chose to leave the company.

61.    Everett and the other Supreme Lending employees made the material misrepresentations, knowing they were false and/or materially misleading, intending for them to be relied and acted on, and/or failed to exercise reasonable care or competence in obtaining or communicating the misrepresentations.  Nevertheless, Everett and the other Supreme Lending employees supplied the misrepresentations to guide the Branch Managers' decisions, knowing and intending that they would rely on the misrepresentations.

62.    The Branch Managers reasonably and justifiably relied on the misrepresentations made before they joined Supreme Lending by accepting Supreme Lending's offer of employment, executing employment agreements, including a so-called Confidentiality,

Inventions and Non-Solicitation Agreement, and signing up for, paying for, and using Media Center. Further, after beginning their employment with Supreme Lending, they relied on the other misrepresentations by continuing to use Media Center while employed at Supreme Lending, and later resigning from Supreme Lending, accepting employment with PRMI and, during that employment, recommending their division employees at Supreme Lending for employment, using client information they saved in Media Center while at Supreme Lending, transitioning loans in progress from Supreme Lending where it benefited the customer, and using equipment that had been deducted from their compensation at Supreme Lending through the P&Ls for their division.

63.     As detailed in paragraphs 38 through 46 above, which are incorporated herein by reference, the Branch Managers' reliance on the misrepresentations (i) impaired their sales, compensation, and ability to transition their books of business in a profitable manner, (ii) interfered with their relationships with each other, their employees, PRMI, and existing and potential clients, (iii) harmed their reputation in the independent mortgage banking industry, (iv) hindered their ability to use Media Center and made it more difficult to access their own information because Supreme Lending has taken actions to prevent them from using that information, and (v) resulted in them not receiving the compensation owed to them by Supreme Lending.

64.     Accordingly, the misrepresentations and the Branch Managers' reliance thereon directly and proximately caused the Branch Managers to suffer and continue to suffer actual damages in an amount to be decided by the trier of fact. Further, the misrepresentations were made intentionally, willfully, wantonly, maliciously, and without justification or excuse, so the

Branch Managers are entitled to recover exemplary damages from Supreme Lending and Everett in an amount to be decided by the trier of fact.

**FOURTH COUNTERCLAIM FOR RELIEF**
**IN THE ALTERNATIVE, PROMISSORY ESTOPPEL**
**(AGAINST SUPREME LENDING AND EVERETT)**

65.     The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 64 and incorporate them by reference as though fully set forth herein.

66.     Prior to the Branch Managers signing their employment agreements with Supreme Lending, including a so-called Confidentiality, Inventions and Non-Solicitation Agreements, Everett represented that if the Branch Managers ever decided to leave Supreme Lending, (i) all employees in the Branch Managers' division/offices would and could move with them, (ii) all actual and potential clients that the Branch Managers and their employees had developed or would develop would and could move with them, (iii) their respective division businesses would and could move with them (offices, equipment, etc.), and (iv) the Branch Managers would and could be paid the amount of any positive balance on their division P&L.  Further, on multiple occasions throughout the Branch Managers' employment with Supreme Lending, Everett represented to Branch Managers that (i) if they felt that another mortgage bank had built a "better mousetrap" they should leave Supreme Lending—that is, as explained by Everett, if the Branch Managers did not like how Supreme Lending did business, they should find another bank to go to, (ii) he would make the transition to another company as smooth as possible, (iii) the Branch Managers had the right to use and/or take with them to their new company all of the employees in the Branch Managers' division/offices, all of the information that the Branch Managers and their employees had developed regarding actual and potential clients, and the leases and equipment that had been deducted from the Branch Managers' compensation through the P&Ls

for their division, and (iv) they had the right to and would be paid the amount of any positive balance on their division P&L.

67.     Moreover, Everett and those acting on his behalf and at his direction, further represented to the Branch Managers and their employees that, if they signed up for, paid to use, and entered their client information that they developed prior to and during their employment with Supreme Lending into Media Center, they could take that information with them and use it if they chose to leave the company.

