## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| EVERETT FINANCIAL, INC. d/b/a SUPREME LENDING | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:14-cv-01028-D |
| PRIMARY RESIDENTIAL MORTGAGE, INC.; BARRY G. JONES, individually; JAMES DURHAM, individually; and SHANNON FORTNER, individually, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF'S THIRD AMENDED COMPLAINT

Plaintiff Everett Financial, Inc. d/b/a Supreme Lending ("Supreme Lending") hereby complains of Defendants Primary Residential Mortgage, Inc. ("PRMI"), Barry Jones, James Durham, and Shannon Fortner.[1]

### PRELIMINARY STATEMENT

Supreme Lending is a leading mortgage banker and broker with branches throughout the country. The lifeblood of Supreme Lending's success is the confidential and proprietary information it compiles to ensure its employees are equipped to provide prospective borrowers with options to meet their particular home-financing needs. PRMI, a competitor of Supreme Lending, solicited and conspired with then-employees of Supreme Lending (the Branch Managers) to plot and execute a raid on Supreme Lending that resulted in the following wrongful acts, among others:

---

[1] "Defendants" refers to Defendants PRMI, Jones, Durham, and Fortner, collectively. "Branch Managers" refers to Defendants Jones, Durham, and Fortner, collectively.

- targeted solicitation of Supreme Lending's entire southeast region leading to a mass exodus of nearly 100 employees — many of whom are bound by non-solicitation and confidentiality agreements;

- theft of Supreme Lending's confidential and proprietary customer property;

- wrongful solicitation of Supreme Lending's customers;

- diversion of scores of loans in process and other business opportunities;

- PRMI holding Supreme Lending's office equipment and furniture hostage; and

- PRMI's ongoing, persistent disparagement of Supreme Lending to Supreme Lending's employees, clients, and business partners.

As a direct consequence of the Defendants' wrongful acts, Supreme Lending has suffered significant damages, including, without limitation, a precipitous drop in profits and market share and a severe detrimental impact to its cornerstone assets — its goodwill and employee morale. Accordingly, Supreme Lending seeks redress for the significant and ongoing harm caused by Defendants' wrongful conduct as set forth in detail below.

## PARTIES

1.      Plaintiff Everett Financial, Inc. d/b/a Supreme Lending is a Texas corporation with its principal place of business in Dallas, Texas.

2.      Defendant PRMI is a Nevada corporation with its principal place of business in Salt Lake City, Utah.  PRMI is, and at all relevant times was, registered to do business in the State of Texas.   PRMI was served in this action through its Texas registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas  75201-3136.

3.      Defendant Jones is an Alabama citizen whose domicile address is 1655 Covington Ridge, Auburn, Alabama 36830.  Counsel for Jones accepted service of process on behalf of Jones in this action.  *See* Waiver of Service of Summons (filed 04/04/14) [Docket No. 5].

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                             **PAGE 2**

4.      Defendant Durham is an Alabama citizen whose domicile address is 3226 Hamilton Road, Opelika, Alabama 36830.  Counsel for Durham accepted service of process on behalf of Durham in this action.  *See* Waiver of Service of Summons (filed 04/04/14).

5.      Defendant Fortner is an Alabama citizen whose domicile address is 8725 Pleasant Grove Road, Albertville, Alabama 35950.  Counsel for Fortner accepted service of process on behalf of Fortner in this action.  *See* Waiver of Service of Summons (filed 04/04/14).

### JURISDICTION AND VENUE

6.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and this action is between a citizen of the State of Texas on the one hand, and citizens of foreign states on the other.

7.      Venue is proper in the United States District Court for the Northern District of Texas, Dallas Division under 28 U.S.C. § 1391(b)(3), because there is no district in which an action may otherwise be brought in accordance; also, all Defendants are subject to the exercise of personal jurisdiction by this Court with respect to the subject matter of this lawsuit. Furthermore, under the forum selection clauses contained in several contracts underlying this litigation, venue lies in courts situated in Dallas, Texas.

8.      This Court has personal jurisdiction over Jones because he conducts business in the State of Texas.  Specifically, Jones entered multiple contracts with Supreme Lending—a Texas company — pursuant to which Jones undertook duties or obligations that were to be performed, in whole or in part, in Dallas, Texas.  Furthermore, under a Confidentiality, Inventions, and Non-Solicitation Agreement between Jones and Supreme Lending that forms, in part, the basis of this lawsuit, Jones expressly consented to the exercise of personal jurisdiction

of Texas courts, including the United States District Court for the Northern District of Texas, Dallas Division.

9.    This Court has personal jurisdiction over Durham because he conducts business in the State of Texas. Specifically, Durham entered multiple contracts with Supreme Lending—a Texas company — pursuant to which Durham undertook duties or obligations that were to be performed, in whole or in part, in Dallas, Texas. Furthermore, under a Confidentiality, Inventions, and Non-Solicitation Agreement between Durham and Supreme Lending that form, in part, the basis of this lawsuit, Durham expressly consented to the exercise of personal jurisdiction of Texas courts, including the United States District Court for the Northern District of Texas, Dallas Division.

10.    This Court has personal jurisdiction over Fortner because he conducts business in the State of Texas. Specifically, Fortner entered multiple contracts with Supreme Lending — a Texas company — pursuant to which Fortner undertook duties or obligations that were to be performed, in whole or in part, in Dallas, Texas. Furthermore, under a Confidentiality, Inventions, and Non-Solicitation Agreement between Fortner and Supreme Lending that form, in part, the basis of this lawsuit, Fortner expressly consented to the exercise of personal jurisdiction of Texas courts, including the United States District Court for the Northern District of Texas, Dallas Division.

11.    This Court has personal jurisdiction over PRMI because it is licensed and registered to, and does conduct, business in the State of Texas. Specifically, PRMI maintains numerous branch offices in the State of Texas, including maintaining at least five branch offices in the Dallas/Fort Worth area alone.

## FACTUAL BACKGROUND

**A.     Supreme Lending is a Market Leader in the Mortgage Banking Industry.**

12.     Supreme Lending is a domestic, closely-held company that focuses on originating and refinancing residential mortgage loans for qualified home-buyers.

13.     Established in Dallas, Texas in 1999, Supreme Lending has enjoyed consistent growth throughout its corporate life.  To date, Supreme Lending maintains close to 120 branch offices throughout the country in all fifty states and the District of Columbia.  Supreme Lending's branches are managed by branch managers; however, the branches, branch managers, and branch employees all fall under the umbrella of Supreme Lending and report to Supreme Lending's corporate officers, in Dallas, Texas.  Supreme Lending's satellite branches are not distinct subsidiary entities.  Supreme Lending protects its employee relationships through various agreements containing, *inter alia*, non-solicitation, non-competition, and confidentiality provisions.

14.     Supreme Lending is highly regarded in the mortgage banking industry as a result of its reputation for superior commitment to customer service and its employees.  For example, Supreme Lending received the highly-coveted "Best Places to Work" designation by both the Dallas Business Journal and the Atlanta Business Chronicle in 2013.  Supreme Lending's success is fueled by its "customer for life" principle of doing business.  Indeed, the majority of Supreme Lending's business is derived from referrals from previous customers and local real estate professionals.

15.     Supreme Lending further distances itself from its competitors by using state-of-the-art technology that combines the use of the Internet, advanced processing software, and

automated underwriting systems to close loans more quickly and at a lower cost than its competitors.

**B.    The Branch Manager Agreements.**

16.    In connection with their employment at Supreme Lending, the Branch Managers entered multiple  written employment agreements with Supreme Lending that established terms and conditions of their employment as branch managers and specifically, among other things:

- prohibited the Branch Managers from diverting loans originated with Supreme Lending;

- governed the Branch Managers' use of Supreme Lending's proprietary and trade secret information;

- bound the Branch Managers to safeguard Supreme Lending's confidential property; and

- established the terms of the Branch Managers' compensation.

17.    On or about January 13, 2014, Jones signed a "Producing Branch Manager Agreement" (the "Jones BM Agreement") pursuant to which he agreed to serve as a producing branch manager for Supreme Lending subject to the terms and conditions of the Jones BM Agreement.[2]

18.    On or about January 3, 2014, Durham signed a "Producing Branch Manger Agreement" (the "Durham BM Agreement") pursuant to which he agreed to serve as a producing branch manager for Supreme Lending subject to the terms and conditions of the Jones BM Agreement.[3]

---

[2] A true and correct copy of the Jones BM Agreement is attached hereto as Exhibit A and fully incorporated herein by reference.

[3] A true and correct copy of the Durham BM Agreement is attached hereto as Exhibit B and fully incorporated herein by reference.

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                    **PAGE 6**

19.     On or about January 6, 2014, Fortner signed a "Producing Branch Manager Agreement" (the "Fortner BM Agreement") pursuant to which he agreed to serve as a producing branch manager for Supreme Lending subject to the terms and conditions of the Jones BM Agreement.[4]

20.     Collectively, the Branch Managers oversaw and managed Supreme Lending's southeast region.   The Jones BM Agreement, Durham BM Agreement, and Fortner BM Agreement (collectively, the "Branch Manager Agreements")[5] are enforceable contracts that contain the following specific terms and conditions:

> RESTRICTIONS: Employee, during the term of his/her employment, shall not engage in any other real estate or mortgage related business without the prior written approval of Supreme and shall devote his/her time, knowledge, skill, and efforts exclusively to Supreme's operations and affairs. Employee shall not alone, or in concert with others, engage in any pursuit, activity, business or relationship that is, or could be, in competition with Supreme or is adverse to Supreme's or another branch manager's best interest.

> COMPLIANCE WITH LAW: Employee represents that he/she is knowledgeable of all laws and regulations applicable to the services to be performed by Employee in the management of his/her branch and in the origination of residential mortgage loans, and agrees to abide by all such laws and regulations. Employee shall at all times comply with, and shall not cause Supreme to fail to comply with, any and all such laws and regulations. . . .   Employee also recognizes the importance of maintaining the confidentiality of personal information gathered and maintained in the course of his/her employment and agrees to comply with all federal and state privacy laws including, but not limited to, Title V of the federal Gramm-Leach Bliley Act ("GLBA") and the regulations and guidelines there under and other similar state laws. . . .

> CONFIDENTIALITY: Employee agrees that during the term of employment and thereafter, Employee shall not directly or indirectly use, disclose, reveal, make available, or disseminate to any person who is not an authorized employee of Supreme Supreme's Proprietary Information. Proprietary Information includes, but is not limited to: (1) products, services, processes, training, business strategies and philosophies, manuals and reference guides; (2) investor and customer

---

[4] A true and correct copy of the Fortner BM Agreement is attached hereto as Exhibit C and fully incorporated herein by reference.
[5] The term "Branch Manager Agreements" also includes all earlier versions of the agreements signed by the Branch Managers, including those signed in 2013.

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                           **PAGE 7**

information including their identities, needs, preferences, requirements, expectations, financial or personal information, contract terms, rates and pricing structure; (3) marketing data, information, leads, lead generation and marketing plans; (4) pricing, commission and rate information; and (5) any information protected by federal or state privacy laws . . . .

TERMINATION: Employee expressly acknowledges and agrees that all loans . . . originated and contracts obtained by Employee during Employee's employment with Supreme are the sole and exclusive property of Supreme . . . . Upon Employee's termination, such loans and contracts shall remain the sole and exclusive property of Supreme. Without the express written consent of the Supreme, Employee agrees that Employee shall take no action of any type to place or divert such loans originated, and contracts obtained by Employee, to any competitor or away from Supreme. Further, Employee agrees to provide a written account of any and all open leads, business prospects and/or loans in process as of the date of Employee's termination.

***

Employee agrees to promptly return to Company immediately upon request, at any time, and upon termination of employment, all Company property, including office keys, access cards, any electronic or other equipment provided by the Company, documents, files, correspondence and notes, containing or relating to confidential material and/or Propriety Information, including but not limited to information obtained from the customers and prospective customers contacted by Employee or other employees located at Employee's branch, and the loans handled by such persons while Employee was employed by Company, without keeping any copies. Employee shall assist Company in securing all original loan files and copies thereof, as requested by Company.

Similar provisions appeared in Branch Manager Agreements signed by the Branch Managers in 2013. Other Supreme Lending employees, including those that worked under the Branch Managers in the southeast region, entered agreements with Supreme Lending containing similar provisions.

## C.    The Branch Managers Entered Confidentiality and Non-Solicitation Agreements with Supreme Lending.

21.    As a prerequisite to their employment with Supreme Lending, the Branch Managers also entered "Confidentiality, Inventions, and Non-Solicitation Agreements" with Supreme Lending under which they agreed to, among other things, refrain from:

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                                    **PAGE 8**

- disclosing Supreme Lending's highly-sensitive, proprietary, and confidential company and customer data;

- soliciting co-employees; and

- soliciting customers or prospective customers with whom they dealt with at Supreme Lending.

22.    Jones signed his Confidentiality, Inventions, and Non-Solicitation Agreement with Supreme Lending (the "Jones Confidentiality Agreement") on November 21, 2011.[6] Durham signed his Confidentiality, Inventions, and Non-Solicitation Agreement with Supreme Lending  (the "Durham Confidentiality Agreement") on May 17, 2012.[7]   Fortner signed his Confidentiality, Inventions, and Non-Solicitation Agreement with Supreme Lending (the "Fortner Confidentiality Agreement") on November 21, 2011.[8]

23.    The Jones Confidentiality Agreement, Durham Confidentiality Agreement, and Fortner Confidentiality Agreement (collectively, the "Confidentiality Agreements") are valid, enforceable contracts that contain the following specific confidentiality covenants, among others:

> Employee recognizes and acknowledges that he or she will have access to confidential information of Employer ("Confidential Information"), including, without limitation, customer information, lists of suppliers and costs, information regarding proposals, designs, concepts, sales figures and other information concerning the business and operations of Employer and other proprietary data or information, that is valuable, special and a unique asset of Employer.  In addition, Employee will have access to similar Confidential Information of Employer's customers. Employee agrees not to disclose such Confidential Information, except as may be necessary in the performance of his or her duties, to any person, firm, corporation, association or entity, nor use such Confidential Information in any way, either during the term of his or her employment or at any time thereafter, until he or she has received the written consent of Employer or until such Confidential Information becomes public knowledge through no wrongful act of

---

[6] A true and correct copy of the Jones Confidentiality Agreement is attached hereto as Exhibit D and fully incorporated herein by reference.

[7] A true and correct copy of the Durham Confidentiality Agreement is attached hereto as Exhibit E and fully incorporated herein by reference.

[8] A true and correct copy of the Fortner Confidentiality Agreement is attached hereto as Exhibit F and fully incorporated herein by reference.

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                                    **PAGE 9**

Employee. Employee shall take such protective measures as are reasonably necessary to preserve the confidentiality of such Confidential Information, and exercise his or her best efforts to prevent unauthorized parties from gaining access thereto.

Employee understands and agrees that any . . . materials containing any Confidential Information, whether furnished to Employee by Employer or Employer's customers or prepared by Employee in connection with his or her employment, is and shall remain the sole property of Employer (or the customer, as the case may be) and is subject to the obligations of confidentiality and non-use set forth herein, and shall be promptly delivered to Employer upon its request, or upon the termination of employment, together with any and all copies thereof.

The Confidentiality Agreements also contain the following specific non-solicitation covenants:

(a)    **Associations with Co-Workers.** Employee agrees that during his or her employment and for two (2) years following the termination of his or her employment for any reason, neither he or she nor his or her affiliates will . . . employ or solicit or attempt to employ or solicit for any employment any of Employer's current employees. Employee and his or her affiliates will not, either directly or indirectly or by acting in concert with others, seek to induce or influence any employee to leave Employer's employment.

(b)    **Solicitation of Customers.** Employee agrees that during his or her retention and for two (2) years following the termination of his or her employment for any reason, neither he, she nor his or her affiliates will, by himself or herself or by acting in concert with others, solicit any of Employer's customers or prospective customers existing as of the date of termination that Employee directly serviced, was assigned to, or was responsible for during the twelve (12) month period immediately preceding termination of Employee's employment with Employer. Employee further agrees not to take any other action to divert business from Employer or influence any vendor, supplier, customer or potential customer of Employer to cease doing business with Employer.

Employees working under the Branch Managers in the southeast region had agreements with Supreme Lending containing similar provisions.

24.    During the lawsuit, Fortner claimed that he crossed out the non-solicitation covenants in his Confidentiality Agreements. Supreme Lending did not consent to Fortner's attempt to modify the agreement and Fortner continued working with Supreme Lending.

**D.    Supreme Lending Entrusts the Branch Managers with Access to Its Confidential and Proprietary Information and Business Methods.**

25.    In reliance on the Branch Managers' contractual commitments, Supreme Lending provided the Branch Managers with access to its Confidential Information, perhaps its most valuable asset.  By way of example, but without limitation, Supreme Lending provided the Branch Managers with the following types of Confidential Information and proprietary technology and data:

- access to, and information concerning, Supreme Lending's proprietary software platform — Supreme Accounting Made Easy;

- information and data concerning current and prospective borrowers/clients;

- financial reports and profit & loss statements;

- customer surveys and data and marketing materials compiled from the same;

- marketing materials;

- vendor lists;

- employee lists and related human resource information;

- marketing services agreements and related information concerning Supreme Lending's negotiations and dealings with real estate professionals and contacts;

- databases containing listings of Supreme Lending's loan applications and related confidential customer information;

- confidential lease, contract, and agreement terms; and

- highly-sensitive information concerning Supreme Lending's pricing, expenses, approval system, and lending policies and procedures.

Supreme Lending compiles its Confidential Information and proprietary data at great expense. Training managers and staff to analyze the information and utilize it in conjunction with Supreme Lending's technology systems also comes at great cost to Supreme Lending.  Armed

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                    **PAGE 11**

with unfettered access to Supreme Lending's proven blueprint for success in the mortgage banking industry, the Branch Managers had all the tools necessary to meet and exceed their performance goals and objectives for Supreme Lending.

**E.    PRMI Conspires with the Branch Managers to Raid and Takeover Supreme Lending's Southeast Region.**

26.    In or around early October 2013, PRMI embarked upon an aggressive and covert plan to poach the Branch Managers and raid Supreme Lending of its southeast region offices, staff, customers, and loan volume. From the outset, PRMI's intent was to use the Branch Managers to takeover Supreme Lending's entire southeast region.