68.     The Branch Managers reasonably and substantially relied, and it was foreseeable that they would do so, on Everett's representations made before they joined Supreme Lending by accepting Supreme Lending's offer of employment, executing employment agreements, including a so-called Confidentiality, Inventions and Non-Solicitation Agreement, and signing up and paying to use Media Center. Further, after beginning their employment with Supreme Lending, they substantially relied, and it was foreseeable that they would do so, on Everett's other misrepresentations by continuing to use Media Center while employed at Supreme Lending, and later resigning from Supreme Lending, accepting employment with PRMI and, during that employment, recommending their division employees at Supreme Lending for employment, using client information they saved in Media Center while at Supreme Lending, transitioning loans in progress from Supreme Lending where it benefited the customer, and using equipment that had been deducted from their compensation at Supreme Lending through the P&Ls for their division.

69.     As detailed in paragraphs 38 through 46 above, which are incorporated herein by reference, the Branch Managers' substantial detrimental reliance on the misrepresentations (i) impaired their sales, compensation, and ability to transition their books of business in a profitable

manner, (ii) interfered with their relationships with each other, their employees, PRMI, and existing and potential clients, (iii) harmed their reputation in the independent mortgage banking industry, (iv) hindered their ability to use Media Center and made it more difficult to access their own information because Supreme Lending has taken actions to prevent them from using that information, and (v) resulted in them not receiving the compensation owed to them by Supreme Lending.

70.     Accordingly, Everett's promises and the Branch Managers' reliance thereon directly and proximately caused the Branch Managers to change their respective positions they had at the time the representations were made, and incur substantial costs and lose substantial compensation they would not have incurred/lost but for Supreme Lending's promises.  As a result, the Branch Managers have and continue to suffer damages in an amount to be decided by the trier of fact.

<u>**FIFTH COUNTERCLAIM FOR RELIEF**</u>
<u>**BREACH OF CONTRACT**</u>
<u>**(AGAINST SUPREME LENDING)**</u>

71.     The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 70 and incorporate them by reference as though fully set forth herein.

72.     Supreme Lending and the Branch Managers entered into valid, enforceable contracts concerning how they would be compensated at Supreme Lending; specifically, among other things, the Branch Managers' salaries would be routinely adjusted based on the performance of the P&Ls for their division and, if the Branch Managers ever decided to leave Supreme Lending, they would be paid the amount of any positive balance on their division P&L.

73.     By virtue of the foregoing promises, Supreme Lending and the Branch Managers made and accepted valid offers with the intent that they be mutually binding. Moreover, the promises were supported by valid and sufficient consideration.

74.     The Branch Managers performed, tendered performance of, or were excused from performing their contractual obligations, but Supreme Lending materially breached its contractual obligations under those contracts by refusing to compensate the Branch Managers for various amounts owed to them and/or credit the P&Ls for their division in a manner that would properly reflect the amount of compensation they were due, including without limitation: (i) $165,000 for Everett unilaterally reassigning the Branch Managers' Orange Beach, Alabama and Daphne, Alabama branches to another Supreme Lending regional manager, (ii) the balance in the Branch Managers' reserve account of at least $500,000, (iii) security deposits and February rents that PRMI reimbursed Supreme Lending for, but that Supreme Lending nonetheless expensed to their division P&Ls, (iv) deductions from the Branch Managers' compensation that resulted from Supreme Lending expensing computers and other branch equipment to their division P&Ls, (v) commissions for loans that were not credited to their division P&Ls in January 2014, but were nonetheless closed in those branches during that month, and loans that were closed in those branches in February 2014 by employees that delayed their transition, (vi) commissions for loans that were not properly credited to the P&Ls for their division; and (vii) the rental value of the furniture and other equipment that the Branch Managers brought with them from Starkey and/or otherwise purchased.

75.     Supreme Lending's material breaches directly and proximately caused the Branch Managers to suffer and continue to suffer damages in the form of actual damages and special damages in amounts to be decided by the trier of fact.