27.    On information and belief, at all times during PRMI's recruitment of the Branch Managers, PRMI had specific knowledge of the Branch Manager's and all the other solicited employees' confidentiality and non-solicitation obligations to Supreme Lending or should have known. At the inception of the solicitation process, PRMI's then Director of Business Development & Implementation, Charles D. Edington, provided and signed a non-disclosure agreement for the negotiations with the Branch Managers.

28.    Of the many examples of Defendants' disregard of the Branch Manager's confidentiality obligations to Supreme Lending, PRMI requested Jones to provide pro forma(s) he had built so PRMI could "accurately depict what [the Branch Manager's] business looks like on [PRMI's] platform" and built and exchanged pro formas with the Branch Managers that were anchored off of Supreme Lending's confidential and proprietary information.

29.    Furthermore, while the Branch Managers were still employed by Supreme Lending, PRMI flew the Branch Managers to PRMI's corporate headquarters for what it refers to as a "Discovery Day."

30.    Tellingly, PRMI attempted to recruit the Branch Managers in secret by only exchanging e-mails with the Branch Managers through their personal e-mail accounts.  However, while planning the Branch Managers' November 2013 trip to visit PRMI's corporate headquarters, PRMI realized an e-mail had slipped through the cracks to a Supreme Lending e-mail account.  PRMI's Business Development Manager, Kenneth Deen, addressed the situation by e-mailing Jones and Durham' via their personal e-mail accounts to tell them the e-mail "*accidentally*" went to a Supreme Lending e-mail account.

31.    PRMI had its sights set on not only recruiting the Branch Managers, but also all of Supreme Lending's employees in the southeast region.  PRMI flew Ted Bryant, business development manager for the southeast region, to their headquarters to meet with PRMI's staff to discuss business development opportunities, marketing, and transitioning key employees.  PRMI also had numerous communications with the Branch Managers about their plans for bringing over certain key employees and the transition needs that the region would need once all the employees were transitioned to PRMI.  PRMI also provided human resources support to the employees looking to transfer.

32.    The Branch Managers made their decision to join PRMI, but decided to keep their impending departure secret from Supreme Lending to allow them more time to solicit the rest of the southeast region.  The Branch Managers — with PRMI's knowledge and support — began meeting with key employees in the southeast region to obtain their commitment to PRMI. During the days and weeks leading up to January 31, 2014, the Branch Managers systematically and secretly attempted to solicit the entire southeast region to resign from Supreme Lending and join PRMI.  The Branch Managers recruited key Supreme Lending employees to do their bidding

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                                      **PAGE 13**

for them by recruiting the employees beneath them.  All of the Branch Managers' actions were conducted with PRMI's full awareness and support.

33.    The Branch Managers went so far as to secretly orchestrate Supreme Lending's employees to resign *en masse* at a specific date and time.  During this time, the Branch Managers repeatedly expressed that they were driven by personal animosity and hatred towards Supreme Lending's officers and possessed intentional desire to harm Supreme Lending.

34.    After months of planning, on January 31, 2014, without notice, the Branch Managers informed Supreme Lending's President, Scott Everett, over the phone that they were resigning from Supreme Lending to join PRMI.  During the call, in accordance with their carefully orchestrated plan, dozens of Supreme Lending employees transmitted their letters of resignation.

35.    In addition to announcing their resignations to Everett over the phone on January 31, 2014, Fortner, Jones, and Durham submitted formal written resignation letters on January 31, 2014, February 3, 2014, and February 5, 2014, respectively.

36.    Upon their resignations, the Branch Managers immediately began (officially) working for PRMI.  However, the Branch Managers had been unofficially working for PRMI long in advance of their resignations. Indeed, prior to the Branch Managers' resignations, the Branch Managers — with PRMI's support — coerced Supreme Lending's employees to follow the Branch Managers to PRMI by disparaging, and perpetrating lies about, Supreme Lending. Specifically, Defendants attempted to lure Supreme Lending's employees to join PRMI through the following deceitful and/or unlawful means, among others:

- falsely representing to existing Supreme Lending employees that they would be terminated by Supreme Lending following the Branch Managers' defection;

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                **PAGE 14**

- falsely representing to current Supreme Lending employees that their only hope of having a job would be to follow the Branch Managers to PRMI;

- coercing Supreme Lending employees to join PRMI by falsely stating words to the effect of, "if you don't join us at PRMI, Supreme Lending doesn't want you;"

- coercing Supreme Lending employees to go to PRMI by derogatorily stating Supreme Lending's president is "greedy" and "lining his pockets," among other things;

- secretly recording phone calls with Supreme Lending executives to bait them into making statements that could be used to lure other employees to join PRMI;

- working hand-in-hand with Supreme Lending employees who had already committed to join PRMI to recruit Supreme Lending's underwriters;

- falsely representing that Supreme Lending was going out of business and/or closing its doors in the coming months;

- falsely representing that Supreme Lending had gone bankrupt;

- falsely representing that Supreme Lending had merged and/or would be merging with PRMI; and

- threatening to call the police on Supreme Lending employees who were perceived to interfere with Defendants' attempts to take the whole region to PRMI.

The Branch Managers also encouraged Supreme Lending employees to solicit other employees that worked in their respective branches or with whom they had relationships. The Branch Managers did so with full knowledge that those employees had non-solicitation provisions in their agreements with Supreme Lending.

37.    PRMI's extensive efforts to plan and execute the raid on Supreme Lending paid off, as a mass exodus of Supreme Lending's southeast workforce took place in late January and early February 2014. When the dust settled, approximately 95 Supreme Lending employees terminated their business relationships with Supreme Lending and aligned with PRMI and significantly more were solicited and/or disrupted by the raid. As a result of the raid, PRMI

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                   **PAGE 15**

hostily took over Supreme Lending's branches in Huntsville, Auburn, Madison, Montgomery, Vestavia Hills, Guntersville, Enterprise, Dothan, Florence, Millbrook, and Alexander City, Alabama, Hinesville Georgia, and Memphis Tennessee (collectively, the "Southeast Offices"). Supreme Lending's operations in the southeast were left as a mere shell.  Most of the solicited employees were contacted while the Branch Managers were still employed by Supreme Lending. PRMI knew that the Branch Managers were soliciting employees in violation of their agreements, while they still worked for Supreme Lending.  PRMI provided material support and encouragement to the Branch Manager's attempts to solicit the employees and made the successful solicitation of a substantial portion of the employees a condition of the deal for the Branch Managers to join PRMI.

**F.    Defendants Conspire to Misappropriate Supreme Lending's Confidential Information and Divert Supreme Lending's Business to PRMI.**

38.     PRMI's raid coupled with the Branch Mangers' disregard of their contractual and fiduciary obligations took, and continues to take, a severe toll on Supreme Lending.  The damages were significant and continue to have a rippling effect throughout Supreme Lending's entire organization as it attempts to begin to rebuild its southeast region.

*(i)    Defendants misappropriate Supreme Lending's confidential and proprietary information.*

39.     On information and belief, prior to and after the mass exodus, the Branch Managers, on PRMI's behalf, misappropriated Supreme Lending's confidential and proprietary information to strengthen the loan origination numbers at PRMI.  As discussed above, by virtue of their positions as producing branch managers at Supreme Lending, the Branch Managers had direct access to Supreme Lending's most valuable assets — its confidential and proprietary information, data, and software, including access to Supreme Lending's databases containing

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                          **PAGE 16**

detailed listings of all loan applications submitted to Supreme Lending contained in Supreme Lending's loan-origination software system.

40.    To vet the Branch Managers' business capabilities and facilitate their transition to PRMI, PRMI requested, and the Branch Managers improperly retained and supplied PRMI with, Supreme Lending's financial, loan and borrower, human resource, lease, and marketing information and even shared and tested pending business opportunities of Supreme Lending with PRMI to determine whether PRMI would be able to capitalize on the deal.

41.    The Branch Managers and other former Supreme Lending employees who joined PRMI even continued to use Supreme Lending's confidential and proprietary information and documents months after they resigned from Supreme Lending to close loans for their new employer, PRMI.

>    ***(ii)    Supreme Lending's Production Plummets As a Result of the Defendants' Misconduct.***

42.    Supreme Lending began suffering concrete losses as a result of the Defendants' actions well in advance of the mass exodus of Supreme Lending's southeast region.  Indeed, throughout the last quarter of 2013 — while PRMI solicited the Branch Managers and the Branch Managers had one foot out the door — Supreme Lending's loan volume and revenues dropped precipitously in comparison to its historical track record.  Supreme Lending's internal records also reveal a jarringly-high number of withdrawn loan applications submitted to its southeast regional branches immediately preceding the mass exodus to PRMI without explanation.  This amount of withdrawn loans was atypically high based on this Supreme Lending's normal output for these months.  Many of the loans were already approved, and others were cleared to close, prior to being withdrawn.  To be sure, the incentive was high for the Branch Managers and other defecting loan officers to stall and/or divert Supreme Lending's

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                    **PAGE 17**

pending loan applications while they strategized and implemented their plan to join forces with PRMI.

### (iii)    *Defendants tortiously interfere with Supreme Lending's Marketing Services Agreements.*

43.    Supreme Lending generates significant business opportunities through strategic relationships with local real estate professionals.  Typically, Supreme Lending formalizes these relationships by entering marketing service agreements ("MSAs").  MSAs provide a means for real estate professionals to provide their clients with exposure to preferred lenders (like Supreme Lending), thus creating a mutually-beneficial relationship that provides brand exposure for the lender and edification for the prospective home-buyer.  Supreme Lending has numerous MSAs with real estate professionals serving areas that overlap with the southeast region's territory.

44.    To further its foothold in the southeast region, the Branch Managers, on PRMI's behalf, disseminated misrepresentations to local real estate professionals that Supreme Lending went out of business, was bankrupt, and/or had merged into PRMI.  These disparaging fallacies were intended to, and did, injure Supreme Lending's relationships, hard-earned goodwill, and business.

### (iv)    *PRMI Misappropriates Supreme Lending's Internet Presence.*

45.    Supreme Lending markets its services, employees, and culture by maintaining an online presence through Facebook web profiles and branch-specific websites.  Supreme Lending's Internet presence benefits its success in the market.  Accordingly, Supreme Lending expends significant resources developing its websites and designing, maintaining, and interacting with clients and potential clients via Facebook.  In today's business climate, garnering "likes" on Facebook and visits to a company website creates a marketing and advertising buzz that can have an exponential impact.

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                          **PAGE 18**

46.     Defendants misappropriated Supreme Lending's Facebook pages and websites, which created the misimpression with the public that Supreme Lending is the source of, or related to, PRMI's business dealings.  Because PRMI's newly-formed offices in the southeast region used Supreme Lending web pages without change of content, it appears that PRMI misappropriated the sites for the purpose of diverting potential borrowers from Supreme Lending to PRMI.  These actions constitute exploitation of Supreme Lending's goodwill for the purpose of deriving a commercial benefit.  The natural and probable consequence of PRMI's conduct has been, and will continue to be, that the public, potential borrowers, and referral sources are likely to be confused, misled, and deceived by PRMI's representations that it is somehow the product of a merger with Supreme Lending or that it has taken over for Supreme Lending.  Indeed, a potential client may mistakenly have believed that a loan from PRMI would be a loan made by Supreme Lending or its successor.

**G.     Supreme Lending Attempts to Stop the Bleeding.**

47.     PRMI's raid on Supreme Lending came as a result of months of planning and conspiring, both internally and with the Branch Managers.  PRMI did not limit its raid to pilfering Supreme Lending's employees and branches; rather, PRMI  took the next step to make its takeover complete by seeking to assume the leases to Supreme Lending's commercial properties so that its new employees could continue doing business in the same locations.  To mitigate its substantial damages and stop the bleeding caused by PRMI's raid and the Branch Managers' breaches of their duties, Supreme Lending agreed to assign its southeast region office leases to PRMI, including the assignment of its office lease in Auburn, Alabama (the "Auburn Assignment").

48.     Initially, the process of assigning the various office leases for the southeast region went smoothly.  However, Supreme Lending's Auburn, Alabama lease (the "Auburn Lease") contained a no-assignment clause for the benefit of the property owner.  Despite this clause, the property owner agreed to work with Supreme Lending and PRMI to facilitate the transition on the condition that PRMI provide financial statements to the property owner so that it could evaluate PRMI's financial ability to assume the commitment.  During the course of discussing the assignment, the property owner provided PRMI with a proposed extension of the lease, but by no means ever informed PRMI that the assignment was contingent upon extending the lease.  PRMI completely failed and refused to ever provide the property owner with financial statements necessary to consummate the assignment.

49.     Subsequently, PRMI refused to honor the Auburn Assignment by falsely claiming Supreme Lending had frustrated the assignment and lease opportunity.  In fact, any frustration was a direct result of PRMI's own refusal to provide necessary financial statements and work with the property owner.  All the while, in June 2013, during his tenure with Supreme Lending, Jones negotiated a separate lease in Auburn, Alabama — purportedly for Supreme Lending's benefit — with a business referral source and moved PRMI's new Auburn staff of former Supreme Lending employees into the lease after the exodus.  On information and belief, PRMI drug its feet concerning the negotiations of the Auburn Assignment and ultimately refused to honor its agreement with Supreme Lending because it was holding the separate lease agreement with Jones' referral source in its back pocket and to further harm Supreme Lending.

**H.    PRMI Continues Its Oppressive Conduct by Holding Supreme Lending's Office Equipment and Furniture Hostage.**

50.     Due to the suddenness of PRMI's raid, Supreme Lending was unable to secure its office equipment and furniture in advance of PRMI's hostile takeover.  Thus, upon PRMI's

assumption of the Southeast Branch offices, PRMI possessed and controlled more than approximately $250,000 of Supreme Lending's office furniture, files, computers, routers, VOIP phones, and a variety of other office equipment and furniture.

51.    PRMI initially agreed to allow Supreme Lending to reacquire certain office equipment such as phones, routers, PCs, and laptops and entered negotiations to purchase Supreme Lending's remaining office furniture.  It soon became apparent that PRMI was only interested in playing games with Supreme Lending and its property to prevent Supreme Lending from using its own property to reemerge in the market.  Indeed, for over a month, PRMI stonewalled Supreme Lending's requests and efforts to reacquire its office furniture and equipment.  In fact, Jones, on behalf of PRMI, threatened to call the police when a Supreme Lending employee attempted to pick up a computer that belongs to Supreme Lending and made multiple disparaging and threatening comments to Supreme Lending concerning its rights to obtain and use its own property.

52.    Because PRMI held Supreme Lending's office equipment and furniture hostage, Supreme Lending's ability to get back on its feet in the southeast region was severely and purposefully thwarted while PRMI continued to unjustly benefit from Supreme Lending's property, offices, and former employees.

**I.      The Damage Done.**

53.    PRMI's raid of Supreme Lending extended to Supreme Lending's human resources, office space, confidential and proprietary information, and valuable business property.  As a direct result of Defendants' wrongful conduct, Supreme Lending has been significantly harmed.  Compounding this damage, Defendants have cast false aspersions into the market and to Supreme Lending's employees and business partners that Supreme Lending is going out of

business, going bankrupt, or merging with PRMI.  PRMI flaunted its raid and takeover by distributing advertising materials with pictures of PRMI's new southeast regional employees (Supreme Lending's former employees), including the Branch Managers, that boldly proclaim, "We are now with Primary Residential Mortgage, Inc."  Clearly banking on Supreme Lending's goodwill and equity in the southeast regional communities, the advertisement represents that PRMI's new employees — i.e., Supreme Lending's former employees — are the "same people," offer the "same service," have "better rates," but simply have a "new name."  Combined with PRMI's false allegations concerning a merger with Supreme Lending, these statements were intended to mislead the marketplace and take advantage of current and prospective customers who are familiar with Supreme Lending.

54.    Accordingly, by this action, Supreme Lending seeks monetary damages as compensation for its resulting losses.

55.    All conditions precedent to Supreme Lending's recovery and Defendants' liability have been performed, have occurred, or have been waived. *See* FED. R. CIV. P. 9(c).

## CAUSES OF ACTION

### COUNT ONE:  BREACH OF CONTRACT—BRANCH MANAGER AGREEMENT
### (Against Jones, Durham, and Fortner)

56.    Supreme Lending incorporates each of the foregoing paragraphs.

57.    The Branch Manager Agreements[9] are valid, enforceable contracts under which Jones, Durham, and/or Fortner contracted with Supreme Lending to manage certain of Supreme Lending's branch offices.

58.    Supreme Lending performed, tendered performance of, or was excused from performing its contractual obligations under the Branch Manager Agreements.

---

[9] The term "Branch Manager Agreements" include all versions of the agreements signed by the Branch Managers with Supreme Lending.

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                              **PAGE 22**

59.    Pursuant to the terms and conditions of the Branch Manger Agreements, Jones, Durham, and Fortner each undertook certain obligations in their individual capacity, including, among others:

- refraining from engaging in any business activity or pursuit that is or could be in competition with Supreme Lending or is adverse to Supreme Lending's or another branch manager's best interest during the term of employment with Supreme Lending (§ 3);

- complying with all state and federal privacy laws, as well as all laws and regulations applicable to origination of residential mortgage loans (§ 4);

- protecting Supreme Lending's confidential and proprietary information (§ 9);

- agreeing that all loans and contracts originated during the term of their employment with Supreme Lending are the sole and exclusive property of Supreme Lending, and that any such loans or contracts will remain the sole and exclusive property of Supreme Lending after termination of the Branch Manager Agreements (§ 13);

- refraining from taking any action to place or divert any loans and contracts to a competitor of Supreme Lending if said loans or contracts originated during the term of their employment with Supreme Lending (§ 13); and

- providing Supreme Lending with a written account of all open leads, business prospects, and/or loans in process at the time of their departure from Supreme Lending. (§ 13).

60.    On information and belief, the Branch Managers materially breached the Branch Manager Agreements by:

- pursuing and/or engaging in business activities in direct competition with or adverse to Supreme Lending during the term of their employment including, without limitation, identifying and diverting loan applications originated during their employment term to PRMI;

- obtaining and disclosing to PRMI Supreme Lending existing and potential customer information, including but not limited to such customers' identities, financial or personal information, contract terms, rates, and/or pricing structure;

- retaining and diverting to PRMI loan applications that originated during the term of their employment with Supreme Lending; and

- failing to provide Supreme Lending with a written account of all open leads, business prospects, and loans in process at the time of their departure from Supreme Lending.

61.    As a direct and proximate result of the Branch Managers' material breaches of the Branch Manager Agreements, Supreme Lending has sustained damages in an amount to be determined at trial.