## SIXTH COUNTERCLAIM FOR RELIEF
### VIOLATION OF TEX. CIV. PRAC. & REM. CODE § 143.001 ET SEQ.
### (ON DURHAM'S BEHALF AGAINST SUPREME LENDING)

76.     The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 75 and incorporate them by reference as though fully set forth herein.

77.     Upon information and belief, Supreme Lending intentionally and knowingly accessed Durham's Computer without Durham's effective consent.

78.     Durham was the lawful owner and in possession of Durham's Computer at the time of Supreme Lending's access.

79.     Upon information and belief, Supreme Lending accessed Durham's Computer with intent to defraud or harm Durham by obtaining confidential information, and with a further intent to delete Durham's property from the computer.

80.     Supreme Lending's tortious acts regarding Durham's Computer directly and proximately caused Durham to sustain and continue to sustain damages in an amount to be decided by the trier of fact. Upon information and belief, Supreme Lending's tortious acts regarding Durham's Computer were committed intentionally, willfully, wantonly, maliciously, and without justification or excuse, so Durham is entitled to recover exemplary damages from Supreme Lending in an amount to be decided by the trier of fact.

## SEVENTH COUNTERCLAIM FOR RELIEF
### INVASION OF PRIVACY/INTRUSION ON SECLUSION
### (ON DURHAM'S BEHALF AGAINST SUPREME LENDING)

81.     Durham repeats and re-alleges the foregoing paragraphs 1 through 80 and incorporates them by reference as though fully set forth herein.

82.     Upon information and belief, Supreme Lending intentionally intruded on Durham's solitude, seclusion, and/or privacy by wrongfully accessing Durham's Computer, and such intrusion would be highly offensive to a reasonable person.

83.     Supreme Lending's intrusion on Durham's privacy and seclusion directly and proximately caused Durham to suffer damages in an amount to be decided by the trier of fact. Upon information and belief, Supreme Lending's intrusion on Durham's privacy and seclusion was committed intentionally, willfully, wantonly, maliciously, and without justification or excuse, so Durham is entitled to recover exemplary damages from Supreme Lending in an amount to be decided by the trier of fact.

### EIGHTH COUNTERCLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (AGAINST SUPREME LENDING)

84.     The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 83 and incorporate them by reference as though fully set forth herein.

85.     Supreme Lending has been unjustly enriched as a result of wrongly securing and/or passively receiving benefits from the Branch Managers that would be unconscionable to retain. Specifically, Supreme Lending owes the Branch Managers and/or their division various amounts including, but not limited to (i) $165,000 for Everett unilaterally reassigning the Branch Managers' Orange Beach, Alabama and Daphne, Alabama branches to another Supreme Lending regional manager, (ii) the balance in the Branch Managers' reserve account of at least $500,000, (iii) security deposits and February rents that PRMI reimbursed Supreme Lending for, but that Supreme Lending nonetheless expensed to their division P&Ls, (iv) deductions from the Branch Managers' compensation that resulted from Supreme Lending expensing computers and other branch equipment to their division P&Ls, (v) commissions for loans that were not credited to

their division P&Ls in January 2014, but were nonetheless closed in those branches during that month, and loans that were closed in those branches in February 2014 by employees that delayed their transition, (vi) commissions for loans that were not properly credited to the P&Ls for their division; and (vii) the rental value of the furniture and other equipment that the Branch Managers brought with them from Starkey and/or otherwise purchased.

86.     Accordingly, equity and good conscience require disgorgement of the ill-gotten gains that Supreme Lending obtained by taking undue advantage of the Branch Managers.

**NINETH COUNTERCLAIM FOR RELIEF**
**MONEY HAD & RECEIVED**
**(AGAINST SUPREME LENDING)**

87.     The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 86 and incorporate them by reference as though fully set forth herein.