## COUNT TWO:  BREACH OF CONTRACT—CONFIDENTIALITY AGREEMENTS
### (Against Jones, Durham, and Fortner)

62.    Supreme Lending incorporates each of the foregoing paragraphs.

63.    The Confidentiality Agreements are valid, enforceable contracts by and between the Branch Managers and Supreme Lending.

64.    Supreme Lending performed, tendered performance of, or was excused from performing its contractual obligations under the Confidentiality Agreements.

65.    Pursuant to the terms of the Confidentiality Agreements, the Branch Managers undertook certain obligations in their individual capacity including, among others:

- agreeing not to disclose or use Supreme Lending's confidential and proprietary information except as may be necessary in the performance of their duties while employed at Supreme Lending (§ 1);

- undertaking protective measures reasonably necessary to preserve the confidentiality of Supreme Lending's confidential and proprietary information (§ 1);

- agreeing that files, records, equipment, and documents (*e.g.*, loan applications) are and will remain the sole property of Supreme Lending (§ 1);

- refraining from soliciting or attempting to employ, whether directly or indirectly, any of Supreme Lending's current employees for a period of two years (§ 3(a)); and

- refraining from soliciting any of Supreme Lending's current or prospective customers existing as of the date of the termination of their employment with Supreme Lending for a period of two years (§ 3(b)).

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                    **PAGE 24**

66.    On information and belief, the Branch Managers materially breached the Confidentiality Agreements by:

- disclosing and/or using Supreme Lending's confidential and proprietary information, including loan applications and client information, in furtherance of their business after joining PRMI;

- taking loan applications and client information with them to PRMI that are the sole property of Supreme Lending after termination of their employment with Supreme Lending;

- soliciting and, at times, coercing Supreme Lending's employees to leave Supreme Lending and follow Jones and/or Durham to PRMI; and

- soliciting Supreme Lending's current and prospective customers to leave Supreme Lending and follow them to PRMI.

67.    As a direct and proximate result of the Branch Managers' material breaches of the Confidentiality Agreements, Supreme Lending has sustained damages in an amount to be determined at trial.

## COUNT THREE:  TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS
### (Against All Defendants)

68.    Supreme Lending incorporates each of the foregoing paragraphs.

69.    Supreme Lending had numerous loan applications with consumers which constituted valid, enforceable contracts, as well as MSAs with real estate professionals and employment agreements with numerous employees.

70.    On information and belief, Defendants willfully and intentionally interfered with those contracts by, among other things:

- diverting loan applications submitted by customers to Supreme Lending to PRMI while said applications were being processed by Supreme Lending;

- diverting loan applications submitted by customers to Supreme Lending to PRMI after Supreme Lending had approved the loans;

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                    **PAGE 25**

- diverting loan applications submitted by customers to Supreme Lending to PRMI after Supreme Lending had cleared said loans to be closed by its loan officers;

- soliciting Supreme Lending's employees while still working for Supreme Lending;

- soliciting Supreme Lending's employees to breach their own agreements with Supreme Lending by asking those employees to solicit other Supreme Lending employees; and/or

- inducing those employees to divert opportunities to PRMI or otherwise breach their agreements with Supreme Lending.

71.    Furthermore, PRMI knew or should have known about the existence of the Branch Manager Agreements, Confidentiality Agreements, and similar agreements with other solicited Supreme Lending employees.  PRMI willfully and intentionally interfered with these contracts.  In the alternative, PRMI willfully and intentionally interfered with the Branch Manager Agreements, Confidentiality Agreements, and similar agreements with other solicited Supreme Lending employees by aiding, abetting, encouraging, and facilitating the Branch Managers above-described breaches of contract.

72.    As a direct and proximate result of Defendants' tortious interference, Supreme Lending has sustained damages in an amount to be determined at trial.

73.    Because the tortious acts and conduct of Defendants were intentional, willful, wanton, malicious, and without justification or excuse, Supreme Lending is also entitled to recover exemplary damages from Defendants in an amount to be determined at trial.

**COUNT FOUR:  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**
**(Against All Defendants)**

74.    Supreme Lending incorporates each of the foregoing paragraphs.

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                    **PAGE 26**

75.    Supreme Lending had expectancies and economic opportunities arising out of its relationships with prospective home owners identified and contained in Supreme Lending's confidential and proprietary customer lists.

76.    As a result of said individuals' respective interests in pursuing residential mortgage loan opportunities with Supreme Lending, there was a reasonable probability that Supreme Lending would have entered into business dealings with those parties.

77.    Defendants had knowledge of these specific relationships and opportunities, but nevertheless interfered with them and continue to interfere with them.

78.    Defendants' actions in this regard were done knowingly, intentionally, and maliciously, for the purpose of interfering with Supreme Lending's business expectations and opportunities.

79.    The actions and conduct of Defendants were calculated to, and in fact did, interfere with Supreme Lending's existing and future business relationships and opportunities.

80.    But for Defendants' interference, there was a reasonable probability that Supreme Lending would have entered into contractual relations with numerous prospective homeowners identified and contained in Supreme Lending's confidential and proprietary customer lists.

81.    As a direct and proximate result of Defendants' conduct, Supreme Lending has suffered, and continues to suffer substantial injury, for which Supreme Lending now seeks to recover actual, compensatory, and consequential monetary damages in an amount to be determined at trial.

82.    Because the tortious acts and conduct of Defendants were intentional, willful, wanton, malicious, and without justification or excuse, Supreme Lending is also entitled to recover exemplary damages from Defendants in an amount to be determined at trial.

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                    **PAGE 27**

## COUNT FIVE:  BREACH OF FIDUCIARY DUTY
### (Against Jones, Durham, and Fortner)

83.    Supreme Lending incorporates each of the foregoing paragraphs.

84.    As producing branch managers for Supreme Lending, the Branch Managers owed Supreme Lending fiduciary duties, including duties of loyalty, due care, good faith, candor, and full disclosure.

85.    On information and belief, Jones, Durham, and Fortner breached their fiduciary duties to Supreme Lending by, among other things:

- misappropriating confidential information, property, and opportunities of Supreme Lending for their own benefit and/or the benefit of PRMI;

- intentionally diverting business opportunities for their own benefit and/or the benefit of PRMI;

- acting in competition with Supreme Lending by pursuing business opportunities owned by Supreme Lending;

- conducting such business while employed by Supreme Lending;

- soliciting Supreme Lending employees to work for PRMI;

- soliciting Supreme Lending employees to solicit other Supreme Lending employees to work for PRMI; and

- soliciting Supreme Lending employees to divert corporate opportunities belonging to Supreme Lending to PRMI.

86.    As a direct and proximate result of the Branch Managers' breach of fiduciary duties, Supreme Lending has suffered, and continues to suffer, substantial injury, including a loss of profits from the business opportunities diverted by the Branch Managers for which Supreme Lending now seeks to recover actual, compensatory, and consequential monetary damages in an amount to be determined at trial.

87.    Furthermore, because the Branch Managers breached their fiduciary duties intentionally, willfully, wantonly, maliciously, and without justification or excuse, Supreme

Lending is also entitled to recover exemplary damages from the Branch Managers in an amount to be determined at trial.

## COUNT SIX:  CONVERSION
### (Against All Defendants)

88.    Supreme Lending incorporates each of the foregoing paragraphs.

89.    Supreme Lending owns and/or has the right to possess the trade secret and confidential information belonging to Supreme Lending and/or its clients, including, without limitation, loan applications, current and prospective customer identities and contact information, other personal and financial information, contract terms, rates, and pricing structure, which Supreme Lending has the right and obligation to possess such information on behalf of its clients.

90.    Supreme Lending's trade secrets and other confidential and proprietary information, including the loan applications and customer database information, are the property of Supreme Lending.

91.    Supreme Lending further had a possessory right to its office furniture and equipment that PRMI wrongfully withheld.

92.    On information and belief, Defendants, individually or through its agents and/or employees, wrongfully exercised dominion and/or control over Supreme Lending's trade secrets and other confidential and proprietary information.  Furthermore, on information and belief, Defendants, individually or through its agents and/or employees, have used and continue to use Supreme Lending's confidential information to divert customers from Supreme Lending to PRMI.  Moreover, despite demand, Defendants wrongfully refused to return Supreme Lending's office furniture and equipment in a timely manner

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                   **PAGE 29**

93.    Because of Defendants' conversion, Supreme Lending has suffered harm, and now seeks to recover its actual, compensatory and consequential monetary damages in an amount to be determined at trial.

94.    Furthermore, because Defendants' conversion was committed willfully, maliciously, wantonly, fraudulently, and/or with gross negligence, Supreme Lending also seeks exemplary or punitive damages in an amount to be determined at trial.

### COUNT SEVEN:  MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

95.    Supreme Lending incorporates each of the foregoing paragraphs.

96.    Supreme Lending is, and has been, engaged in efforts to provide superior mortgage origination services to its customers.

97.    Information at issue in this case was not known to Supreme Lending's competitors, was developed at considerable expense, and constitutes valuable trade secrets that give Supreme Lending a competitive advantage over others in the mortgage industry.

98.    The Branch Managers acquired certain trade secrets of Supreme Lending by virtue of their employment relationship with Supreme Lending.  PRMI obtained certain trade secrets of Supreme Lending pursuant to their business relationship with the Branch Managers.

99.    As Producing Branch Managers at Supreme Lending, Jones, Durham, and Fortner had a duty not to disclose such trade secrets to third parties, such as PRMI, absent Supreme Lending's express permission.  PRMI knew that the Branch Managers were prohibited from misappropriating Supreme Lending's trade secrets and confidential information.

100.    On information and belief, Defendants, however, in violation of confidential, contractual, and fiduciary relationships with Supreme Lending, and/or through other unfair means, have intentionally and wrongfully used and/or disclosed Supreme Lending's trade secrets

for their own gain.  Specifically, on information and belief, PRMI misappropriated Supreme Lending's trade secrets for the purpose of using them to compete with Supreme Lending, and to tortiously interfere with Supreme Lending's contracts, business opportunities, and prospective business relationships.

101.    Because of Defendants' actions, Supreme Lending has suffered harm, and now seeks to recover its actual, compensatory and consequential monetary damages in an amount to be determined at trial.

102.    Because Defendants' misappropriation of Supreme Lending's trade secrets have been done willfully, maliciously, fraudulently, and with gross negligence, Supreme Lending also seeks exemplary or punitive damages in an amount to be determined at trial.

**COUNT EIGHT:  UNFAIR COMPETITION**
**(Against All Defendants)**

103.    Supreme Lending incorporates each of the foregoing paragraphs.

104.    Supreme Lending created its relationships, reputation, goodwill, loan pipeline, and other proprietary information through extensive time, labor, skill, and money.  Defendants gained an advantage by acquiring Supreme Lending's relationships, reputation, goodwill, loan pipeline, and other proprietary information.  PRMI, in particular, was able to take over Supreme Lending's entire southeast region and take full advantage of all of the infrastructure, relationships, reputation, goodwill, loan pipeline, and other proprietary information without spending the necessary expense to acquire it.  Instead, PRMI utilized Supreme Lending's confidential and proprietary information and sent out marketing materials claiming that Supreme Lending changed its name to PRMI in the southeast region.

105.    Because of Defendants' actions, Supreme Lending has suffered commercial damage and harm, and now seeks to recover its actual, compensatory and consequential monetary damages in an amount to be determined at trial.

106.    Because Defendants' unfair competition has been done willfully, maliciously, fraudulently, and with gross negligence, Supreme Lending also seeks exemplary or punitive damages in an amount to be determined at trial.

### COUNT NINE:  BREACH OF CONTRACT—LEASE ASSIGNMENT
### (Against PRMI)

107.    Supreme Lending incorporates each of the foregoing paragraphs.

108.    The Auburn Lease Assignment is a valid, enforceable contract by and between Supreme Lending and PRMI.

109.    Supreme Lending performed, tendered performance of, or was excused from performing its contractual obligations under the Auburn Lease Assignment.

110.    PRMI failed and refused to assume the Auburn Lease as obligated under the Auburn Lease Assignment and, therefore, breached that contract.

111.    As a direct and proximate result of PRMI's material breach of the Auburn Lease Assignment, Supreme Lending has sustained damages in an amount to be determined at trial.

### COUNT TEN:  PROMISSORY ESTOPPEL
### (Against PRMI)

112.    Supreme Lending incorporates each of the foregoing paragraphs.

113.    PRMI made a promise to Supreme Lending that it would assume the rights and obligations of the Auburn Lease.

114.    Supreme Lending reasonably and substantially relied on PRMI's promise to assume the rights and obligations of the Auburn Lease.  Supreme Lending's reliance on PRMI's promise to assume the Auburn Lease was to Supreme Lending's detriment.

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                    **PAGE 32**

115.     Injustice can only be avoided by enforcing PRMI's promise to assume the Auburn Lease and, therefore, PRMI should be estopped from refusing to accept the assignment of the Auburn Lease.

## COUNT ELEVEN:  UNJUST ENRICHMENT
### (Against PRMI)

116.     Supreme Lending each of the foregoing paragraphs.

117.     Defendants have wrongly secured and/or passively received benefits from Supreme Lending that would be unconscionable to retain.   Specifically, Defendants misappropriation of Supreme Lending's confidential information, as well as the diversion of loan applications from Supreme Lending to PRMI, has unjustly enriched Defendants.

118.     Accordingly, Supreme Lending seeks disgorgement of the ill-gotten gains that Defendants obtained as a result of their breaches of contract, fiduciary duties, and/or misappropriation of Supreme Lending's trade secrets.

## COUNT TWELVE:  CONSPIRACY
### (Against All Defendants)

119.     Supreme Lending incorporates each of the foregoing paragraphs.

120.     Defendants conspired to conduct a raid of Supreme Lending employees and customers and to deprive Supreme Lending of the benefit of confidential information, trade secrets, and proprietary information Supreme Lending developed at considerable expense.

121.     Defendants have, either in concert with one another, or individually, agreed to solicit Supreme Lending employees in violation of their contractual obligations to Supreme Lending for the purpose of diverting the benefits of Supreme Lending's time, expense and effort for Defendants.  On information and belief, each of the co-conspirators agreed to a course of conduct whereby together they would appropriate Supreme Lending's confidential information, trade secrets, and business opportunities for the benefit of PRMI and each of the individuals

**SUPREME LENDING'S 3RD AMENDED COMPLAINT**                                    **PAGE 33**

involved.  On information and belief, Defendants also agreed to, and did, deprive Supreme Lending of the benefit of the agreements it had with employees, business partners, and customers.

122.    As a proximate result of this conspiracy, Supreme Lending has suffered, and will continue to suffer, injuries and will continue to suffer substantial and irreparable harm. Defendants' actions were done intentionally, knowingly, and maliciously, entitling Supreme Lending to exemplary damages.

## COUNT THIRTEEN: AIDING AND ABETTING
### (Against All Defendants)

123.    Supreme Lending incorporates each of the foregoing paragraphs.

124.    As described herein and above, the Branch Managers committed torts against Supreme Lending, including, but not limited to, breach of fiduciary duty, conversion, misappropriation of trade secrets, and tortious interference with existing contracts and prospective business relations.  PRMI knew that the Branch Managers' conduct was tortious, intended to assist the Branch Managers in committing such torts, and gave the Branch Mangers assistance or encouragement in committing such torts.  PRMI's assistance, encouragement, aiding, and abetting was a substantial factor in the commission and causation of said tortious conduct.

125.    In addition, other Supreme Lending employees who left for PRMI committed torts against Supreme Lending, including, but not limited to, breaches of fiduciary duty, conversions, misappropriations of trade secrets, and tortuous interferences with existing contracts and prospective business relations.  The Branch Managers had knowledge that the employees' conduct was tortuous, intended to assist the employees in committing such torts, and gave the employees assistance or encouragement in committing such torts.  The Branch Managers'

assistance, encouragement, aiding, and abetting was a substantial factor in the commission and causation of said tortuous conduct.

126.    As a proximate result of Defendants' aiding and abetting, Supreme Lending has suffered, and will continue to suffer, injuries and will continue to suffer substantial and irreparable harm.  Defendants' actions were done intentionally, knowingly, and maliciously, entitling Supreme Lending to exemplary damages.

## COUNT FOURTEEN: EXEMPLARY DAMAGES
### (Against All Defendants)

127.    Supreme Lending incorporates each of the foregoing paragraphs.

128.    Defendants committed the tortious actions described herein and above with malice, gross negligence, and/or fraud, as those terms are defined by Chapter 41 of the Texas Civil Practice and Remedies Code.  Therefore, Supreme Lending is entitled to, and requests, an award of exemplary damages in an amount the trier of fact finds sufficient.

## REQUEST FOR ATTORNEYS' FEES

129.    Supreme Lending incorporates each of the foregoing paragraphs.

130.    Pursuant to Sections 38.001 and 134.001, *et seq*. of the Texas Civil Practice and Remedies Code, the Branch Manager Agreements, and the Confidentiality Agreements, Supreme Lending is entitled to reimbursement of its reasonable attorneys' fees incurred as a result of bringing this action.

## JURY DEMAND

131.    Supreme Lending incorporates each of the foregoing paragraphs.

132.    Supreme Lending requests that a jury be convened to try the factual issues in this case.

## PRAYER

**WHEREFORE,** Supreme Lending requests that, on final trial, the Court enter judgment for Supreme Lending and against Defendants and award Supreme Lending the following relief:

- actual, compensatory, consequential, and exemplary damages;

- disgorgement of the ill-gotten gains that Defendants earned or otherwise obtained as a result of Defendants' unlawful conduct;

- Supreme Lending's reasonable attorneys' fees and costs of court;

- permanent injunctive relief;

- pre-judgment and post-judgment interest at the highest lawful rates; and

- such additional relief, at law and in equity, to which Supreme Lending may be justly entitled.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By: _____

Mikel J. Bowers
State Bar No. 02734500
mbowers@bellnunnally.com
R. Heath Cheek
State Bar No. 24053141
hcheek@bellnunnally.com
Kristopher D. Hill
State Bar No. 24066674
khill@bellnunnally.com

1400 One McKinney Plaza
3232 McKinney Avenue
Dallas, Texas  75204-2429
Tel.:  (214) 740-1400
Fax:  (214) 740-1499

**ATTORNEYS FOR PLAINTIFF EVERETT FINANCIAL, INC. d/b/a SUPREME LENDING**

## <u>CERTIFICATE OF SERVICE</u>

On the _____ day of August, 2015, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Texas using the electronic filing system of the Court.  I hereby certify that I served a true and correct copy of the foregoing document on all counsel of record for Plaintiff electronically or in another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

_____
Kristopher D. Hill

2285087_1.docx / 9328.2



## PRODUCING BRANCH MANAGER AGREEMENT

This Producing Branch Manager Agreement ("**Agreement**") is made the day of Barry jones ___, 20 14 , by and between EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING ("**Supreme**") and Barry Jones ___ ("**Employee**").