88.     Supreme Lending owes the Branch Managers and/or their division for money it is holding. Supreme Lending improperly maintains possession of monies, which, in equity and good conscience, belong to the Branch Managers and/or their division, specifically, but not limited to: (i) $165,000 for Everett unilaterally reassigning the Branch Managers' Orange Beach, Alabama and Daphne, Alabama branches to another Supreme Lending regional manager, (ii) the balance in the Branch Managers' reserve account of at least $500,000, (iii) security deposits and February rents that PRMI reimbursed Supreme Lending for, but that Supreme Lending nonetheless expensed to their division P&Ls, (iv) deductions from the Branch Managers' compensation that resulted from Supreme Lending expensing computers and other branch equipment to their division P&Ls, (v) commissions for loans that were not credited to their division P&Ls in January 2014, but were nonetheless closed in those branches during that month, and loans that were closed in those branches in February 2014 by employees that delayed their

transition, (vi) commissions for loans that were not properly credited to the P&Ls for their division; and (vii) the rental value of the furniture and other equipment that the Branch Managers brought with them from Starkey and/or otherwise purchased.

89.    Supreme Lending's holding of and failure to return the monies which in equity and good conscience belong to the Branch Managers and/or their division directly and proximately caused the Branch Managers to suffer and continue to suffer actual damages in an amount to be decided by the trier of fact. Further, because Supreme Lending withheld the funds fraudulently and/or maliciously, the Branch Manages are entitled to exemplary damages Supreme Lending in an amount to be decided by the trier of fact.

**TENTH COUNTERCLAIM FOR RELIEF**
**REQUEST FOR DECLARATORY JUDGMENT**
**(AGAINST SUPREME LENDING)**

90.    The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 89 and incorporate them by reference as though fully set forth herein.

91.    The Declaratory Judgment Act, codified in 28 U.S.C. § 2201, provides in pertinent part:

>        In the case of an actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

92.    Supreme Lending has taken the position that the Branch Managers violated non-solicitation clauses contained in their written agreements with Supreme Lending by allegedly soliciting Supreme Lending employees to work for PRMI.  However, as discussed above, before and throughout the Branch Managers' employment with Supreme Lending, Everett represented, and the parties to those contracts agreed, that any provisions in those agreements regarding

soliciting employees, if any, did not apply to employees that worked in the Branch Managers' divisions/regions and their corporate underwriters, and that the Branch Managers would and could take such employees with them if they ever chose to accept employment at a different mortgage bank. In fact, Everett even repeated such representations after the Branch Managers resigned from Supreme Lending by (i) stating that the Branch Managers were not only free to take their employees and corporate underwriters with them to PRMI, but also that he would try to talk them into going to PRMI if they expressed a desire to stay at Supreme Lending, (ii) stating that the non-solicitation provisions in the Branch Managers' agreement with Supreme Lending only applied to Supreme Lending's employees other than those in the Branch Managers' region/division and their corporate underwriters, and (iii) rather than objecting to any of the Branch Managers' actions, giving Branch Managers advice on how to complete the transition and offering to talk through a specific strategy with them.

93.     Supreme Lending has further taken the position that the Branch Managers violated written agreements they had with Supreme Lending and misappropriated Supreme Lending's trade secrets by the Branch Managers and/or their employees allegedly taking client information and client/contact lists with them from Media Center and using the information at PRMI. However, as discussed above, before and throughout the Branch Managers' employment with Supreme Lending, Everett represented to the Branch Managers, and the parties to those contracts agreed, that the Branch Managers and their employees could use the information if they left Supreme Lending. Moreover, Supreme Lending represented to the Branch Managers and their employees and the parties to those contracts agreed that, if they used Media Center to store the information, they would be able to take the information with them to a new employer.

94.     Accordingly, an actual controversy exists between the Branch Managers and Supreme Lending regarding whether the Branch Managers misappropriated Supreme Lending's alleged trade secrets or violated non-solicitation clauses contained in their written agreements with Supreme Lending or other law by allegedly soliciting Supreme Lending employees to work for PRMI.