WHEREAS, Supreme is engaged in the residential mortgage loan business, including the origination of such loans; and

WHEREAS, Supreme desires to employ Employee as a producing branch manager of Supreme in its branch located at 1530 E Glenn Ave ___, to manage such branch and originate residential mortgage loans based upon the following terms and conditions;

WHEREAS, Employee desires to be so employed by Supreme based upon the following terms and conditions:

1.     TERM: Employee shall be an employee at will and either party may terminate the employment relationship at any time with or without cause in compliance with Section 13 of this Agreement.

2.     DUTIES: Employee's primary duties shall be to manage his/her branch and originate residential mortgage loans which meet the guidelines of Supreme and such other duties as Employee may from time to time be assigned.

3.     RESTRICTIONS: Employee, during the term of his/her employment, shall not engage in any other real estate or mortgage related business without the prior written approval of Supreme and shall devote his/her time, knowledge, skill, and efforts exclusively to Supreme's operations and affairs. Employee shall not alone, or in concert with others, engage in any pursuit, activity, business or relationship that is, or could be, in competition with Supreme or is adverse to Supreme's or another branch manager's best interest.

4.     COMPLIANCE WITH LAW: Employee represents that he/she is knowledgeable of all laws and regulations applicable to the services to be performed by Employee in the management of his/her branch and in the origination of residential mortgage loans, and agrees to abide by all such laws and regulations. Employee shall at all times comply with, and shall not cause Supreme to fail to comply with, any and all such laws and regulations. Employee shall not steer borrowers to a particular product based upon increased compensation for such product; rather, Employee shall provide borrowers with options that are in the borrower's best interest.  Employee also recognizes the importance of maintaining the confidentiality of personal information gathered and maintained in the course of his/her employment and agrees to comply with all federal and state privacy laws including, but not limited to, Title V of the federal Gramm-Leach Bliley Act ("**GLBA**") and the regulations and guidelines there under and other similar state laws.  Moreover, Employee shall take all steps to obtain and maintain all individual licenses, registrations and other approvals as required by either state or federal law for Employee to perform

**EXHIBIT A**

his/her duties on behalf of Supreme. Employee must, at all times, give Supreme access to his/her licensing records. Removal of access on the NMLS system could result in immediate termination. Employee agrees to not solicit or originate any loans in a state in which he/she and the Company are not licensed. Employee shall not engage in, cause or permit Supreme to be associated with any activity that is illegal, unethical or improper.

5.    QUALIFICATIONS: Employee represents that he/she is licensed or otherwise qualified by law and experience to engage in the profession of a branch manager/mortgage loan originator in the state or states in which Employee and the Company will be working. Employee shall maintain all required licenses and registrations during employment with Supreme and shall immediately notify Supreme's Licensing Department if Employee becomes ineligible for or otherwise does not maintain his/her license or registration.

6.    WORK HOURS: Employee agrees to use his/her best efforts to meet Supreme's production goals during the scheduled working hours as may from time to time be designated by Supreme. Employee is an exempt employee and shall be paid a salary in accordance with the attached <u>Exhibit A</u>.

7.    MINIMUM PRODUCTION FOR PRODUCING BRANCH MANAGERS: Employee is expected to personally Fund at least two Eligible Loans during any two-consecutive month period. Absent Employer's written consent, the failure to meet this minimum standard may subject Employee to discipline including, but not limited to, termination. In the event an extenuating circumstance has prevented Employee from meeting this expectation, Employee may seek an exception to the minimum production standard for the relevant time period. Such request must be approved by Supreme. Supreme in its sole discretion, may deny the exception request. The failure to terminate Employee for not meeting the minimum production standard in any given time period shall not constitute a waiver by Supreme to later exercise its right to terminate Employee for failure to meet the minimum production standard.

For purposes of this Agreement and its exhibits (as amended), an *"**Eligible Loan**"* is defined as a residential mortgage loan that is (a) originated by Employee in accordance with all applicable state and federal law and regulation as well as Supreme's policies and procedures; (b) Funded in accordance with all applicable state and federal law and regulation as well as Supreme's policies and procedures; and (c) in the period in which the Employee's commission amount or override amount is calculated. For purposes of this Agreement and its exhibits (as amended), a loan shall "***Fund***" or be considered "***Funded***" when all of the following have occurred: (i) Supreme has determined that the loan is an Eligible Loan; (ii) the loan has funded; (iii) the escrow on the property which is the subject of the loan has closed; and (iv) all loan documentation have been received at Supreme's main corporate office.

8.    QUALITY CONTROL: Employee shall adhere strictly to the quality control standards of Supreme. Current versions of Supreme's quality control standards are maintained by Supreme's Compliance Department. Employee is responsible for maintaining excellent customer service and satisfaction with borrowers and other business contacts. Employee shall be responsible for originating complete, accurate and quality loans and shall be held directly accountable for the integrity of the loans originated. Employee is responsible for notifying management immediately of any impropriety of which he/she becomes aware at any stage of the loan process. Failure to comply with this section may result in disciplinary action up to, and including, termination of employment.

---

9.      CONFIDENTIALITY: Employee agrees that during the term of employment and thereafter, Employee shall not directly or indirectly use, disclose, reveal, make available, or disseminate to any person who is not an authorized employee of Supreme Supreme's Proprietary Information. Proprietary Information includes, but is not limited to: (1) products, services, processes, training, business strategies and philosophies, manuals and reference guides; (2) investor and customer information including their identities, needs, preferences, requirements, expectations, financial or personal information, contract terms, rates and pricing structure; (3) marketing data, information, leads, lead generation and marketing plans; (4) pricing, commission and rate information; and (5) any information protected by federal or state privacy laws, including but not limited to GLBA.

10.     COMPENSATION: Employee shall be eligible to be compensated in accordance with the attached Exhibit A.  Employee understands that he/she is only permitted to be paid in accordance with this Agreement and Exhibit A (which may only be modified per this Agreement) and understands that accepting payments not documented in the plan is not only a violation of the law, but also Supreme's policy.

Notwithstanding anything herein (or the exhibits) to the contrary, in the event a provision of the compensation plan is construed as invalid, impermissible or unenforceable by any regulatory agency or court of competent jurisdiction, such provision shall: (i) if possible, be automatically and retroactively deemed modified to the slightest degree necessary to make such provision enforceable, remaining as close as possible to the original intentions of the parties; or (ii) if not possible, be automatically and retroactively deemed stricken and the parties hereto shall negotiate in good faith for a permissible revised provision.

11.     EXHIBIT B: For the consideration as set forth in this Agreement and as a material inducement to Supreme for the employment of Employee, the parties hereto covenant and agree to execute that certain Confidentiality and Non-Solicitation Agreement attached hereto as Exhibit B and incorporated herein for all purposes.  To the extent the terms of Exhibit B conflict with this Agreement, the terms of Exhibit B shall control.

12.     MARKETING: To facilitate compliance with applicable laws and regulations, Employee acknowledges and agrees that any and all marketing materials must be approved in due course by Supreme's Marketing Department.  Employee agrees that he/she shall not create his/her own marketing materials or work directly with outside vendors for same without prior written approval from Supreme's Marketing Department.

13.     TERMINATION: For purposes of this Section "*Termination Date*" shall mean the earliest of the date: (i) Employee resigns, (ii) Employee's termination becomes effective, or (iii) Nationwide Mortgage Licensing System & Registry sponsorship changes.

Employee may terminate this Agreement by providing Supreme with thirty (30) days prior written notice.  Upon receipt of such notice, Supreme may elect to terminate Employee on an earlier date.

Employee shall be eligible to receive net commission earned for all Funded Eligible Loans as of Termination Date.   On Termination Date, loans which have not been Funded (regardless of status) shall be transferred to a new qualified loan officer.  If any transferred loans are Funded within thirty (30) days of Termination Date, Employee shall receive fifty percent (50%) of the commission which would have been owed to Employee under their former compensation plan.  Notwithstanding the forgoing, such

payments shall be reduced by the amount of non-offset Wages of Employee (if any).  Employee shall receive no compensation for all other loans.

In no event may Employee receive commission for loans that: (1) are not an Eligible Loan; or (2) if Employee failed to satisfy the terms and conditions of Employee's employment with Supreme.

In the event Employee is terminated for cause, Employee shall be entitled to receive net commission earned only for those Eligible Loans that Fund on or before Termination Date.  Notwithstanding the forgoing, such payments shall be reduced by the amount of non-offset Wages of Employee (if any). Further, Supreme shall be entitled to offset against any commission owed all losses incurred by Supreme including, but not limited to, the following: (1) all losses incurred by Supreme as a result of Employee's breach of this agreement; (2) all losses incurred by Supreme as a result of any fraudulent activity on the part of the Employee; or (3) any loss incurred as a result of any misrepresentation made by Employee to Supreme, a borrower, an investor or any other third party.

Employee expressly acknowledges and agrees that all loans (including Eligible Loans) originated and contracts obtained by Employee during Employee's employment with Supreme are the sole and exclusive property of Supreme, without regard to whether Employee took the applications, Employee knows the borrower or the stage of processing of such loans or performance of such contracts. Upon Employee's termination, such loans and contracts shall remain the sole and exclusive property of Supreme. Without the express written consent of the Supreme, Employee agrees that Employee shall take no action of any type to place or divert such loans originated, and contracts obtained by Employee, to any competitor or away from Supreme.  Further, Employee agrees to provide a written account of any and all open leads, business prospects and/or loans in process as of the date of Employee's termination. Employee shall promptly obtain and provide, in writing, any and all outstanding invoices and expenses to Supreme.  Promptly after Termination Date, any and all expenses and contingent liabilities shall be paid, resolved, terminated and/or accounted for by Employee in good faith.

Employee agrees to promptly return to Company immediately upon request, at any time, and upon termination of employment, all Company property, including office keys, access cards, any electronic or other equipment provided by the Company, documents, files, correspondence and notes, containing or relating to confidential material and/or Propriety Information, including but not limited to information obtained from the customers and prospective customers contacted by Employee or other employees located at Employee's branch, and the loans handled by such persons while Employee was employed by Company, without keeping any copies.  Employee shall assist Company in securing all original loan files and copies thereof, as requested by Company.

14.    REPRESENTATIONS OF EMPLOYEE: All representations of Employee made herein, or in advance hereof to induce Supreme to enter into this Agreement are true and correct.



Employee further represents that he/she is not a party to or bound by any agreement, contract or understanding with any other party or entity that would in any way restrict or prohibit Employee from entering into this Agreement or performing all the terms hereof.  Employee recognizes that Supreme is not in a position to know of any existing contracts and it is relying on the representations of Employee. Employee's failure to advise Supreme of the existence of any such agreement, contract or understanding shall result in disciplinary action, including but not limited to termination.

---



Employee further represents that he/she has not, and shall not, perform any activities which are in violation of any continuing contractual relations with its former employer(s). Such activities shall include, but are not limited to, the transfer of loans which were in progress (to any extent) with such previous employer(s). Employee acknowledges and agrees that Supreme does not, and shall not, approve, endorse, support, or defend any such actions, and any contractual violations or loan transfers. Such actions shall subject Employee to discipline including, but not limited to, termination. Employee acknowledges and agrees that Supreme may, in its sole discretion, send a copy of the Agreement to any previous employer to verify compliance with these terms.

15.    GOVERNING LAW: To the maximum extent permitted under applicable law, this Agreement shall be governed by, construed under and enforced in accordance with the laws of the State of Texas.

16.    SUCCESSORS AND ASSIGNS: Employee may not, under any circumstances assign or delegate Employee's rights or obligations under this Agreement, absent Supreme's written consent. This Agreement shall be binding upon the parties hereto and their respective successors, assigns, and personal representatives, including any successor of Supreme by merger, consolidation or other reorganization.

17.    ENTIRE AGREEMENT: This Agreement and its exhibits (as amended) represent the entire agreement between the parties and may only be amended in a written instrument signed by the parties.

18.    NOTICES: Any notice required by this Agreement shall be given in writing and personally delivered or sent to the respective parties with proper postage by registered or certified mail addressed to the parties at their addresses set forth below. Such notice shall be deemed given five (5) days after mailing by registered or certified mail, unless personally delivered.

19.    AUTHORITY / MODIFICATIONS:  Employee acknowledges and agrees that only persons with a "Chief" designation in their official title may execute this Agreement and/or bind Supreme to the terms contained herein. Further, any amendment or modification of this Agreement must be in writing and executed by such persons. This Agreement and its exhibits (as amended) cannot be waived, changed, modified or discharged orally by any person. Employee agrees to execute such further instruments and documents reasonably necessary to effectuate the terms and purposes of this Agreement.

20.    WAIVERS: A waiver by either party of any of the terms or conditions of the Agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof, or any other term or condition of the Agreement.

21.    SEVERABILITY: The invalidity, illegality or unenforceability of any provision of this Agreement shall not affect the enforceability of any other provision of this Agreement, all of which other provisions shall remain in full force and effect; provided, however, if any provision of this Agreement is held to be unenforceable and such unenforceability shall substantially alter this Agreement or change the intent and/or effect hereof, the parties hereby agree to amend and/or modify this Agreement sufficiently to restore the original intended effect.

22.    COUNTERPARTS AND FACSIMILES. This Agreement may be executed in several counterparts, each of which shall be deemed as an original, but all of which together shall constitute one and the same instrument; signed copies of this Agreement may be delivered by .pdf, .jpeg or fax and will be accepted as an original.

---

**Supreme:**

Signature: _Anthony Schmeck_

DocuSigned by:
8FB36E09D17D4F4...

Printed Name: Anthony Schmeck

Date: 1/13/2014

**Employee:**

Signature: _Barry Jones_

DocuSigned by:
0FAA6809A36848A...

Printed Name: Barry Jones

Date: 1/13/2014

Exhibit A

## Addendum to Producing Branch Manager Compensation Agreement

Employee Name: Barry Jones          Branch #: 571          Effective Date: 1/01/2014

As of the effective date hereof, Employee shall earn compensation equal to: (a) a Base Salary; plus (b) Commission; plus (c) Override; plus (d) Profit Bonus minus (e) Permitted Reductions.

Special Stipulations:

n/a

**Base Salary:**

Employee shall receive a base semi-monthly salary in the amount of $ 17,500.00 per pay period.

**Commission:**

If Employee's personal Eligible Loan production volume between the first and last day of the calendar month immediately preceding the period in which the commission is calculated is equal to the amounts below, Employee shall receive a commission calculated as a percentage of the total principal amount of credit extended per month, based on the dollar amount or the number of Eligible Loans originated per month, whichever results in the greater number of basis points, as shown in the following commission tier structure:

| ELIGIBLE LOAN VOLUME | | | OR | ELIGIBLE LOAN UNITS | | |
|---|---|---|---|---|---|---|
| $n/a | - n/a | = n/a bps | | n/a - n/a units | = n/a bps |
| $_____ | - _____ | = ____bps | | ____ - ____ units | = ____bps |
| $_____ | - _____ | = ____bps | | ____ - ____ units | = ____bps |
| $_____ | - _____ | = ____bps | | ____ - ____ units | = ____bps |
| $_____ | - _____ | = ____bps | | ____ - ____ units | = ____bps |

Commission is earned at the time when the Eligible Loan is Funded.

**Override:**

Employee shall receive an override amount for the Eligible Loan production volume of his/her branch between the first and last day of the calendar month immediately preceding the period in which the commission is calculated. Employee shall receive an override calculated as a percentage of the total principal amount of credit extended by branch per month, based on the dollar amount or the number of

Eligible Loans originated per month, whichever results in the greater number of basis points, as shown in the following override tier structure:

Branch Production (Eligible Loans Funded)

| | BRANCH ELIGIBLE LOAN VOLUME | OR | | BRANCH ELIGIBLE LOAN UNITS | |
|---|---|---|---|---|---|
| $n/a - n/a = n/a bps | | | n/a - n/a units = n/a bps | | |
| $_____ - _____ = ____bps | | | ____ - ____ units = ____bps | | |
| $_____ - _____ = ____bps | | | ____ - ____ units = ____bps | | |
| $_____ - _____ = ____bps | | | ____ - ____ units = ____bps | | |
| $_____ - _____ = ____bps | | | ____ - ____ units = ____bps | | |

**Maximum and Minimum Commission:**

Notwithstanding the foregoing, in no event may the commission earned by Employee for an Eligible Loan originated by Employee be less than $n/a_____ or more than $ n/a_____.

**Profit Bonus**

Employee is eligible for a discretionary periodic Net Profit bonus not to exceed ten percent (10%) of Employee's total compensation when, and only to the extent, expressly permitted by applicable state and federal laws and regulations.  For purposes hereof, "**Net Profit**" shall equal all revenue which Employee's branch generated for Eligible Loans minus any and all expenses, charges, costs, fees and/or loss attributable to Employee's branch and its operations for the applicable period.  Employee acknowledges and agrees that in the event changes in law or regulation make such payment not possible, permitted, practical or prudent Supreme shall not pay any such bonus.

**Permitted Reductions:**

Employee acknowledges and agrees that in the event of the following events Employee's compensation and/or its branch personnel's compensation shall be proportionally reduced.

1. In the event of an Early Payoff (as such term may be defined by the applicable loan investor or within one hundred eighty (180) days, the commission paid on such loan will be deducted from the originating employee's compensation in the next payment cycle and the override paid on for such loan will be deducted from the branch production in the next payment cycle. In the event the originating employee is no longer employed by Employer, its compensation shall remain deducted from the branch production in the next payment cycle; and

2. In the event of an investor repurchase due to any actual or suspected fraud, gross negligence or willful misconduct, (i) the originating employee's compensation shall be reduced by all costs and fees associated with such loan; and (ii) such loan shall not be included in Eligible Loan Volume or Eligible Loan Unit calculations for the originating employee or branch production.