95.     Based on the foregoing, the Branch Managers seek declarations from this Court that (i) any non-solicitation provisions contained in agreements executed by the Branch Managers do not apply to persons who worked in the Branch Managers' region/division of branches at Supreme Lending, or were their corporate underwriters, (ii) as to Supreme Lending employees who worked in the Branch Managers' divisions and offices, or were their corporate underwriters, any non-solicitation provisions contained in agreements executed by the Branch Managers are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective by Supreme Lending's conduct and/or later agreements (iii) the Branch Managers did not violate any agreements with Supreme Lending or applicable law by soliciting Supreme Lending employees to work for PRMI, to the extent they did so  at all, (iv) the Branch Managers' client and potential customer lists and contacts, developed prior to and during their employment with Supreme Lending, are not confidential or proprietary information of Supreme Lending, including the information they saved into Media Center while at Supreme Lending.

### ELEVENTH COUNTERCLAIM FOR RELIEF
### VIOLATION OF SECTION 15.51 OF THE TEXAS BUSINESS
### AND COMMERCE CODE
### (AGAINST SUPREME LENDING)

96.     The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 95 and incorporate them by reference as though fully set forth herein.

97.     Supreme Lending filed this instant action, in part, to enforce non-solicitation provisions in the Confidentiality and Non-Solicitation Agreements between Branch Managers and Supreme Lending.    The non-solicitation provisions of the Confidentiality and Non-Solicitation Agreements provide that:

(a)     Associations with Co-Workers.    Employee agrees that during his or her employment and for two (2) years following the termination of his or her employment for any reason, neither he or she or her affiliates will, by himself or herself or by acting in concert with others, employ or solicit or attempt to employ or solicit for any employment any of Employer's current employees.    Employee and his or her affiliates will not, either directly or indirectly or by acting in concert with others, seek to induce or influence any employee to leave Employer's employment.

(b)     Solicitation of Customers.    Employee agrees that during his or her retention and for two (2) years following the termination of his or her employment for any reason, neither he, she or his or her affiliates will, by himself or herself or by acting in concert with others, by acting in concert with others, solicit any of Employer's customers or prospective customers existing as of the date of termination that Employee directly serviced, was assigned to, or was responsible for during the twelve (12) month period immediately preceding termination of Employee's employment with Employer.    Employee further agrees not to take any other action to divert business from Employer or influence any vendor supplier, customer or potential customer of Employer to cease doing business with Employer.

98.     Through their lawsuit, Plaintiffs are seeking to enforce the non-solicitation provisions against Branch Managers although: (i) Defendant Fortner struck through the provision which Supreme Lending is attempting to enforce; (ii) the two (2) year restriction period is also unreasonable and imposes a greater restraint than necessary to protect any goodwill or other business interest of Supreme Lending; (iii) the non-solicitation of employees and customers (specifically in the second sentence of (b) above) contain no geographic restriction; (iv) the non-solicitation provision of "prospective" customers is not reasonably limited in scope; and (v) the non-solicitation provision relating to association with co-workers is not reasonably limited in scope.    Moreover, the second sentence of paragraph (b) above also seeks to restrict Branch

Managers from calling on any customer or potential customer regardless of its location and regardless of whether Branch Managers ever conducted business with any such customer or potential customer during Branch Managers' employment with Supreme Lending and contains no limitation on time.

99.     Supreme Lending knew at the time of the execution of the Confidentiality and Non-Solicitation Agreements that the non-solicitation provisions in the Confidentiality and Non-Solicitation Agreements did not apply to Defendant Fortner and did not contain reasonable limitations as to geographical area, scope of activity to be restrained, or time and that the provisions imposed greater restraints than necessary to protect Supreme Lending's purported goodwill or other business interest.

100.     Therefore, pursuant to Section 15.51 of the Texas Business and Commerce Code, Branch Managers are entitled to an award of attorneys' fees and costs for having to defend the instant action to enforce the non-solicitation covenants in the Confidentiality and Non-Solicitation Agreements as they are overbroad and unreasonable as to geographical area, scope of activity to be restrained, and time and Supreme Lending knew at the time of the execution of the Confidentiality and Non-Solicitation Agreements that the limitations imposed a greater restraint than necessary to protect any goodwill or other business interest.