**Periodic Reviews:**

DocuSign Envelope ID: BAC9A811-B55D-4B5E-94D5-68C8A18997B3

Periodically, Supreme, at its sole discretion, may evaluate the amounts paid to Employee based on factors such as loan performance, transaction volume, and current market conditions and may prospectively revise the compensation it agrees to pay to Employee. Supreme shall have the right, at its sole discretion, to modify this compensation schedule (<u>Exhibit A</u>), in whole or in part, at any time on a prospective (but not a retroactive) basis. In such event, Supreme shall issue and deliver to Employee a new <u>Exhibit A</u> which reflects such changes and shall, as of the effective date stated thereon, supersede and replace the prior <u>Exhibit A</u>. The calculations found in the modified <u>Exhibit A</u> shall apply to all Eligible Loans which are Funded subsequent to the effective date, and the calculations found in this version of <u>Exhibit A</u> shall apply to all Eligible Loans which are Funded prior to the effective date.

**Transferred Loans:**

From time to time, in Supreme's sole discretion, Supreme may elect to transfer certain loans to Employee. Employee may receive Five Hundred Dollars ($500) for any transferred loans which are Funded by Employee for which Employee is the loan officer of record. Provided that, Employee shall reject, in writing, any loan transfer for which Employee was not (i) licensed in the state in which the property is located; and (ii) sponsored by Supreme, on the date the file was created for the applicable loan.

**Calculations:**

Any and all compensation calculations shall be made solely by Supreme and provided to Employee on a regular basis. Supreme reserves the right to revise and adjust the compensation calculations for clerical errors or if its personnel discover new information. Employee shall have a period of thirty (30) days after its receipt of such calculations to provide Supreme written notice of any items which it disputes. In such an event, Supreme and Employee shall reasonably and in good faith resolve such disputes. In the event Employee does not provide Supreme written notice of disputed items within the thirty (30) day period, Employee shall be deemed to have approved the compensation calculations. This provision expressly survives the termination of this Agreement.

ANY MODIFICATION TO THIS EXHIBIT MUST BE ACKNOWLEDGED, IN WRITING, BY SUPREME HUMAN RESOURCES AND FINANCE.

**Supreme:**

Signature _Anthony Schmeck_
—8FB36E09D17D4F4...

Printed Name: Anthony Schmeck

Date: 1/13/2014

**Employee:**

Signature _Barry Jones_
—0FAA6809A36649A...

Printed Name: Barry Jones

Date: 1/13/2014

Anticipated Start: 01-01-2014

---



## PRODUCING BRANCH MANAGER AGREEMENT

This Producing Branch Manager Agreement ("**Agreement**") is made the day of Jan 2, 20 2014 by and between EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING ("**Supreme**") and James Durham ("**Employee**").

WHEREAS, Supreme is engaged in the residential mortgage loan business, including the origination of such loans; and

WHEREAS, Supreme desires to employ Employee as a producing branch manager of Supreme in its branch located at 1530 east Glenn ave auburn al 36830, to manage such branch and originate residential mortgage loans based upon the following terms and conditions;

WHEREAS, Employee desires to be so employed by Supreme based upon the following terms and conditions:

1.    TERM: Employee shall be an employee at will and either party may terminate the employment relationship at any time with or without cause in compliance with Section 13 of this Agreement.

2.    DUTIES: Employee's primary duties shall be to manage his/her branch and originate residential mortgage loans which meet the guidelines of Supreme and such other duties as Employee may from time to time be assigned.

3.    RESTRICTIONS: Employee, during the term of his/her employment, shall not engage in any other real estate or mortgage related business without the prior written approval of Supreme and shall devote his/her time, knowledge, skill, and efforts exclusively to Supreme's operations and affairs. Employee shall not alone, or in concert with others, engage in any pursuit, activity, business or relationship that is, or could be, in competition with Supreme or is adverse to Supreme's or another branch manager's best interest.

4.    COMPLIANCE WITH LAW: Employee represents that he/she is knowledgeable of all laws and regulations applicable to the services to be performed by Employee in the management of his/her branch and in the origination of residential mortgage loans, and agrees to abide by all such laws and regulations. Employee shall at all times comply with, and shall not cause Supreme to fail to comply with, any and all such laws and regulations. Employee shall not steer borrowers to a particular product based upon increased compensation for such product; rather, Employee shall provide borrowers with options that are in the borrower's best interest. Employee also recognizes the importance of maintaining the confidentiality of personal information gathered and maintained in the course of his/her employment and agrees to comply with all federal and state privacy laws including, but not limited to, Title V of the federal Gramm-Leach Bliley Act ("**GLBA**") and the regulations and guidelines there under and other similar state laws. Moreover, Employee shall take all steps to obtain and maintain all individual licenses, registrations and other approvals as required by either state or federal law for Employee to perform

EXHIBIT
B

DocuSign Envelope ID: 2D27676105273AE79-9B5149B3908A52

his/her duties on behalf of Supreme. Employee must, at all times, give Supreme access to his/her licensing records. Removal of access on the NMLS system could result in immediate termination. Employee agrees to not solicit or originate any loans in a state in which he/she and the Company are not licensed. Employee shall not engage in, cause or permit Supreme to be associated with any activity that is illegal, unethical or improper.

5.    QUALIFICATIONS: Employee represents that he/she is licensed or otherwise qualified by law and experience to engage in the profession of a branch manager/mortgage loan originator in the state or states in which Employee and the Company will be working. Employee shall maintain all required licenses and registrations during employment with Supreme and shall immediately notify Supreme's Licensing Department if Employee becomes ineligible for or otherwise does not maintain his/her license or registration.

6.    WORK HOURS: Employee agrees to use his/her best efforts to meet Supreme's production goals during the scheduled working hours as may from time to time be designated by Supreme. Employee is an exempt employee and shall be paid a salary in accordance with the attached <u>Exhibit A</u>.

7.    MINIMUM PRODUCTION FOR PRODUCING BRANCH MANAGERS: Employee is expected to personally Fund at least two Eligible Loans during any two-consecutive month period. Absent Employer's written consent, the failure to meet this minimum standard may subject Employee to discipline including, but not limited to, termination. In the event an extenuating circumstance has prevented Employee from meeting this expectation, Employee may seek an exception to the minimum production standard for the relevant time period. Such request must be approved by Supreme. Supreme in its sole discretion, may deny the exception request. The failure to terminate Employee for not meeting the minimum production standard in any given time period shall not constitute a waiver by Supreme to later exercise its right to terminate Employee for failure to meet the minimum production standard.

For purposes of this Agreement and its exhibits (as amended), an *"Eligible Loan"* is defined as a residential mortgage loan that is (a) originated by Employee in accordance with all applicable state and federal law and regulation as well as Supreme's policies and procedures; (b) Funded in accordance with all applicable state and federal law and regulation as well as Supreme's policies and procedures; and (c) in the period in which the Employee's commission amount or override amount is calculated. For purposes of this Agreement and its exhibits (as amended), a loan shall *"Fund"* or be considered *"Funded"* when all of the following have occurred: (i) Supreme has determined that the loan is an Eligible Loan; (ii) the loan has funded; (iii) the escrow on the property which is the subject of the loan has closed; and (iv) all loan documentation have been received at Supreme's main corporate office.

8.    QUALITY CONTROL: Employee shall adhere strictly to the quality control standards of Supreme. Current versions of Supreme's quality control standards are maintained by Supreme's Compliance Department. Employee is responsible for maintaining excellent customer service and satisfaction with borrowers and other business contacts. Employee shall be responsible for originating complete, accurate and quality loans and shall be held directly accountable for the integrity of the loans originated. Employee is responsible for notifying management immediately of any impropriety of which he/she becomes aware at any stage of the loan process. Failure to comply with this section may result in disciplinary action up to, and including, termination of employment.



DocuSign Envelope ID: 4D276701072347A3-AEA9-001-BE90C652

9.    CONFIDENTIALITY: Employee agrees that during the term of employment and thereafter, Employee shall not directly or indirectly use, disclose, reveal, make available, or disseminate to any person who is not an authorized employee of Supreme Supreme's Proprietary Information. Proprietary Information includes, but is not limited to: (1) products, services, processes, training, business strategies and philosophies, manuals and reference guides; (2) investor and customer information including their identities, needs, preferences, requirements, expectations, financial or personal information, contract terms, rates and pricing structure; (3) marketing data, information, leads, lead generation and marketing plans; (4) pricing, commission and rate information; and (5) any information protected by federal or state privacy laws, including but not limited to GLBA.

10.    COMPENSATION: Employee shall be eligible to be compensated in accordance with the attached Exhibit A.  Employee understands that he/she is only permitted to be paid in accordance with this Agreement and Exhibit A (which may only be modified per this Agreement) and understands that accepting payments not documented in the plan is not only a violation of the law, but also Supreme's policy.

Notwithstanding anything herein (or the exhibits) to the contrary, in the event a provision of the compensation plan is construed as invalid, impermissible or unenforceable by any regulatory agency or court of competent jurisdiction, such provision shall: (i) if possible, be automatically and retroactively deemed modified to the slightest degree necessary to make such provision enforceable, remaining as close as possible to the original intentions of the parties; or (ii) if not possible, be automatically and retroactively deemed stricken and the parties hereto shall negotiate in good faith for a permissible revised provision.

11.    EXHIBIT B: For the consideration as set forth in this Agreement and as a material inducement to Supreme for the employment of Employee, the parties hereto covenant and agree to execute that certain Confidentiality and Non-Solicitation Agreement attached hereto as Exhibit B and incorporated herein for all purposes. To the extent the terms of Exhibit B conflict with this Agreement, the terms of Exhibit B shall control.

12.    MARKETING: To facilitate compliance with applicable laws and regulations, Employee acknowledges and agrees that any and all marketing materials must be approved in due course by Supreme's Marketing Department.  Employee agrees that he/she shall not create his/her own marketing materials or work directly with outside vendors for same without prior written approval from Supreme's Marketing Department.

13.    TERMINATION: For purposes of this Section "*Termination Date*" shall mean the earliest of the date: (i) Employee resigns, (ii) Employee's termination becomes effective, or (iii) Nationwide Mortgage Licensing System & Registry sponsorship changes.

Employee may terminate this Agreement by providing Supreme with thirty (30) days prior written notice.  Upon receipt of such notice, Supreme may elect to terminate Employee on an earlier date.

Employee shall be eligible to receive net commission earned for all Funded Eligible Loans as of Termination Date.   On Termination Date, loans which have not been Funded (regardless of status) shall be transferred to a new qualified loan officer.  If any transferred loans are Funded within thirty (30) days of Termination Date, Employee shall receive fifty percent (50%) of the commission which would have been owed to Employee under their former compensation plan.  Notwithstanding the forgoing, such

payments shall be reduced by the amount of non-offset Wages of Employee (if any). Employee shall receive no compensation for all other loans.

In no event may Employee receive commission for loans that: (1) are not an Eligible Loan; or (2) if Employee failed to satisfy the terms and conditions of Employee's employment with Supreme.

In the event Employee is terminated for cause, Employee shall be entitled to receive net commission earned only for those Eligible Loans that Fund on or before Termination Date. Notwithstanding the forgoing, such payments shall be reduced by the amount of non-offset Wages of Employee (if any). Further, Supreme shall be entitled to offset against any commission owed all losses incurred by Supreme including, but not limited to, the following: (1) all losses incurred by Supreme as a result of Employee's breach of this agreement; (2) all losses incurred by Supreme as a result of any fraudulent activity on the part of the Employee; or (3) any loss incurred as a result of any misrepresentation made by Employee to Supreme, a borrower, an investor or any other third party.

Employee expressly acknowledges and agrees that all loans (including Eligible Loans) originated and contracts obtained by Employee during Employee's employment with Supreme are the sole and exclusive property of Supreme, without regard to whether Employee took the applications, Employee knows the borrower or the stage of processing of such loans or performance of such contracts. Upon Employee's termination, such loans and contracts shall remain the sole and exclusive property of Supreme. Without the express written consent of the Supreme, Employee agrees that Employee shall take no action of any type to place or divert such loans originated, and contracts obtained by Employee, to any competitor or away from Supreme. Further, Employee agrees to provide a written account of any and all open leads, business prospects and/or loans in process as of the date of Employee's termination. Employee shall promptly obtain and provide, in writing, any and all outstanding invoices and expenses to Supreme. Promptly after Termination Date, any and all expenses and contingent liabilities shall be paid, resolved, terminated and/or accounted for by Employee in good faith.

Employee agrees to promptly return to Company immediately upon request, at any time, and upon termination of employment, all Company property, including office keys, access cards, any electronic or other equipment provided by the Company, documents, files, correspondence and notes, containing or relating to confidential material and/or Propriety Information, including but not limited to information obtained from the customers and prospective customers contacted by Employee or other employees located at Employee's branch, and the loans handled by such persons while Employee was employed by Company, without keeping any copies. Employee shall assist Company in securing all original loan files and copies thereof, as requested by Company.

14. REPRESENTATIONS OF EMPLOYEE: All representations of Employee made herein, or in advance hereof to induce Supreme to enter into this Agreement are true and correct.



Employee further represents that he/she is not a party to or bound by any agreement, contract or understanding with any other party or entity that would in any way restrict or prohibit Employee from entering into this Agreement or performing all the terms hereof. Employee recognizes that Supreme is not in a position to know of any existing contracts and it is relying on the representations of Employee. Employee's failure to advise Supreme of the existence of any such agreement, contract or understanding shall result in disciplinary action, including but not limited to termination.

Employee further represents that he/she has not, and shall not, perform any activities which are in violation of any continuing contractual relations with its former employer(s). Such activities shall include, but are not limited to, the transfer of loans which were in progress (to any extent) with such previous employer(s). Employee acknowledges and agrees that Supreme does not, and shall not, approve, endorse, support, or defend any such actions, and any contractual violations or loan transfers. Such actions shall subject Employee to discipline including, but not limited to, termination. Employee acknowledges and agrees that Supreme may, in its sole discretion, send a copy of the Agreement to any previous employer to verify compliance with these terms.

15.    GOVERNING LAW: To the maximum extent permitted under applicable law, this Agreement shall be governed by, construed under and enforced in accordance with the laws of the State of Texas.

16.    SUCCESSORS AND ASSIGNS: Employee may not, under any circumstances assign or delegate Employee's rights or obligations under this Agreement, absent Supreme's written consent. This Agreement shall be binding upon the parties hereto and their respective successors, assigns, and personal representatives, including any successor of Supreme by merger, consolidation or other reorganization.

17.    ENTIRE AGREEMENT: This Agreement and its exhibits (as amended) represent the entire agreement between the parties and may only be amended in a written instrument signed by the parties.

18.    NOTICES: Any notice required by this Agreement shall be given in writing and personally delivered or sent to the respective parties with proper postage by registered or certified mail addressed to the parties at their addresses set forth below. Such notice shall be deemed given five (5) days after mailing by registered or certified mail, unless personally delivered.

19.    AUTHORITY / MODIFICATIONS: Employee acknowledges and agrees that only persons with a "Chief" designation in their official title may execute this Agreement and/or bind Supreme to the terms contained herein. Further, any amendment or modification of this Agreement must be in writing and executed by such persons. This Agreement and its exhibits (as amended) cannot be waived, changed, modified or discharged orally by any person. Employee agrees to execute such further instruments and documents reasonably necessary to effectuate the terms and purposes of this Agreement.

20.    WAIVERS: A waiver by either party of any of the terms or conditions of the Agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof, or any other term or condition of the Agreement.

21.    SEVERABILITY: The invalidity, illegality or unenforceability of any provision of this Agreement shall not affect the enforceability of any other provision of this Agreement, all of which other provisions shall remain in full force and effect; provided, however, if any provision of this Agreement is held to be unenforceable and such unenforceability shall substantially alter this Agreement or change the intent and/or effect hereof, the parties hereby agree to amend and/or modify this Agreement sufficiently to restore the original intended effect.

22.    COUNTERPARTS AND FACSIMILES. This Agreement may be executed in several counterparts, each of which shall be deemed as an original, but all of which together shall constitute one and the same instrument; signed copies of this Agreement may be delivered by .pdf, .jpeg or fax and will be accepted as an original.

**Supreme:**

Signature: _Anthony Schmeck_
DocuSigned by:
8FB36E09D17D4F4...

Printed Name: Anthony Schmeck

Date: 1/3/2014

**Employee:**

Signature: _James Durham_
DocuSigned by:
D4F51497FF8B479...

Printed Name: James Durham

Date: 1/3/2014



## PRODUCING BRANCH MANAGER AGREEMENT

This Producing Branch Manager Agreement ("**Agreement**") is made the day of January 6,_____, 20 14 , by and between EVERETT FINANCIAL, INC. D/B/A SUPREME LENDING ("**Supreme**") and Shannon Fortner_____ ("**Employee**").

WHEREAS, Supreme is engaged in the residential mortgage loan business, including the origination of such loans; and

WHEREAS, Supreme desires to employ Employee as a producing branch manager of Supreme in its branch located at 2101 Clinton Ave, Huntsville, AL  35801 to manage such branch and originate residential mortgage loans based upon the following terms and conditions;

WHEREAS, Employee desires to be so employed by Supreme based upon the following terms and conditions:

1.      TERM: Employee shall be an employee at will and either party may terminate the employment relationship at any time with or without cause in compliance with Section 13 of this Agreement.

2.      DUTIES: Employee's primary duties shall be to manage his/her branch and originate residential mortgage loans which meet the guidelines of Supreme and such other duties as Employee may from time to time be assigned.

3.      RESTRICTIONS: Employee, during the term of his/her employment, shall not engage in any other real estate or mortgage related business without the prior written approval of Supreme and shall devote his/her time, knowledge, skill, and efforts exclusively to Supreme's operations and affairs. Employee shall not alone, or in concert with others, engage in any pursuit, activity, business or relationship that is, or could be, in competition with Supreme or is adverse to Supreme's or another branch manager's best interest.

4.      COMPLIANCE WITH LAW: Employee represents that he/she is knowledgeable of all laws and regulations applicable to the services to be performed by Employee in the management of his/her branch and in the origination of residential mortgage loans, and agrees to abide by all such laws and regulations. Employee shall at all times comply with, and shall not cause Supreme to fail to comply with, any and all such laws and regulations. Employee shall not steer borrowers to a particular product based upon increased compensation for such product; rather, Employee shall provide borrowers with options that are in the borrower's best interest.  Employee also recognizes the importance of maintaining the confidentiality of personal information gathered and maintained in the course of his/her employment and agrees to comply with all federal and state privacy laws including, but not limited to, Title V of the federal Gramm-Leach Bliley Act ("**GLBA**") and the regulations and guidelines there under and other similar state laws.  Moreover, Employee shall take all steps to obtain and maintain all individual licenses, registrations and other approvals as required by either state or federal law for Employee to perform



EXHIBIT

C

his/her duties on behalf of Supreme. Employee must, at all times, give Supreme access to his/her licensing records. Removal of access on the NMLS system could result in immediate termination. Employee agrees to not solicit or originate any loans in a state in which he/she and the Company are not licensed. Employee shall not engage in, cause or permit Supreme to be associated with any activity that is illegal, unethical or improper.