<u>**TWELFTH COUNTERCLAIM FOR RELIEF**</u>
**EXEMPLARY DAMAGES**

101.    The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 100 and incorporate them by reference as though fully set forth herein.

102.    Supreme Lending committed its conduct described herein with fraud, malice, and/or gross negligence, as the terms are defined by Chapter 41 of the Texas Civil Practices and

Remedies Code and/or other applicable law. As such, the Branch Managers are entitled to and request an award of exemplary damages in an amount to be decided by the trier of fact.

## THIRTEENTH COUNTERCLAIM FOR RELIEF
### ATTORNEYS' FEES

103.    The Branch Managers repeat and re-allege the foregoing paragraphs 1 through 102 and incorporate them by reference as though fully set forth herein.

104.    The Branch Managers have retained the services of the undersigned law firm to protect their rights and prosecute their causes of action and request that they be awarded their reasonable attorneys' fees and costs on all causes of action for which an award of attorneys' fees and costs is appropriate, including, without limitation, to the extent Texas law applies, under Chapters 38 and 143 of the Texas Civil Practices and Remedies Code for breach of contract and Durham's counterclaim that Supreme Lending violated chapter 143 of the Texas Civil Practice and Remedies Code and pursuant to Section 15.51 of the Texas Business and Commerce Code.

## JURY DEMAND

105.    The Branch Managers request a jury trial on all claims and issues so triable.

## PRAYER FOR RELIEF

Defendants pray that the Court, upon a final hearing of this matter, deny and dismiss with prejudice all claims set forth in the Amended Complaint, and any amendment or supplement thereto. Counter–Plaintiffs pray that the Court enter judgment in its favor and against Supreme Lending and Everett on all counts raised in their Counterclaims and described herein awarding Branch Managers the following relief:

(i)     actual, compensatory, consequential, special, incidental, and exemplary damages;

(ii)    a declaratory judgment that (i) any non-solicitation provisions contained in agreements executed by the Branch Managers do not apply to persons who worked in the Branch Managers' region/division of branches at Supreme Lending, or were their corporate underwriters, (ii) as to Supreme Lending employees who

worked in the Branch Managers' divisions and offices, or were their corporate underwriters, any non-solicitation provisions contained in agreements executed by the Branch Managers are unenforceable, inapplicable, and/or were superseded or otherwise rendered ineffective by Supreme Lending's conduct and/or later agreements (iii) the Branch Managers did not violate any agreements with Supreme Lending or applicable law by soliciting Supreme Lending employees to work for PRMI, to the extent they did so if at all, (iv) the Branch Managers' client and potential customer lists are not confidential or proprietary information of Supreme Lending, including the information they saved into Media Center while at Supreme Lending.

(iii)   reasonable attorneys' fees and costs of court;

(iv)   prejudgment and post judgment at the maximum rate permitted by applicable law;

(v)   such other and further relief, whether at law or equity, general or specific, to which the Branch Managers may otherwise be justly entitled.

Respectfully submitted,

*s/ Robert Blackwell*
Robert Blackwell
Texas Bar No. 24001744
BLACKWELL, BLACKBURN
  & STEPHENSON, LLP
7557 Rambler Road, Suite 1400
Dallas, TX 75231
Telephone:  (214) 442-9602
Facsimile:  (214) 442-9621
Email:  bblackwell@bbsllp.com
ATTORNEY FOR
DEFENDANTS/COUNTER–PLAINTIFFS
BARRY G. JONES, JAMES DURHAM, AND
SHANNON FORTNER

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2014, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic filing system of the court.  The electronic filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept the Notice of Electronic Filing as service of this document by electronic means:

Mikel J. Bowers                          Richard S. Krumholz
Kristopher D. Hill                       Matt Durfee
Bell Nunnally & Martin LLP               Stephen L. Myers
1400 One McKinney Plaza                  FULBRIGHT & JAWORSKI, LLP
3232 McKinney Ave.                       2200 Ross Avenue, Suite 2800
Dallas, TX 75204-2429                    Dallas, TX  75201-2784


_s/ Robert Blackwell_
Robert Blackwell