5.    QUALIFICATIONS: Employee represents that he/she is licensed or otherwise qualified by law and experience to engage in the profession of a branch manager/mortgage loan originator in the state or states in which Employee and the Company will be working. Employee shall maintain all required licenses and registrations during employment with Supreme and shall immediately notify Supreme's Licensing Department if Employee becomes ineligible for or otherwise does not maintain his/her license or registration.

6.    WORK HOURS: Employee agrees to use his/her best efforts to meet Supreme's production goals during the scheduled working hours as may from time to time be designated by Supreme. Employee is an exempt employee and shall be paid a salary in accordance with the attached Exhibit A.

7.    MINIMUM PRODUCTION FOR PRODUCING BRANCH MANAGERS:   Employee is expected to personally Fund at least two Eligible Loans during any two-consecutive month period.   Absent Employer's written consent, the failure to meet this minimum standard may subject Employee to discipline including, but not limited to, termination.   In the event an extenuating circumstance has prevented Employee from meeting this expectation, Employee may seek an exception to the minimum production standard for the relevant time period. Such request must be approved by Supreme. Supreme in its sole discretion, may deny the exception request. The failure to terminate Employee for not meeting the minimum production standard in any given time period shall not constitute a waiver by Supreme to later exercise its right to terminate Employee for failure to meet the minimum production standard.

For purposes of this Agreement and its exhibits (as amended), an "*Eligible Loan*" is defined as a residential mortgage loan that is (a) originated by Employee in accordance with all applicable state and federal law and regulation as well as Supreme's policies and procedures; (b) Funded in accordance with all applicable state and federal law and regulation as well as Supreme's policies and procedures; and (c) in the period in which the Employee's commission amount or override amount is calculated.   For purposes of this Agreement and its exhibits (as amended), a loan shall "*Fund*" or be considered "*Funded*" when all of the following have occurred: (i) Supreme has determined that the loan is an Eligible Loan; (ii) the loan has funded; (iii) the escrow on the property which is the subject of the loan has closed; and (iv) all loan documentation have been received at Supreme's main corporate office.

8.    QUALITY CONTROL: Employee shall adhere strictly to the quality control standards of Supreme. Current versions of Supreme's quality control standards are maintained by Supreme's Compliance Department. Employee is responsible for maintaining excellent customer service and satisfaction with borrowers and other business contacts. Employee shall be responsible for originating complete, accurate and quality loans and shall be held directly accountable for the integrity of the loans originated. Employee is responsible for notifying management immediately of any impropriety of which he/she becomes aware at any stage of the loan process.   Failure to comply with this section may result in disciplinary action up to, and including, termination of employment.

9.    CONFIDENTIALITY: Employee agrees that during the term of employment and thereafter, Employee shall not directly or indirectly use, disclose, reveal, make available, or disseminate to any person who is not an authorized employee of Supreme Supreme's Proprietary Information. Proprietary Information includes, but is not limited to: (1) products, services, processes, training, business strategies and philosophies, manuals and reference guides; (2) investor and customer information including their identities, needs, preferences, requirements, expectations, financial or personal information, contract terms, rates and pricing structure; (3) marketing data, information, leads, lead generation and marketing plans; (4) pricing, commission and rate information; and (5) any information protected by federal or state privacy laws, including but not limited to GLBA.

10.    COMPENSATION: Employee shall be eligible to be compensated in accordance with the attached Exhibit A.  Employee understands that he/she is only permitted to be paid in accordance with this Agreement and Exhibit A (which may only be modified per this Agreement) and understands that accepting payments not documented in the plan is not only a violation of the law, but also Supreme's policy.

Notwithstanding anything herein (or the exhibits) to the contrary, in the event a provision of the compensation plan is construed as invalid, impermissible or unenforceable by any regulatory agency or court of competent jurisdiction, such provision shall: (i) if possible, be automatically and retroactively deemed modified to the slightest degree necessary to make such provision enforceable, remaining as close as possible to the original intentions of the parties; or (ii) if not possible, be automatically and retroactively deemed stricken and the parties hereto shall negotiate in good faith for a permissible revised provision.

11.    EXHIBIT B: For the consideration as set forth in this Agreement and as a material inducement to Supreme for the employment of Employee, the parties hereto covenant and agree to execute that certain Confidentiality and Non-Solicitation Agreement attached hereto as Exhibit B and incorporated herein for all purposes.  To the extent the terms of Exhibit B conflict with this Agreement, the terms of Exhibit B shall control.

12.    MARKETING: To facilitate compliance with applicable laws and regulations, Employee acknowledges and agrees that any and all marketing materials must be approved in due course by Supreme's Marketing Department.  Employee agrees that he/she shall not create his/her own marketing materials or work directly with outside vendors for same without prior written approval from Supreme's Marketing Department.

13.    TERMINATION: For purposes of this Section *"Termination Date"* shall mean the earliest of the date: (i) Employee resigns, (ii) Employee's termination becomes effective, or (iii) Nationwide Mortgage Licensing System & Registry sponsorship changes.

Employee may terminate this Agreement by providing Supreme with thirty (30) days prior written notice.  Upon receipt of such notice, Supreme may elect to terminate Employee on an earlier date.

Employee shall be eligible to receive net commission earned for all Funded Eligible Loans as of Termination Date.   On Termination Date, loans which have not been Funded (regardless of status) shall be transferred to a new qualified loan officer.  If any transferred loans are Funded within thirty (30) days of Termination Date, Employee shall receive fifty percent (50%) of the commission which would have been owed to Employee under their former compensation plan.  Notwithstanding the forgoing, such



payments shall be reduced by the amount of non-offset Wages of Employee (if any). Employee shall receive no compensation for all other loans.

In no event may Employee receive commission for loans that: (1) are not an Eligible Loan; or (2) if Employee failed to satisfy the terms and conditions of Employee's employment with Supreme.

In the event Employee is terminated for cause, Employee shall be entitled to receive net commission earned only for those Eligible Loans that Fund on or before Termination Date. Notwithstanding the forgoing, such payments shall be reduced by the amount of non-offset Wages of Employee (if any). Further, Supreme shall be entitled to offset against any commission owed all losses incurred by Supreme including, but not limited to, the following: (1) all losses incurred by Supreme as a result of Employee's breach of this agreement; (2) all losses incurred by Supreme as a result of any fraudulent activity on the part of the Employee; or (3) any loss incurred as a result of any misrepresentation made by Employee to Supreme, a borrower, an investor or any other third party.

Employee expressly acknowledges and agrees that all loans (including Eligible Loans) originated and contracts obtained by Employee during Employee's employment with Supreme are the sole and exclusive property of Supreme, without regard to whether Employee took the applications, Employee knows the borrower or the stage of processing of such loans or performance of such contracts. Upon Employee's termination, such loans and contracts shall remain the sole and exclusive property of Supreme. Without the express written consent of the Supreme, Employee agrees that Employee shall take no action of any type to place or divert such loans originated, and contracts obtained by Employee, to any competitor or away from Supreme. Further, Employee agrees to provide a written account of any and all open leads, business prospects and/or loans in process as of the date of Employee's termination. Employee shall promptly obtain and provide, in writing, any and all outstanding invoices and expenses to Supreme. Promptly after Termination Date, any and all expenses and contingent liabilities shall be paid, resolved, terminated and/or accounted for by Employee in good faith.

Employee agrees to promptly return to Company immediately upon request, at any time, and upon termination of employment, all Company property, including office keys, access cards, any electronic or other equipment provided by the Company, documents, files, correspondence and notes, containing or relating to confidential material and/or Propriety Information, including but not limited to information obtained from the customers and prospective customers contacted by Employee or other employees located at Employee's branch, and the loans handled by such persons while Employee was employed by Company, without keeping any copies. Employee shall assist Company in securing all original loan files and copies thereof, as requested by Company.

14.    REPRESENTATIONS OF EMPLOYEE: All representations of Employee made herein, or in advance hereof to induce Supreme to enter into this Agreement are true and correct.



Employee further represents that he/she is not a party to or bound by any agreement, contract or understanding with any other party or entity that would in any way restrict or prohibit Employee from entering into this Agreement or performing all the terms hereof. Employee recognizes that Supreme is not in a position to know of any existing contracts and it is relying on the representations of Employee. Employee's failure to advise Supreme of the existence of any such agreement, contract or understanding shall result in disciplinary action, including but not limited to termination.





Employee further represents that he/she has not, and shall not, perform any activities which are in violation of any continuing contractual relations with its former employer(s). Such activities shall include, but are not limited to, the transfer of loans which were in progress (to any extent) with such previous employer(s). Employee acknowledges and agrees that Supreme does not, and shall not, approve, endorse, support, or defend any such actions, and any contractual violations or loan transfers. Such actions shall subject Employee to discipline including, but not limited to, termination. Employee acknowledges and agrees that Supreme may, in its sole discretion, send a copy of the Agreement to any previous employer to verify compliance with these terms.

15.    GOVERNING LAW: To the maximum extent permitted under applicable law, this Agreement shall be governed by, construed under and enforced in accordance with the laws of the State of Texas.

16.    SUCCESSORS AND ASSIGNS: Employee may not, under any circumstances assign or delegate Employee's rights or obligations under this Agreement, absent Supreme's written consent. This Agreement shall be binding upon the parties hereto and their respective successors, assigns, and personal representatives, including any successor of Supreme by merger, consolidation or other reorganization.

17.    ENTIRE AGREEMENT: This Agreement and its exhibits (as amended) represent the entire agreement between the parties and may only be amended in a written instrument signed by the parties.

18.    NOTICES: Any notice required by this Agreement shall be given in writing and personally delivered or sent to the respective parties with proper postage by registered or certified mail addressed to the parties at their addresses set forth below. Such notice shall be deemed given five (5) days after mailing by registered or certified mail, unless personally delivered.

19.    AUTHORITY / MODIFICATIONS: Employee acknowledges and agrees that only persons with a "Chief" designation in their official title may execute this Agreement and/or bind Supreme to the terms contained herein. Further, any amendment or modification of this Agreement must be in writing and executed by such persons. This Agreement and its exhibits (as amended) cannot be waived, changed, modified or discharged orally by any person. Employee agrees to execute such further instruments and documents reasonably necessary to effectuate the terms and purposes of this Agreement.

20.    WAIVERS: A waiver by either party of any of the terms or conditions of the Agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof, or any other term or condition of the Agreement.

21.    SEVERABILITY: The invalidity, illegality or unenforceability of any provision of this Agreement shall not affect the enforceability of any other provision of this Agreement, all of which other provisions shall remain in full force and effect; provided, however, if any provision of this Agreement is held to be unenforceable and such unenforceability shall substantially alter this Agreement or change the intent and/or effect hereof, the parties hereby agree to amend and/or modify this Agreement sufficiently to restore the original intended effect.

22.    COUNTERPARTS AND FACSIMILES. This Agreement may be executed in several counterparts, each of which shall be deemed as an original, but all of which together shall constitute one and the same instrument; signed copies of this Agreement may be delivered by .pdf, .jpeg or fax and will be accepted as an original.

---



**Supreme:**

Signature: *Anthony Schmeck*

— DocuSigned by:

— 8FB36E09D17D4F4...

Printed Name: Anthony Schmeck

Date: 1/6/2014

**Employee:**

Signature: *Shannon Fortner*

— DocuSigned by:

— 0B0D2E70EB34458...

Printed Name: Shannon Fortner

Date: 1/6/2014

**Exhibit A**

**Addendum to Producing Branch Manager Compensation Agreement**

**Employee Name:** <u>Shannon Fortner</u>    **Branch #:** <u>570</u>    **Effective Date:** <u>1/01/2014</u>

As of the effective date hereof, Employee shall earn compensation equal to: (a) a Base Salary; plus (b) Commission; plus (c) Override; plus (d) Profit Bonus minus (e) Permitted Reductions.

Special Stipulations:

n/a

**Base Salary:**

Employee shall receive a base semi-monthly salary in the amount of $ <u>17,500.00</u> per pay period.

**Commission:**

If Employee's personal Eligible Loan production volume between the first and last day of the calendar month immediately preceding the period in which the commission is calculated is equal to the amounts below, Employee shall receive a commission calculated as a percentage of the total principal amount of credit extended per month, based on the dollar amount or the number of Eligible Loans originated per month, whichever results in the greater number of basis points, as shown in the following commission tier structure:

| ELIGIBLE LOAN VOLUME | | | OR | ELIGIBLE LOAN UNITS | | |
|---|---|---|---|---|---|---|
| $<u>n/a</u> | - <u>n/a</u> | = <u>n/a</u> bps | | <u>n/a</u> - <u>n/a</u> units | = <u>n/a</u> bps |
| $_____ | - _____ | = ____bps | | ____ - ____ units | = ____bps |
| $_____ | - _____ | = ____bps | | ____ - ____ units | = ____bps |
| $_____ | - _____ | = ____bps | | ____ - ____ units | = ____bps |
| $_____ | - _____ | = ____bps | | ____ - ____ units | = ____bps |

Commission is earned at the time when the Eligible Loan is Funded.

**Override:**

Employee shall receive an override amount for the Eligible Loan production volume of his/her branch between the first and last day of the calendar month immediately preceding the period in which the commission is calculated. Employee shall receive an override calculated as a percentage of the total principal amount of credit extended by branch per month, based on the dollar amount or the number of

Eligible Loans originated per month, whichever results in the greater number of basis points, as shown in the following override tier structure:

Branch Production (Eligible Loans Funded)

| BRANCH ELIGIBLE LOAN VOLUME | OR | BRANCH ELIGIBLE LOAN UNITS |
|---|---|---|

| | | | |
|---|---|---|---|
| $n/a - n/a = n/a bps | | n/a - n/a units = n/a bps | |
| $_____ - _____ = ___bps | | ___ - ___ units = ___bps | |
| $_____ - _____ = ___bps | | ___ - ___ units = ___bps | |
| $_____ - _____ = ___bps | | ___ - ___ units = ___bps | |
| $_____ - _____ = ___bps | | ___ - ___ units = ___bps | |

**Maximum and Minimum Commission:**

Notwithstanding the foregoing, in no event may the commission earned by Employee for an Eligible Loan originated by Employee be less than $n/a_____ or more than $ n/a_____.

**Profit Bonus**

Employee is eligible for a discretionary periodic Net Profit bonus not to exceed ten percent (10%) of Employee's total compensation when, and only to the extent, expressly permitted by applicable state and federal laws and regulations. For purposes hereof, "**Net Profit**" shall equal all revenue which Employee's branch generated for Eligible Loans minus any and all expenses, charges, costs, fees and/or loss attributable to Employee's branch and its operations for the applicable period. Employee acknowledges and agrees that in the event changes in law or regulation make such payment not possible, permitted, practical or prudent Supreme shall not pay any such bonus.

**Permitted Reductions:**

Employee acknowledges and agrees that in the event of the following events Employee's compensation and/or its branch personnel's compensation shall be proportionally reduced.

1. In the event of an Early Payoff (as such term may be defined by the applicable loan investor or within one hundred eighty (180) days, the commission paid on such loan will be deducted from the originating employee's compensation in the next payment cycle and the override paid on for such loan will be deducted from the branch production in the next payment cycle. In the event the originating employee is no longer employed by Employer, its compensation shall remain deducted from the branch production in the next payment cycle; and

2. In the event of an investor repurchase due to any actual or suspected fraud, gross negligence or willful misconduct, (i) the originating employee's compensation shall be reduced by all costs and fees associated with such loan; and (ii) such loan shall not be included in Eligible Loan Volume or Eligible Loan Unit calculations for the originating employee or branch production.

**Periodic Reviews:**

Periodically, Supreme, at its sole discretion, may evaluate the amounts paid to Employee based on factors such as loan performance, transaction volume, and current market conditions and may prospectively revise the compensation it agrees to pay to Employee. Supreme shall have the right, at its sole discretion, to modify this compensation schedule (Exhibit A), in whole or in part, at any time on a prospective (but not a retroactive) basis. In such event, Supreme shall issue and deliver to Employee a new Exhibit A which reflects such changes and shall, as of the effective date stated thereon, supersede and replace the prior Exhibit A. The calculations found in the modified Exhibit A shall apply to all Eligible Loans which are Funded subsequent to the effective date, and the calculations found in this version of Exhibit A shall apply to all Eligible Loans which are Funded prior to the effective date.

**Transferred Loans:**

From time to time, in Supreme's sole discretion, Supreme may elect to transfer certain loans to Employee. Employee may receive Five Hundred Dollars ($500) for any transferred loans which are Funded by Employee for which Employee is the loan officer of record. Provided that, Employee shall reject, in writing, any loan transfer for which Employee was not (i) licensed in the state in which the property is located; and (ii) sponsored by Supreme, on the date the file was created for the applicable loan.

**Calculations:**

Any and all compensation calculations shall be made solely by Supreme and provided to Employee on a regular basis. Supreme reserves the right to revise and adjust the compensation calculations for clerical errors or if its personnel discover new information. Employee shall have a period of thirty (30) days after its receipt of such calculations to provide Supreme written notice of any items which it disputes. In such an event, Supreme and Employee shall reasonably and in good faith resolve such disputes. In the event Employee does not provide Supreme written notice of disputed items within the thirty (30) day period, Employee shall be deemed to have approved the compensation calculations. This provision expressly survives the termination of this Agreement.

ANY MODIFICATION TO THIS EXHIBIT MUST BE ACKNOWLEDGED, IN WRITING, BY SUPREME HUMAN RESOURCES AND FINANCE.

**Supreme:**

Signature _Anthony Schmeck_
— DocuSigned by:
— 8FB36E09D17D4F4...

Printed Name: Anthony Schmeck

Date: 1/6/2014

**Employee:**

Signature _Shannon Fortner_
— DocuSigned by:
— 0B0D2E70EB34458...

Printed Name: Shannon Fortner

Date: 1/6/2014

Anticipated Start: na

## CONFIDENTIALITY, INVENTIONS AND NON-SOLICITATION AGREEMENT

THIS CONFIDENTIALITY, INVENTIONS AND NON-SOLICITATION (this "Agreement") is made and entered into as of the 21ˢᵗ day of *November*, 20 11 between Everett Financial Inc. DBA: Supreme Lending, ("Employer") and *Barry C. Jones* ("Employee").

Employer requires all employees to enter into agreements such as this one as a prerequisite for continued employment with Employer.

In consideration of the covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Confidential Information.** Employee recognizes and acknowledges that he or she will have access to confidential information of Employer ("Confidential Information"), including, without limitation, customer information, lists of suppliers and costs, information regarding proposals, designs, concepts, sales figures and other information concerning the business and operations of Employer and other proprietary data or information, that is valuable, special and a unique asset of Employer. In addition, Employee will have access to similar Confidential Information of Employer's customers. Employee agrees not to disclose such Confidential Information, except as may be necessary in the performance of his or her duties, to any person, firm, corporation, association or entity, nor use such Confidential Information in any way, either during the term of his or her employment or at any time thereafter, until he or she has received the written consent of Employer or until such Confidential Information becomes public knowledge through no wrongful act of Employee. Employee shall take such protective measures as are reasonably necessary to preserve the confidentiality of such Confidential Information, and exercise his or her best efforts to prevent unauthorized parties from gaining access thereto.

Nothing contained in this Agreement shall be construed as a grant of any right or license or an offer to grant any rights or licenses with respect to such Confidential Information, or any portion thereof, except as expressly set forth herein.

Employee understands and agrees that any drawings, sketches, designs, manuals, files, records, equipment and other documents and any other materials containing any Confidential Information, whether furnished to Employee by Employer or Employer's customers or prepared by Employee in connection with his or her employment, is and shall remain the sole property of Employer (or the customer, as the case may be) and is subject to the obligations of confidentiality and non-use set forth herein, and shall be promptly delivered to Employer upon its request, or upon the termination of employment, together with any and all copies thereof.

2. **Inventions.** It is understood and agreed that any and materials developed by Employee in connection with his or her employment, either previously or in the future, shall be

**EXHIBIT D**

the sole property of Employer, and -that Employee shall have no tangible or intangible rights therein.

Without limitation of the foregoing, it is further understood and agreed that any and all inventions, discoveries, developments and improvements made or acquired by Employee pursuant to his or her employment, or any information related thereto, shall be the exclusive property of Employer. Employee shall promptly report the making of all such inventions, discoveries, developments and improvements to Employer, and Employee agrees to execute any and all documents necessary for the vesting or protection of Employers interests in said inventions, discoveries, developments and improvements, including the execution of written assignments thereof to Employer, and to assist Employer, at Employer's expense, in the making and prosecution of any and all intellectual property applications relating thereto.

Employer shall acquire the ownership of all originals and copies of documents, drawings, disks, tapes and other media or works prepared by Employee pursuant to his or her employment from the time of their creation, together with the copyright and all other intangible rights in all works embodied therein. Employee agrees to execute any and all documents necessary for the vesting or protection of Employer's interests in said materials and the copyright and other intangible rights embodied therein, including the execution of written assignments thereof to Employer, and to assist Employer, at Employer's expense, in the making and prosecution of any and all copyright applications relating thereto.

Employee hereby appoints Employer as his or her attorney-in-fact to execute on his or her behalf any assignments or other documents deemed necessary by Employer to protect or perfect its rights to any items described above.

Employee's obligations under this Section 2 shall inure to the benefit of Employer and its successors and assigns and shall survive the expiration of the term of this Agreement for such time as may be necessary to protect the proprietary rights of Employer in the items described above.

Employee acknowledges that any copyrightable contributions made by Employee to the items described above were prepared by the Employee within the scope of his or her employment by Employer within the meaning of 17 U.S.C. § 10 l. In no way limiting the foregoing, Employee agrees that portions of the items described above developed by Employee for Employer constitute contributions to one or more collective works and that the Employee and Employer agree for purposes of 17 U.S.C. § 101 that such portions constitute works made for hire.

3. **Non-Solicitation.**

(a) **Associations with Co-Workers.** Employee agrees that during his or her employment and for two (2) years following the termination of his or her employment for any reason, neither he or she nor his or her affiliates will, by himself or herself or by acting in concert with others, employ or solicit or attempt to employ or solicit for any employment any of Employer's

current employees. Employee and his or her affiliates will not, either directly or indirectly or by acting in concert with others, seek to induce or influence any employee to leave Employer's employment.

**(b) Solicitation of Customers.**  Employee agrees that during his or her retention and for two (2) years following the termination of his or her employment for any reason, neither he, she nor his or her affiliates will, by himself or herself or by acting in concert with others, solicit any of Employer's customers or prospective customers existing as of the date of termination that Employee directly serviced, was assigned to, or was responsible for during the twelve (12) month period immediately preceding termination of Employee's employment with Employer. Employee further agrees not to take any other action to divert business from Employer or influence any vendor, supplier, customer or potential customer of Employer to cease doing business with Employer.

**4. Inconsistent Obligations.**  Employee represents and warrants that he or she has not previously assumed any obligations inconsistent with those of this Agreement. Without limitation of the foregoing, Employee represents that he or she has left any previous employers in good faith and shall abide by any and all confidentiality or similar agreements previously entered into with said persons. Employee shall return to any previous employer all assets of every kind belonging to such employer, including files, records, documents, cost and pricing information, sales figures, projections or estimates and customer lists. Employee further agrees not to divulge to Employer or to any of Employer's clients any confidential, proprietary or trade secrets of any of Employee's previous employers.

**5. Acknowledgements Regarding Other Covenants.**  With regard to the covenants set forth herein, Employee acknowledges and agrees that:

**(a)**    The restrictions set forth above are ancillary to an otherwise enforceable agreement, including the provisions of this Agreement regarding the disclosure, ownership and use of Confidential Information of Employer;

**(b)** The limitations as to time, geographical area, and scope of activity to be restrained by Section 3 are reasonable and acceptable to the Employee, and do not impose any greater restraint than is reasonably necessary to protect the goodwill and other business interests of Employer;

**(c)** The performance by the Employee of the covenants and agreements contained herein, and the enforcement by Employer of the provisions contained herein, will cause no undue hardship on the Employee;

**(d)** The time period covered by the restrictive covenants contained in this Agreement will not include any period(s) of violation of any restrictive covenant or any period(s) of time required for litigation brought by Employer to enforce any covenant or in which Employee is in violation of his promises contained in Section 3. The extension of time provided in this Section 5(d) will not exceed two (2) years.

**6. Covenants Are Independent Elements.** The parties acknowledge that the restrictive covenants contained in Section 3 of this Agreement are essential independent elements of this Agreement and that, but for Employee agreeing to comply with them, Employer would not continue to employ Employee. Accordingly, the existence or assertion of any claim by Employee against Employer, whether based on this Agreement or otherwise, shall not operate as a defense to Employer' enforcement of the restrictive covenants of this Agreement. An alleged or actual breach of the Agreement by Employer will not be a defense to enforcement of the provisions of Section 3 or other obligations of Employee to Employer. The covenants in this Agreement will remain in full force and effect whether Employee is terminated by Employer or voluntarily resigns.

**7. Promises Regarding Confidential Information and Goodwill.**

**(a)** In consideration of Employee's promises contained in this Agreement, including the Employee's promise not to disclose Confidential Information, as set forth in more detail in Section 1, Employer, immediately upon the execution of this Agreement and during the term of Employee's employment, will provide Employee with Confidential Information immediately upon the execution of this Agreement.

**(b)** In further consideration of Employee's promises contained in this Agreement, Employer, during the term of Employee's employment, will reimburse Employee for business expenses incurred in the execution of duties, subject to the reasonable approval of Employer. Submission of business expenses for reimbursement will be in accordance with Employer's regularly established procedures and must conform to the requirements adopted under the Internal Revenue Code.

**(c)** Employee further acknowledges and agrees that, in consideration of the payment described below and the promise to employ Employee during the Term as set forth in this Agreement, he releases, quitclaims, and discharges any claim to the Confidential Information developed prior to the execution of this Agreement and acknowledges that such Confidential Information belong solely to Employer.

**8. Waiver.** No wavier of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a wavier of any continuing or succeeding breach of such provision, a wavier of the provision itself, or a waiver of any right under this Agreement. No waiver shall be binding unless executed in writing by the party making the waiver.

**9. Limitation of Rights.** Nothing in this Agreement, except as specifically stated herein, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective permitted successors and assigns and other legal representatives, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over against any party to this

Agreement. **The parties agree that the employment of Employee by Employer shall be at-will in nature and nothing contained herein shall change the nature of that relationship.**

   **10.    Notice.** Any consent, notice, demand or other communication (including any payment hereunder) required or permitted hereby must be in writing to be effective and shall be deemed to have been received on the date delivered, if personally delivered, or three days following the date the same is deposited in the United States mail, postage prepaid, certified return receipt requested, addressed to the applicable party at the address for such party set forth below or at such other address as such party may designate by like notice:

| | |
|---|---|
| Employer: | Everett Financial Inc., DBA: Supreme Lending 14801 Quorum Rd. #300 Dallas, TX 75254 |
| Employee: | The address of Employee listed in the payroll records of Employer. |

   **11.    Entirety and Amendments.** This instrument and the instruments referred to herein embody the entire agreement between the parties, supersede all prior agreements and understandings, if any, relating to the subject matter hereof, and may be amended only by an instrument in writing executed by all parties, and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof.

   **12.    Remedies for Breach of Agreement.** Employee acknowledges that compliance with the covenants previously set forth herein is necessary to protect the business and goodwill of Employer and that Employee's breach of any restrictive covenant contained in Sections 1 through 3 of this Agreement will result in irreparable injury to Employer and that Employer's remedies at law for such a breach will be inadequate. Accordingly, Employee agrees and consents that Employer, in addition to all other remedies available at law and in equity, shall be entitled to both preliminary and permanent injunctions (without posting any bond) to prevent and/or halt a breach or threatened breach by Employee of any restrictive covenant contained herein, and to obtain specific performance and/or money damages for any breach of this Agreement, but nothing herein contained shall be construed to prevent such remedy or combination of remedies as Employer may elect to invoke. Employee agrees not to bring or institute an action for declaratory judgment concerning the enforceability of any section of this Agreement.

   **13.    Successors and Assigns.** This Agreement will be binding upon and inure to the benefit of the parties hereto and any successors in interest to Employer, but neither this Agreement nor any rights hereunder may be assigned by Employee except in the case of the death of Employee.

   **14.    Governing Law and Venue.** This contract, the entire relationship of the parties hereto, and any litigation between the parties (whether grounded in contract, tort, statute, law or equity) shall be governed by, construed in accordance with, and interpreted pursuant to the laws of the' State of Texas, without giving effect to its choice of laws principles. This contract is

wholly performable in Dallas, Texas. Exclusive venue for any litigation between the parties hereto shall be in Dallas, Texas, and shall be brought in the State District Courts of Dallas, Texas. The parties hereto waive any challenge to personal jurisdiction or venue (including without limitation a challenge based on inconvenience) in Dallas Texas, and specifically consent to the jurisdiction of the State District Courts of Dallas and the United States District Court for Dallas, Texas.

**15.   Cumulative Remedies.**  No remedy herein conferred upon any party is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right, power or remedy hereunder shall preclude any other or further exercise thereof.

**16.   Multiple Counterparts.**  This Agreement may be executed in a number of identical counterparts, each of which constitute collectively, one agreement; but in making proof of this Agreement, it shall not be necessary to produce or account for more than one counterpart.

**17.   Severability.**   Every portion of this Agreement is intended to be severable. Whenever possible, each such provision shall be interpreted in such manner as to be valid and enforceable under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, the prohibited or invalid provision (as) shall be deemed severed herefrom and shall be unenforceable to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement. The parties further agree that should any provisions of this Agreement be prohibited by or invalid under applicable state law, this Agreement may be modified to the extent reasonable by a court of competent jurisdiction.

**18.   Descriptive Headings.**   The headings, captions and arrangements used in this Agreement are for convenience only and shall not be deemed to limit, amplify or modify the terms of this Agreement, nor affect the meaning hereof.

To evidence the binding effect of the covenants and agreements described above, the parties hereto have executed this Agreement effective as of the date first above written.

EMPLOYER:

Everett Financial Inc., DBA: Supreme Lending

By: Scott Everett
Its: President

EMPLOYEE:

7601071v.2

## CONFIDENTIALITY, INVENTIONS AND NON-SOLICITATION AGREEMENT

THIS CONFIDENTIALITY, INVENTIONS AND NON-SOLICITATION (this "Agreement") is made and entered into as of the __17th__ day of __May__, 20__12__ between Everett Financial Inc. DBA: Supreme Lending, ("Employer") and __James Durham__ ("Employee").

Employer requires all employees to enter into agreements such as this one as a prerequisite for continued employment with Employer.

In consideration of the covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**1. Confidential Information.** Employee recognizes and acknowledges that he or she will have access to confidential information of Employer ("Confidential Information"), including, without limitation, customer information, lists of suppliers and costs, information regarding proposals, designs, concepts, sales figures and other information concerning the business and operations of Employer and other proprietary data or information, that is valuable, special and a unique asset of Employer. In addition, Employee will have access to similar Confidential Information of Employer's customers. Employee agrees not to disclose such Confidential Information, except as may be necessary in the performance of his or her duties, to any person, firm, corporation, association or entity, nor use such Confidential Information in any way, either during the term of his or her employment or at any time thereafter, until he or she has received the written consent of Employer or until such Confidential Information becomes public knowledge through no wrongful act of Employee. Employee shall take such protective measures as are reasonably necessary to preserve the confidentiality of such Confidential Information, and exercise his or her best efforts to prevent unauthorized parties from gaining access thereto.

Nothing contained in this Agreement shall be construed as a grant of any right or license or an offer to grant any rights or licenses with respect to such Confidential Information, or any portion thereof, except as expressly set forth herein.

Employee understands and agrees that any drawings, sketches, designs, manuals, files, records, equipment and other documents and any other materials containing any Confidential Information, whether furnished to Employee by Employer or Employer's customers or prepared by Employee in connection with his or her employment, is and shall remain the sole property of Employer (or the customer, as the case may be) and is subject to the obligations of confidentiality and non-use set forth herein, and shall be promptly delivered to Employer upon its request, or upon the termination of employment, together with any and all copies thereof.

**2. Inventions.** It is understood and agreed that any and materials developed by Employee in connection with his or her employment, either previously or in the future, shall be

EXHIBIT
E

the sole property of Employer, and -that Employee shall have no tangible or intangible rights therein.

Without limitation of the foregoing, it is further understood and agreed that any and all inventions, discoveries, developments and improvements made or acquired by Employee pursuant to his or her employment, or any information related thereto, shall be the exclusive property of Employer. Employee shall promptly report the making of all such inventions, discoveries, developments and improvements to Employer, and Employee agrees to execute any and all documents necessary for the vesting or protection of Employers interests in said inventions, discoveries, developments and improvements, including the execution of written assignments thereof to Employer, and to assist Employer, at Employer's expense, in the making and prosecution of any and all intellectual property applications relating thereto.

Employer shall acquire the ownership of all originals and copies of documents, drawings, disks, tapes and other media or works prepared by Employee pursuant to his or her employment from the time of their creation, together with the copyright and all other intangible rights in all works embodied therein. Employee agrees to execute any and all documents necessary for the vesting or protection of Employer's interests in said materials and the copyright and other intangible rights embodied therein, including the execution of written assignments thereof to Employer, and to assist Employer, at Employer's expense, in the making and prosecution of any and all copyright applications relating thereto.

Employee hereby appoints Employer as his or her attorney-in-fact to execute on his or her behalf any assignments or other documents deemed necessary by Employer to protect or perfect its rights to any items described above.

Employee's obligations under this Section 2 shall inure to the benefit of Employer and its successors and assigns and shall survive the expiration of the term of this Agreement for such time as may be necessary to protect the proprietary rights of Employer in the items described above.

Employee acknowledges that any copyrightable contributions made by Employee to the items described above were prepared by the Employee within the scope of his or her employment by Employer within the meaning of 17 U.S.C. § 10 l. In no way limiting the foregoing, Employee agrees that portions of the items described above developed by Employee for Employer constitute contributions to one or more collective works and that the Employee and Employer agree for purposes of 17 U.S.C. § 101 that such portions constitute works made for hire.

3. **Non-Solicitation.**

(a) **Associations with Co-Workers.** Employee agrees that during his or her employment and for two (2) years following the termination of his or her employment for any reason, neither he or she nor his or her affiliates will, by himself or herself or by acting in concert with others, employ or solicit or attempt to employ or solicit for any employment any of Employer's

current employees. Employee and his or her affiliates will not, either directly or indirectly or by acting in concert with others, seek to induce or influence any employee to leave Employer's employment.

**(b) Solicitation of Customers.** Employee agrees that during his or her retention and for two (2) years following the termination of his or her employment for any reason, neither he, she nor his or her affiliates will, by himself or herself or by acting in concert with others, solicit any of Employer's customers or prospective customers existing as of the date of termination that Employee directly serviced, was assigned to, or was responsible for during the twelve (12) month period immediately preceding termination of Employee's employment with Employer. Employee further agrees not to take any other action to divert business from Employer or influence any vendor, supplier, customer or potential customer of Employer to cease doing business with Employer.

**4. Inconsistent Obligations.** Employee represents and warrants that he or she has not previously assumed any obligations inconsistent with those of this Agreement. Without limitation of the foregoing, Employee represents that he or she has left any previous employers in good faith and shall abide by any and all confidentiality or similar agreements previously entered into with said persons. Employee shall return to any previous employer all assets of every kind belonging to such employer, including files, records, documents, cost and pricing information, sales figures, projections or estimates and customer lists. Employee further agrees not to divulge to Employer or to any of Employer's clients any confidential, proprietary or trade secrets of any of Employee's previous employers.

**5. Acknowledgements Regarding Other Covenants.** With regard to the covenants set forth herein, Employee acknowledges and agrees that:

**(a)** The restrictions set forth above are ancillary to an otherwise enforceable agreement, including the provisions of this Agreement regarding the disclosure, ownership and use of Confidential Information of Employer;

**(b)** The limitations as to time, geographical area, and scope of activity to be restrained by Section 3 are reasonable and acceptable to the Employee, and do not impose any greater restraint than is reasonably necessary to protect the goodwill and other business interests of Employer;

**(c)** The performance by the Employee of the covenants and agreements contained herein, and the enforcement by Employer of the provisions contained herein, will cause no undue hardship on the Employee;

**(d)** The time period covered by the restrictive covenants contained in this Agreement will not include any period(s) of violation of any restrictive covenant or any period(s) of time required for litigation brought by Employer to enforce any covenant or in which Employee is in violation of his promises contained in Section 3. The extension of time provided in this Section 5(d) will not exceed two (2) years.

**6. Covenants Are Independent Elements.** The parties acknowledge that the restrictive covenants contained in Section 3 of this Agreement are essential independent elements of this Agreement and that, but for Employee agreeing to comply with them, Employer would not continue to employ Employee. Accordingly, the existence or assertion of any claim by Employee against Employer, whether based on this Agreement or otherwise, shall not operate as a defense to Employer' enforcement of the restrictive covenants of this Agreement. An alleged or actual breach of the Agreement by Employer will not be a defense to enforcement of the provisions of Section 3 or other obligations of Employee to Employer. The covenants in this Agreement will remain in full force and effect whether Employee is terminated by Employer or voluntarily resigns.

**7. Promises Regarding Confidential Information and Goodwill.**

**(a)** In consideration of Employee's promises contained in this Agreement, including the Employee's promise not to disclose Confidential Information, as set forth in more detail in Section 1, Employer, immediately upon the execution of this Agreement and during the term of Employee's employment, will provide Employee with Confidential Information immediately upon the execution of this Agreement.

**(b)** In further consideration of Employee's promises contained in this Agreement, Employer, during the term of Employee's employment, will reimburse Employee for business expenses incurred in the execution of duties, subject to the reasonable approval of Employer. Submission of business expenses for reimbursement will be in accordance with Employer's regularly established procedures and must conform to the requirements adopted under the Internal Revenue Code.

**(c)** Employee further acknowledges and agrees that, in consideration of the payment described below and the promise to employ Employee during the Term as set forth in this Agreement, he releases, quitclaims, and discharges any claim to the Confidential Information developed prior to the execution of this Agreement and acknowledges that such Confidential Information belong solely to Employer.

**8. Waiver.** No wavier of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a wavier of any continuing or succeeding breach of such provision, a wavier of the provision itself, or a waiver of any right under this Agreement. No waiver shall be binding unless executed in writing by the party making the waiver.

**9. Limitation of Rights.** Nothing in this Agreement, except as specifically stated herein, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective permitted successors and assigns and other legal representatives, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over against any party to this

Agreement. **The parties agree that the employment of Employee by Employer shall be at-will in nature and nothing contained herein shall change the nature of that relationship.**

**10.   Notice.**   Any consent, notice, demand or other communication (including any payment hereunder) required or permitted hereby must be in writing to be effective and shall be deemed to have been received on the date delivered, if personally delivered, or three days following the date the same is deposited in the United States mail, postage prepaid, certified return receipt requested, addressed to the applicable party at the address for such party set forth below or at such other address as such party may designate by like notice:

| | |
|---|---|
| Employer: | Everett Financial Inc., DBA: Supreme Lending 14801 Quorum Rd. #300 Dallas, TX 75254 |
| Employee: | The address of Employee listed in the payroll records of Employer. |

**11.   Entirety and Amendments.**   This instrument and the instruments referred to herein embody the entire agreement between the parties, supersede all prior agreements and understandings, if any, relating to the subject matter hereof, and may be amended only by an instrument in writing executed by all parties, and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof.

**12.   Remedies for Breach of Agreement.**   Employee acknowledges that compliance with the covenants previously set forth herein is necessary to protect the business and goodwill of Employer and that Employee's breach of any restrictive covenant contained in Sections I through 3 of this Agreement will result in irreparable injury to Employer and that Employer's remedies at law for such a breach will be inadequate. Accordingly, Employee agrees and consents that Employer, in addition to all other remedies available at law and in equity, shall be entitled to both preliminary and permanent injunctions (without posting any bond) to prevent and/or halt a breach or threatened breach by Employee of any restrictive covenant contained herein, and to obtain specific performance and/or money damages for any breach of this Agreement, but nothing herein contained shall be construed to prevent such remedy or combination of remedies as Employer may elect to invoke.  Employee agrees not to bring or institute an action for declaratory judgment concerning the enforceability of any section of this Agreement.

**13.   Successors and Assigns.**   This Agreement will be binding upon and inure to the benefit of the parties hereto and any successors in interest to Employer, but neither this Agreement nor any rights hereunder may be assigned by Employee except in the case of the death of Employee.

**14.   Governing Law and Venue.**   This contract, the entire relationship of the parties hereto, and any litigation between the parties (whether grounded in contract, tort, statute, law or equity) shall be governed by, construed in accordance with, and interpreted pursuant to the laws of the' State of Texas, without giving effect to its choice of laws principles. This contract is

wholly performable in Dallas, Texas. Exclusive venue for any litigation between the parties hereto shall be in Dallas, Texas, and shall be brought in the State District Courts of Dallas, Texas. The parties hereto waive any challenge to personal jurisdiction or venue (including without limitation a challenge based on inconvenience) in Dallas Texas, and specifically consent to the jurisdiction of the State District Courts of Dallas and the United States District Court for Dallas, Texas.

**15. Cumulative Remedies.** No remedy herein conferred upon any party is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right, power or remedy hereunder shall preclude any other or further exercise thereof.

**16. Multiple Counterparts.** This Agreement may be executed in a number of Identical counterparts, each of which constitute collectively, one agreement; but in making proof of this Agreement, it shall not be necessary to produce or account for more than one counterpart.

**17. Severability**. Every portion of this Agreement is intended to be severable. Whenever possible, each such provision shall be interpreted in such manner as to be valid and enforceable under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, the prohibited or invalid provision (as) shall be deemed severed herefrom and shall be unenforceable to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement. The parties further agree that should any provisions of this Agreement be prohibited by or invalid under applicable state law, this Agreement may be modified to the extent reasonable by a court of competent jurisdiction.

**18. Descriptive Headings.** The headings, captions and arrangements used in this Agreement are for convenience only and shall not be deemed to limit, amplify or modify the terms of this Agreement, nor affect the meaning hereof.

To evidence the binding effect of the covenants and agreements described above, the parties hereto have executed this Agreement effective as of the date first above written.

EMPLOYER:

Everett Financial Inc., DBA: Supreme Lending

By: Scott Everett
Its: President

EMPLOYEE:

James Durham
7EB3A49E5A4F456...

7601071v.2

*B5?o*

## CONFIDENTIALITY, INVENTIONS AND NON-SOLICITATION AGREEMENT

THIS CONFIDENTIALITY, INVENTIONS AND NON-SOLICITATION (this "Agreement") is made and entered into as of the 2nd day of March , 20 11 between Everett Financial Inc. DBA: Supreme Lending, ("Employer") and _Shannon Fortva_ ("Employee").

Employer requires all employees to enter into agreements such as this one as a prerequisite for continued employment with Employer.

In consideration of the covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Confidential Information.** Employee recognizes and acknowledges that he or she will have access to confidential information of Employer ("Confidential Information"), including, without limitation, customer information, lists of suppliers and costs, information regarding proposals, designs, concepts, sales figures and other information concerning the business and operations of Employer and other proprietary data or information, that is valuable, special and a unique asset of Employer. In addition, Employee will have access to similar Confidential Information of Employer's customers. Employee agrees not to disclose such Confidential Information, except as may be necessary in the performance of his or her duties, to any person, firm, corporation, association or entity, nor use such Confidential Information in any way, either during the term of his or her employment or at any time thereafter, until he or she has received the written consent of Employer or until such Confidential Information becomes public knowledge through no wrongful act of Employee. Employee shall take such protective measures as are reasonably necessary to preserve the confidentiality of such Confidential Information, and exercise his or her best efforts to prevent unauthorized parties from gaining access thereto.

Nothing contained in this Agreement shall be construed as a grant of any right or license or an offer to grant any rights or licenses with respect to such Confidential Information, or any portion thereof, except as expressly set forth herein.

Employee understands and agrees that any drawings, sketches, designs, manuals, files, records, equipment and other documents and any other materials containing any Confidential Information, whether furnished to Employee by Employer or Employer's customers or prepared by Employee in connection with his or her employment, is and shall remain the sole property of Employer (or the customer, as the case may be) and is subject to the obligations of confidentiality and non-use set forth herein, and shall be promptly delivered to Employer upon its request, or upon the termination of employment, together with any and all copies thereof.

2. **Inventions.** It is understood and agreed that any and materials developed by Employee in connection with his or her employment, either previously or in the future, shall be

EXHIBIT

F

the sole property of Employer, and -that Employee shall have no tangible or intangible rights therein.

Without limitation of the foregoing, it is further understood and agreed that any and all inventions, discoveries, developments and improvements made or acquired by Employee pursuant to his or her employment, or any information related thereto, shall be the exclusive property of Employer. Employee shall promptly report the making of all such inventions, discoveries, developments and improvements to Employer, and Employee agrees to execute any and all documents necessary for the vesting or protection of Employers interests in said inventions, discoveries, developments and improvements, including the execution of written assignments thereof to Employer, and to assist Employer, at Employer's expense, in the making and prosecution of any and all intellectual property applications relating thereto.

Employer shall acquire the ownership of all originals and copies of documents, drawings, disks, tapes and other media or works prepared by Employee pursuant to his or her employment from the time of their creation, together with the copyright and all other intangible rights in all works embodied therein. Employee agrees to execute any and all documents necessary for the vesting or protection of Employer's interests in said materials and the copyright and other intangible rights embodied therein, including the execution of written assignments thereof to Employer, and to assist Employer, at Employer's expense, in the making and prosecution of any and all copyright applications relating thereto.

Employee hereby appoints Employer as his or her attorney-in-fact to execute on his or her behalf any assignments or other documents deemed necessary by Employer to protect or perfect its rights to any items described above.

Employee's obligations under this Section 2 shall inure to the benefit of Employer and its successors and assigns and shall survive the expiration of the term of this Agreement for such time as may be necessary to protect the proprietary rights of Employer in the items described above.

Employee acknowledges that any copyrightable contributions made by Employee to the items described above were prepared by the Employee within the scope of his or her employment by Employer within the meaning of 17 U.S.C. § 10 l. In no way limiting the foregoing, Employee agrees that portions of the items described above developed by Employee for Employer constitute contributions to one or more collective works and that the Employee and Employer agree for purposes of 17 U.S.C. § 101 that such portions constitute works made for hire.

3. **Non-Solicitation.**

(a) **Associations with Co-Workers.** Employee agrees that during his or her employment and for two (2) years following the termination of his or her employment for any reason, neither he or she nor his or her affiliates will, by himself or herself or by acting in concert with others, employ or solicit or attempt to employ or solicit for any employment any of Employer's

current employees. Employee and his or her affiliates will not, either directly or indirectly or by acting in concert with others, seek to induce or influence any employee to leave Employer's employment.



(b) **Solicitation of Customers.** Employee agrees that during his or her retention and for two (2) years following the termination of his or her employment for any reason, neither he, she nor his or her affiliates will, by himself or herself or by acting in concert with others, solicit any of Employer's customers or prospective customers existing as of the date of termination that Employee directly serviced, was assigned to, or was responsible for during the twelve (12) month period immediately preceding termination of Employee's employment with Employer. Employee further agrees not to take any other action to divert business from Employer or influence any vendor, supplier, customer or potential customer of Employer to cease doing business with Employer.



4. **Inconsistent Obligations.**  Employee represents and warrants that he or she has not previously assumed any obligations inconsistent with those of this Agreement. Without limitation of the foregoing, Employee represents that he or she has left any previous employers in good faith and shall abide by any and all confidentiality or similar agreements previously entered into with said persons. Employee shall return to any previous employer all assets of every kind belonging to such employer, including files, records, documents, cost and pricing information, sales figures, projections or estimates and customer lists. Employee further agrees not to divulge to Employer or to any of Employer's clients any confidential, proprietary or trade secrets of any of Employee's previous employers.

5. **Acknowledgements Regarding Other Covenants.**  With regard to the covenants set forth herein, Employee acknowledges and agrees that:

(a)    The restrictions set forth above are ancillary to an otherwise enforceable agreement, including the provisions of this Agreement regarding the disclosure, ownership and use of Confidential Information of Employer;

(b) The limitations as to time, geographical area, and scope of activity to be restrained by Section 3 are reasonable and acceptable to the Employee, and do not impose any greater restraint than is reasonably necessary to protect the goodwill and other business interests of Employer;



(c)    The performance by the Employee of the covenants and agreements contained herein, and the enforcement by Employer of the provisions contained herein, will cause no undue hardship on the Employee;

(d)  The time period covered by the restrictive covenants contained in this Agreement will not include any period(s) of violation of any restrictive covenant or any period(s) of time required for litigation brought by Employer to enforce any covenant or in which Employee is in violation of his promises contained in Section 3. The extension of time provided in this Section 5(d) will not exceed two (2) years.

**6. Covenants Are Independent Elements.** The parties acknowledge that the restrictive covenants contained in Section 3 of this Agreement are essential independent elements of this Agreement and that, but for Employee agreeing to comply with them, Employer would not continue to employ Employee. Accordingly, the existence or assertion of any claim by Employee against Employer, whether based on this Agreement or otherwise, shall not operate as a defense to Employer' enforcement of the restrictive covenants of this Agreement. An alleged or actual breach of the Agreement by Employer will not be a defense to enforcement of the provisions of Section 3 or other obligations of Employee to Employer. The covenants in this Agreement will remain in full force and effect whether Employee is terminated by Employer or voluntarily resigns.

**7. Promises Regarding Confidential Information and Goodwill.**

**(a)** In consideration of Employee's promises contained in this Agreement, including the Employee's promise not to disclose Confidential Information, as set forth in more detail in Section 1, Employer, immediately upon the execution of this Agreement and during the term of Employee's employment, will provide Employee with Confidential Information immediately upon the execution of this Agreement.

**(b)** In further consideration of Employee's promises contained in this Agreement, Employer, during the term of Employee's employment, will reimburse Employee for business expenses incurred in the execution of duties, subject to the reasonable approval of Employer. Submission of business expenses for reimbursement will be in accordance with Employer's regularly established procedures and must conform to the requirements adopted under the Internal Revenue Code.

**(c)** Employee further acknowledges and agrees that, in consideration of the payment described below and the promise to employ Employee during the Term as set forth in this Agreement, he releases, quitclaims, and discharges any claim to the Confidential Information developed prior to the execution of this Agreement and acknowledges that such Confidential Information belong solely to Employer.

**8. Waiver.** No wavier of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a wavier of any continuing or succeeding breach of such provision, a wavier of the provision itself, or a waiver of any right under this Agreement. No waiver shall be binding unless executed in writing by the party making the waiver.

**9. Limitation of Rights.** Nothing in this Agreement, except as specifically stated herein, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective permitted successors and assigns and other legal representatives, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over against any party to this

Agreement. **The parties agree that the employment of Employee by Employer shall be at-will in nature and nothing contained herein shall change the nature of that relationship.**

**10.   Notice.**   Any consent, notice, demand or other communication (including any payment hereunder) required or permitted hereby must be in writing to be effective and shall be deemed to have been received on the date delivered, if personally delivered, or three days following the date the same is deposited in the United States mail, postage prepaid, certified return receipt requested, addressed to the applicable party at the address for such party set forth below or at such other address as such party may designate by like notice:

Employer:            Everett Financial Inc., DBA: Supreme Lending 14801 Quorum Rd. #300 Dallas, TX 75254

Employee:            The address of Employee listed in the payroll records of Employer.

**11.   Entirety and Amendments.**   This instrument and the instruments referred to herein embody the entire agreement between the parties, supersede all prior agreements and understandings, if any, relating to the subject matter hereof, and may be amended only by an instrument in writing executed by all parties, and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof.

**12.   Remedies for Breach of Agreement.**   Employee acknowledges that compliance with the covenants previously set forth herein is necessary to protect the business and goodwill of Employer and that Employee's breach of any restrictive covenant contained in Sections I through 3 of this Agreement will result in irreparable injury to Employer and that Employer's remedies at law for such a breach will be inadequate. Accordingly, Employee agrees and consents that Employer, in addition to all other remedies available at law and in equity, shall be entitled to both preliminary and permanent injunctions (without posting any bond) to prevent and/or halt a breach or threatened breach by Employee of any restrictive covenant contained herein, and to obtain specific performance and/or money damages for any breach of this Agreement, but nothing herein contained shall be construed to prevent such remedy or combination of remedies as Employer may elect to invoke. Employee agrees not to bring or institute an action for declaratory judgment concerning the enforceability of any section of this Agreement.

**13.   Successors and Assigns.**   This Agreement will be binding upon and inure to the benefit of the parties hereto and any successors in interest to Employer, but neither this Agreement nor any rights hereunder may be assigned by Employee except in the case of the death of Employee.

**14.   Governing Law and Venue.**   This contract, the entire relationship of the parties hereto, and any litigation between the parties (whether grounded in contract, tort, statute, law or equity) shall be governed by, construed in accordance with, and interpreted pursuant to the laws of the' State of Texas, without giving effect to its choice of laws principles. This contract is

wholly performable in Dallas, Texas. Exclusive venue for any litigation between the parties hereto shall be in Dallas, Texas, and shall be brought in the State District Courts of Dallas, Texas. The parties hereto waive any challenge to personal jurisdiction or venue (including without limitation a challenge based on inconvenience) in Dallas Texas, and specifically consent to the jurisdiction of the State District Courts of Dallas and the United States District Court for Dallas, Texas.

**15. Cumulative Remedies.**  No remedy herein conferred upon any party is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right, power or remedy hereunder shall preclude any other or further exercise thereof.

**16. Multiple Counterparts.**  This Agreement may be executed in a number of Identical counterparts, each of which constitute collectively, one agreement; but in making proof of this Agreement, it shall not be necessary to produce or account for more than one counterpart.

**17. Severability.**  Every portion of this Agreement is intended to be severable. Whenever possible, each such provision shall be interpreted in such manner as to be valid and enforceable under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, the prohibited or invalid provision (as) shall be deemed severed herefrom and shall be unenforceable to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement. The parties further agree that should any provisions of this Agreement be prohibited by or invalid under applicable state law, this Agreement may be modified to the extent reasonable by a court of competent jurisdiction.

**18. Descriptive Headings.**  The headings, captions and arrangements used in this Agreement are for convenience only and shall not be deemed to limit, amplify or modify the terms of this Agreement, nor affect the meaning hereof.

To evidence the binding effect of the covenants and agreements described above, the parties hereto have executed this Agreement effective as of the date first above written.

EMPLOYER:

Everett Financial Inc., DBA: Supreme Lending

By: Scott Everett
Its: President

EMPLOYEE:

7601071v.2