IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EVERETT FINANCIAL, INC. d/b/a SUPREME LENDING, | § § § | |
| Plaintiff-counterdefendant, | § § | |
| VS. | § § | Civil Action No. 3:14-CV-1028-D |
| PRIMARY RESIDENTIAL MORTGAGE, INC., | § § § § | |
| Defendant, | § " § | |
| and | § § | |
| BARRY G. JONES, JAMES DURHAM, and SHANNON FORTNER, | § § | |
| Defendants-counterplaintiffs. | §", Vj ku'o go qtcpf wo "qr kpkqp"cpf §"qtf gt'y cu'qtki kpcm('hkngf "wpf gt §"ugcrl'qp'F gego dgt'8.'42380"K'y cu | |
| SCOTT EVERETT, individually, | §'hkngf "wpugcrgf "qp'F gego dgt'42.'4238 § after the parties agreed that no part needed | |
| Counterdefendant. | § to remain under seal. | |

MEMORANDUM OPINION
AND ORDER

In this litigation arising from the departure of three branch managers and other employees from a large mortgage bank and the ensuing competition between that bank and the departing managers' and employees' new employer, the parties' cross-motions for partial summary judgment present questions related to the viability of several contract, tort, and statutory claims and counterclaims. For the reasons that follow, although the court concludes that partial summary judgment is warranted in limited respects, it largely denies the motions.

I

This is an action by plaintiff-counterdefendant Everett Financial, Inc. d/b/a Supreme

Lending ("Supreme") against defendant Primary Residential Mortgage, Inc. ("PRMI") and

defendants-counterplaintiffs Barry G. Jones ("Jones"), James Durham ("Durham"), and

Shannon Fortner ("Fortner") (collectively the "Branch Managers"), arising from conduct

related to the Branch Managers' resignations from Supreme and moves to PRMI. Supreme's

chief executive officer, Scott Everett ("Everett"), is a counterclaim defendant.[1]

Supreme is a large mortgage bank with more than 100 branches in 50 states.[2] In 2011

Supreme recruited the Branch Managers to leave their positions at two other mortgage banks

and come to Supreme, bringing along their subordinate employees. Supreme's process for

bringing managers onboard called for advance diligence into each manager's existing

business at his previous employer. During recruitment, Supreme requested, and the Branch

Managers provided, information about their businesses, including about their loan volume,

expenses, and employees. Supreme and the Branch Managers also discussed how to handle

an eventual exit by the Branch Managers, and Everett stated that they could take their branch

---

[1]Everett is more properly characterized as a third-party defendant. But because throughout this litigation the parties have referred to Everett as a counterclaim defendant, the court does so as well in this memorandum opinion and order.

[2]Because both sides move for summary judgment, the court will recount the evidence that is undisputed, and, when it is necessary to set out evidence that is contested, will do so favorably to the side who is the summary judgment nonmovant in the context of that evidence. *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

employees with them, provided that a "smooth transition plan" was in place.   Branch

Managers App. [105-30] 1396.[3]

The Branch Managers joined Supreme in November 2011, along with the majority of

the employees who worked for them at their previous employers.   Around that time, two

employment agreements were presented for their signatures.   Each Branch Manager executed

a Confidentiality, Inventions and Non-Solicitation Agreement ("Non-Solicitation

Agreement") with Supreme.   The Non-Solicitation Agreement's terms restricted the Branch

Managers from disclosing or using Supreme's confidential information and from soliciting

or employing Supreme employees.

> 1. Confidential Information.   Employee recognizes and
> acknowledges that he or she will have access to confidential
> information of Employer ("Confidential Information"),
> including, without limitation, customer information, lists of
> suppliers and costs, information regarding proposals, designs,
> concepts, sales figures and other information concerning the
> business and operations of Employer and other proprietary data
> or information, that is valuable, special and a unique asset of
> Employer.   In addition, Employee will have access to similar
> Confidential Information of Employer's customers.   Employee
> agrees not to disclose such Confidential Information, except as
> may be necessary in the performance of his or her duties, to any
> person, firm, corporation, association or entity, nor use such
> Confidential Information in any way, either during the term of
> his or her employment or at any time thereafter, until he or she
> has received the written consent of Employer or until such
> Confidential Information becomes public knowledge through no

---

[3]Due to the number of filings that relate to the four pending summary judgment motions, the court for clarity will identify in brackets the docket number of the brief, appendix, or other pleading cited.   In this instance, for example, the docket number of the cited appendix is 105-30.

wrongful act of Employee.  Employee shall take such protective measures as are reasonably necessary to preserve the confidentiality of such Confidential Information, and exercise his or her best efforts to prevent unauthorized parties from gaining access thereto.
. . .

3. Non-Solicitation

(a) Associations with Co-Workers.  Employee agrees that during his or her employment and for two (2) years following the termination of his or her employment for any reason, neither he or she nor his or her affiliates will . . . employ or solicit or attempt to employ or solicit for any employment any of Employer's current employees.   Employee and his or her affiliates will not, either directly or indirectly or by acting in concert with others, seek to induce or influence any employee to leave Employer's employment.

(b) Solicitation of Customers.  Employee agrees that during his or her retention and for two (2) years following the termination of his or her employment for any reason, neither he, she nor his or her affiliates will, by himself or herself or by acting in concert with others, solicit any of Employer's customers or prospective customers existing as of the date of termination that Employee directly serviced, was assigned to, or was responsible for during the twelve (12) month period immediately preceding termination of Employee's employment with Employer.  Employee further agrees not to take any other action to divert business from Employer or influence any vendor, supplier, customer or potential customer of Employer to cease doing business with Employer.

Supreme App. [77-11] 1057, 1058-59 (bold font omitted).

Jones and Durham executed the Non-Solicitation Agreement as presented.  But Fortner crossed out the provisions relating to non-solicitation of Supreme employees and customers (¶¶ 3(a), 3(b), and 5(b)), and initialed the changes.  Fortner signed and returned

- 4 -

the modified agreement to Supreme. The summary judgment evidence conflicts as to whether Fortner informed Everett about the changes at the time he signed the Non-Solicitation Agreement. Several months later, while Fortner was employed at Supreme, a Supreme human resources representative contacted him and requested that he sign a non-solicitation agreement. Fortner declined, explaining that he had deliberately crossed out the provisions in the Non-Solicitation Agreement because he did not agree to them. After this exchange, Fortner remained employed at Supreme until he resigned more than a year and a half later.

At the beginning of their employment, the Branch Managers also signed a second agreement, called the Producing Branch Manager Agreement ("Branch Manager Agreement"). The court refers to the most recent version of the Branch Manager Agreement, signed in January 2014, in this memorandum opinion and order. The Branch Manager Agreement provides, in relevant part:

> 3. RESTRICTIONS: Employee, during the term of his/her employment, shall not engage in any other real estate or mortgage related business without the prior written approval of Supreme and shall devote his/her time, knowledge, skill, and efforts exclusively to Supreme's operations and affairs. Employee shall not alone, or in concert with others, engage in any pursuit, activity, business or relationship that is, or could be, in competition with Supreme or is adverse to Supreme's or another branch manager's best interest.
>
> . . .
>
> 9. CONFIDENTIALITY: Employee agrees that during the term of employment and thereafter, Employee shall not directly or indirectly use, disclose, reveal, make available, or

disseminate to any person who is not an authorized employee of Supreme Supreme's Proprietary Information.

. . .

13.    TERMINATION: . . .

Employee expressly acknowledges and agrees that all loans . . . originated and contracts obtained by Employee during Employee's employment with Supreme are the sole and exclusive property of Supreme . . . . Upon Employee's termination, such loans and contracts shall remain the sole and exclusive property of Supreme.  Without the express written consent of the Supreme, Employee agrees that Employee shall take no action of any type to place or divert such loans originated, and contracts obtained by Employee, to any competitor or away from Supreme.

Supreme App. [77-11] 1024, 1026-27.  Section 11 of the Branch Manager Agreement refers

to an attached Exhibit B, which it identifies as a separate agreement concerning

confidentiality and non-solicitation.

11.    EXHIBIT B: For the consideration as set forth in this Agreement and as a material inducement to Supreme for the employment of Employee, the parties hereto covenant and agree to execute that certain Confidentiality and Non-Solicitation Agreement attached hereto as Exhibit B and incorporated herein for all purposes.  To the extent the terms of Exhibit B conflict with this Agreement, the terms of Exhibit B shall control.

*Id.* at 1026.  But although the Branch Manager Agreement contained an Exhibit A, no

Exhibit B was attached.

During their tenure at Supreme, the Branch Managers were responsible for up to 20

branches and 100 employees, referred to as Supreme's southeast region.  They reported

directly to "c-level" Supreme executives.  They had access to Supreme information such as

loan data, daily financial reports, and all Supreme branches' performance and operations information.

The Branch Managers came into conflict with Supreme during their tenure. Disagreements arose about loan interest rates, fees, and whether to cut costs by terminating employees at their branches. On at least one occasion, Everett told the Branch Managers they had the choice to leave for another company. These conflicts were exacerbated when Everett decided to place two branches originally supervised by the Branch Managers (Orange Beach, Alabama and Daphne, Alabama) under the leadership of a different Supreme employee, David Redmond ("Redmond"). In October 2013, while continuing their employment at Supreme, the Branch Managers began communicating with PRMI about employment opportunities.

To evaluate the potential move, the Branch Managers provided PRMI information about their branches' loans, financial condition, expenses, and employees. Fortner emailed a Supreme "funding report" to his personal account. Supreme App. [77-11] 1069-1282. This document listed every loan closed and funded in Supreme's southeast region in 2013, including several categories of detailed information about each loan. The Branch Managers and their employees (who were also evaluating the prospective move) had particular interest in PRMI's condo loan business. To evaluate PRMI's abilities in this area, the Branch Managers gave PRMI five documents from a Supreme condo transaction to enable PRMI to run a test. Of these five documents, some were publicly available, but others were not. In addition to analyzing this condo loan transaction, PRMI also held a conference call with 12

of the Branch Managers' employees, who were all still employed at Supreme, to convince them that PRMI could handle condo transactions.

As the prospective move developed, the Branch Managers recruited the employees in their branches to come with them.  They worked with PRMI to ensure that employees' job applications were delivered in advance of a planned mass resignation from Supreme.  PRMI ran background checks on the employees who elected to fill out the applications.  All of this occurred before the Branch Managers or their employees resigned from Supreme.  Some of the employees whom the Branch Managers recruited felt pressured to move, for reasons such as concern that they would no longer have a job at Supreme if they did not move to PRMI with their branch.  At least one PRMI representative spoke with subordinate employees of the Branch Managers—while the employees and the Branch Managers were still employed at Supreme—to provide them information about employment at PRMI.  The Branch Managers coordinated their employees to resign from Supreme at the same time on the same day, to coincide with the Branch Managers' notification of their departure to Everett.

In January 2014 the Branch Managers were near a final decision to move their business to PRMI.  Supreme was aware that the Branch Managers were considering leaving. In a recorded conference call among the Branch Managers and Everett on January 24, Everett stated that the Branch Managers needed to choose between remaining at Supreme, and implementing Everett's preferred reforms, or moving along with their employees to another company.

> You do have a choice.  You have choices.  And part—and one
> of the choices, Barry, is to say, I think there's a better mouse
> trap for us.  I truly want the best for you guys.  I want it,
> honestly.  If that means it's a f---ing better company out there
> that has construction loans and all kinds of flow downs and all
> this shit and moves with the market better than we do, I think—I
> seriously want the best for you, honestly.  If that's it, then do it.
> . . .
> So I think—I personally think the three of you guys should just
> have that kind of come-to-Jesus, heart-to-heart conversation
> with yourselves and either agree or disagree with me on that,
> and then either agree or disagree that Supreme's the place for
> you.  And if it is, really believe it and really, really have a f---in'
> formalized plan and know the consequences of some of the stuff
> that's going to happen.  And if it isn't, let's just make a f---in'
> plan to get everybody moved with you.

Branch Managers App. [105-2] 148, 149-50 (alterations added).

On January 31, 2014 the Branch Managers officially committed to leave for PRMI.

They informed PRMI's chief executive officer that morning.  They held a conference call

with Everett shortly afterward to inform him of their resignations from Supreme.  Durham

began the call by telling Everett that the Branch Managers, together with their employees,

were leaving Supreme, and that all of their licensed employees would tender their

resignations that day.  In response, Everett began to address the details of the branches'

transition from Supreme to PRMI, including how to close out loans that were currently in the

pipeline, how to settle the balance of the branches' profit and loss account with Supreme, and

how to divide up the branches' office equipment according to who owned it.  Everett

reiterated his commitment to make the transition smooth.  Everett also offered a piece of

advice.

> If I was you guys, what I would do is I would send a branch
> there and I would test the waters before you move a hundred
> people and a $30 million massive pipeline.  But that's me.  And
> so if you want to talk through that strategy, I'm happy to do that
> as well.

Branch Managers App. [105-2] 171.

The conference call then turned to how each side would handle contact with employees who were deciding whether to follow the Branch Managers or remain at Supreme. Everett stated that a non-solicitation agreement prohibited the Branch Managers from attempting to take employees outside their branches.  Durham agreed and said the Branch Managers had no intention of soliciting employees from other branches.  Durham had stated earlier in the call that the Branch Managers intended to take the Orange Beach and Daphne branches as part of their move.  They still considered these two branches part of their business, despite Supreme's earlier decision to place them under new management.

The topic of soliciting employees continued to come up throughout the call.  Durham reiterated the commitment that the Branch Managers would not solicit anyone outside their branches.  Everett accepted Durham's assurances as to Durham's and Fortner's activities, but he expressed continuing reservations about whether Jones would comply with the commitment not to solicit employees outside his own branches.  Everett also stated concerning the Orange Beach and Daphne branches that he intended to encourage those employees to stay with Supreme up until they resigned.  He said he was texting the newly-installed Supreme manager (Redmond) to have him speak to the Orange Beach and Daphne employees about remaining with Supreme.  But Everett stated that if other employees

contacted him about remaining at Supreme, he would do his best to encourage them to go with the Branch Managers.

Finally, the call turned to how to implement the branches' transition out of Supreme while maintaining service to consumers.  Everett asked the Branch Managers to "figure out who's staying and who's going" among branch employees.  Branch Managers App. [105-2] 180.  Everett asked for clarification on who was leaving that day.  "So today is the last day of everyone or just these selective people that we say stay?"  *Id.* at 181.  Durham responded that a plan would be worked out to close on the branches' loans in progress, move the employees who would follow the Branch Managers to PRMI, and lay off employees who were not needed for either.  Durham specified that the branches' underwriters, although technically Supreme corporate employees, had been invited to come with the Branch Managers.  Everett agreed to this course of action.  "So whatever—whatever ones want to go, absolutely. . . . Even though they are technically right at corporate, they're really part of you, so absolutely."  *Id.* at 184.  The call ended with compliments, and Everett told the Branch Managers that they were welcome to return to Supreme in the future.

Everett continued to coordinate the transition with the Branch Managers after their resignations on January 31.  A subsequent email and text message to the Branch Managers confirmed Everett's intent to make the Branch Managers' and their employees' transition smooth.  In February Everett asked Fortner via text message what to tell employees who were contacting Everett about staying with Supreme, and stated that "as I showed u herein and ALWAYS told u anyone that wants to leave is welcome to leave.  I just want everyone

to have all options open." Branch Managers App. [105-9] 664 (errors in original). Everett also texted two branch employees to inform them that they were welcome to come back, and that he thought they had been wrongly informed that they were not wanted at Supreme. "In the pasting never reached out because I gave my word to Barry, James, and Shannon that of they left Supreme they could take whomever they wanted and I would t interfere." Branch Managers App. [105-2] 19 (errors in original).

Supreme brings this action against PRMI and the Branch Managers. As relevant here, Supreme alleges claims against the Branch Managers for breach of contract, breach of fiduciary duty, conspiracy, and aiding and abetting, and against PRMI for tortious interference with contract, tortious interference with prospective business relations, unjust enrichment, conspiracy, and aiding and abetting. And as relevant here, the Branch Managers assert counterclaims against Supreme and Everett for fraudulent inducement, fraud, negligent misrepresentation, and promissory estoppel, and counterclaims against Supreme only for breach of contract, violation of Tex. Civ. Prac. & Rem. Code Ann. § 143.001, invasion of privacy, unjust enrichment, money had and received, declaratory judgment, and attorney's fees under Tex. Bus. & Comm. Code Ann. § 15.51. The following motions are pending for decision: PRMI's motion for partial summary judgment; the Branch Manager's motion for partial summary judgment; Supreme and Everett's motion for partial summary judgment against the Branch Managers; and Supreme and Everett's motion for partial summary judgment against PRMI. The Branch Managers and PRMI have filed objections to some of

the summary judgment evidence on which Supreme and Everett rely.[4]

## II

Each movant's summary judgment burden depends on whether it is moving for relief on a claim or defense for which it will have the burden of proof at trial. To be entitled to summary judgment on a claim or defense for which it will have the burden of proof, a party "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that it must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law. *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

When the summary judgment movant will not have the burden of proof at trial on a specific claim or defense, the party need only point the court to the absence of evidence of any essential element of the opposing party's claim or defense. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmovant must go beyond

---

[4]Also pending are six motions to exclude and strike designated experts, filed by PRMI and the Branch Managers. These motions will be decided separately from the instant motions for partial summary judgment.

its pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial. *TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where the nonmoving party fails to meet this burden. *Little*, 37 F.3d at 1076.

### III

As a threshold matter, the court addresses objections filed by the Branch Managers and PRMI to some of the summary judgment evidence on which Supreme and Everett rely.

### A

The Branch Managers and PRMI object that statements in Everett's declaration that Supreme had no notice of interlineations in Fortner's Non-Solicitation Agreement lack foundation, are conclusory, and are not within Everett's personal knowledge. Supreme responds that Everett was the chief executive officer of Supreme when the Branch Managers signed their Non-Solicitation Agreements, and he had knowledge of hiring procedures. Fortner in fact acknowledged that Everett had personal knowledge of the interlineations. The court overrules this objection, concluding that this evidence is admissible.[5]

---

[5]Other objections—to the form of the Everett declaration and to a missing exhibit— have been resolved by agreement and through an amendment of Everett's declaration.

B

The Branch Managers and PRMI object that two of Supreme and Everett's exhibits, Exhibits 21 and 23, contain small print that makes them illegible. Because the court does not rely on the small-print portions of the exhibits in this memorandum opinion and order, the court overrules this objection as moot.

The Branch Managers and PRMI object on the ground that Exhibit 32 contains handwritten notes. Because these notes are not relied on in this memorandum opinion and order, this objection is also overruled as moot.

The Branch Managers and PRMI object that Exhibits 65 and 66 are emails that identify attachments, but do not include the attachments with the exhibits. Because these exhibits are not relied in this memorandum opinion and order, this objection is also overruled as moot.[6]

C

The Branch Managers and PRMI also object on the ground that Supreme and Everett have submitted some exhibits and parts of exhibits that they do not cite in their motions and briefs. They maintain that the court should strike the exhibits and pages that Supreme and Everett do not cite in their opening brief. The court overrules this objection.

_____

Supreme and Everett Combined Resp. to Ds. Objs. [148] 2-3.

[6]Other objections to the authentication of 17 exhibits relied on by Supreme and Everett were resolved by agreement of the parties. *See* Supreme and Everett Combined Resp. to Ds. Objs. [132] 2.

The authority on which PRMI and the Branch Managers rely only establishes that a party must adequately cite the summary judgment evidence on which it relies. *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Perez v. Johnson*, 122 F.3d 1067, 1067 (5th Cir. 1997); *Forsyth v. Barr*, 19 F.3d 1527, 1536-37 (5th Cir. 1994). If a party includes summary judgment evidence in the record that it does not adequately cite, the court need not—indeed, typically does not—consider that evidence when deciding the summary judgment motion. But that is not a basis to exclude the evidence in response to an evidence objection. Instead, as here, it is a basis for the court not to consider uncited evidence when making its rulings.[7] Therefore, this objection is overruled.

D

Finally, the Branch Managers and PRMI object to statements in the affidavit of Rick Hogle ("Hogle"). They contend that nine of the sixteen paragraphs in this affidavit are conclusory, vague, or lack sufficient foundation to show that the information is within Hogle's personal knowledge. In particular, they contend that Hogle's characterization of certain documents and information as "confidential" or "proprietary" is a legal conclusion.

---

[7]Fed. R. Civ. P. 56 "saddles the non-movant with the duty to 'designate' the specific facts in the record that create genuine issues precluding summary judgment, and does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at *2 n.3 (N.D. Tex. Dec. 12, 2008) (Fitzwater, C.J.) (quoting *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996)), *aff'd sub nom., Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644 (5th Cir. 2012). "[T]he court is not obligated to comb the record in search of evidence that will permit a nonmovant to survive summary judgment." *Id.* (citing *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006)).

Supreme and Everett respond that, according to the affidavit, Hogle is the chief strategic officer of Supreme, and, in this role, he has personal knowledge of the information that Supreme regards or treats as confidential.

Whether information is confidential or proprietary is a legal conclusion. *See Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F.Supp.2d 776, 811 (N.D. Tex. 2013) (Fitzwater, C.J.), *appeal docketed*, No. 16-11381 (5th Cir. Sept. 16, 2016). The objection to the Hogle affidavit is therefore sustained to the extent that it states a legal conclusion about what information is confidential or proprietary.[8]

IV

The court now turns to Supreme's claims against the Branch Managers.

A

Supreme moves for summary judgment as to liability on its breach of contract claim against the Branch Managers, and the Branch Managers cross-move for summary judgment. "'The elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach.'" *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 579 (5th Cir. 2015) (quoting *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex. App. 2009, no pet.)). Supreme alleges that the Branch Managers breached the

---

[8]The Branch Managers and PRMI make several other objections to each of nine paragraphs in the Hogle affidavit. To the extent not addressed above, these other objections are overruled as moot or as lacking merit.

Non-Solicitation Agreement and the Branch Manager Agreement when they used or disclosed Supreme's confidential information, solicited Supreme employees, and engaged in business activity adverse to Supreme's best interest. The Branch Managers maintain that the Non-Solicitation Agreement is unreasonable and must be reformed; that, with respect to Fortner, the non-solicitation provisions were never agreed to; and that Supreme's claim is barred by waiver and other affirmative defenses.

## B

### 1

The Branch Managers' contention that provisions of the Non-Solicitation Agreement are overbroad and unreasonable and must be reformed is a legal question that must be resolved before addressing other breach of contract arguments. Texas law requires covenants not to compete to contain reasonable limits as to geographical area and scope of activity. Tex. Bus. & Com. Code Ann. § 15.50(a) (West 2011). This requirement applies to employee non-solicitation agreements. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011). If a non-solicitation agreement is held to be unreasonable, no damages can be awarded for a breach that occurred before it was reformed by the court. *See* Tex. Bus. & Com. Code Ann. § 15.51(c); *Alliantgroup, L.P. v. Feingold*, 803 F.Supp.2d 610, 621 (S.D. Tex. 2011).

### 2

The Branch Managers contend that the Non-Solicitation Agreement is unreasonable under Texas law because it contains no geographical limitation, contains no exception for employees who worked with the Branch Managers before joining Supreme, and restrains

undefined "affiliates" of the Branch Managers.   On the issue of geographical limitation, Supreme responds that, although the Non-Solicitation Agreement lacks a geographical limitation, other inherent limitations in restrictive covenants have been held to be an adequate substitute.   *See Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 654 (Tex. App. 2009, pet. denied).   Supreme maintains that the employee non-solicitation provisions were inherently limited to Supreme employees, and that the Branch Managers were still free to recruit other people in the mortgage business to join them at PRMI.   According to Supreme, this limitation is sufficient to make the Non-Solicitation agreement reasonable under Texas law.   *See Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F.Supp.3d 625, 639-40 (N.D. Tex. 2015) (Solis, C. J.).

The Branch Managers reply that a restraint on soliciting all Supreme employees is still too broad to be reasonable; that a reasonable covenant would be limited to only those employees with whom the Branch Managers had contact at Supreme, leaving the Branch Managers free to solicit other Supreme employees; that employee solicitation covenants are governed by the same reasonableness standard as client solicitation covenants, *see Marsh*, 354 S.W.3d at 768; and that client solicitation covenants must be limited to clients with whom the employees had personal contact, *see Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991).   The Branch Managers therefore maintain that a restraint against soliciting all Supreme employees, including those with whom they never had contact, is unreasonable.

The Branch Managers have not identified an authority holding that it is unreasonable

to restrain solicitation of all current employees at a company of Supreme's size. And it is not clear that the Supreme Court of Texas would extend its reasonableness analysis of client solicitation covenants to operate identically with respect to employee solicitation covenants. For example, although the Branch Managers rely on *Haass*, in that case the client solicitation restriction at issue would have required the departing partner to "in effect, take a prospective client's accounting history" to determine if the client had been served by his previous firm. *Haass*, 818 S.W.2d at 387 (internal quotation marks omitted). By contrast, in this case, the restriction only applies to soliciting *current* Supreme employees. This court has previously held that an employee non-solicitation covenant extending to all current employees is a reasonable protection of the employer's interest in maintaining its employees. *Merritt Hawkins*, 79 F.Supp.3d at 639-40 (upholding covenant against soliciting all employees). The court therefore holds that the Non-Solicitation Agreement is not invalid for lack of a geographical or similar limitation.

### 3

As for the Branch Managers' other two arguments against the reasonableness of the Non-Solicitation Agreement, neither has force. The Branch Managers argue that employee non-solicitation agreements must contain a carve-out that permits them to solicit employees with whom they worked before joining Supreme. But the only case that supports this argument does not explain the court's reasoning for this particular statement, nor does it contain the text of the covenant that it was reforming. *See Alliantgroup, L.P. v. Feingold*, 2009 WL 1357209, at *2 (S.D. Tex. May 11, 2009). This court is therefore unable to decide

how it applies, if at all, to the facts of this case.

The Branch Managers also maintain that prohibiting their "affiliates" from soliciting Supreme employees makes the covenant's scope unreasonably broad, and might, for example, prohibit any employee of a Branch Manager's subsequent employer from recruiting a Supreme employee. Supreme responds that the term "affiliates" is only meant to prevent indirect solicitation by the Branch Managers, such as through use of another as an agent to accomplish what the Branch Managers cannot do themselves. Supreme also posits that a contract should not be interpreted to create an unreasonable result. "If a contract is susceptible to two constructions, one of which would render it valid and the other invalid, the construction validating it must prevail." *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 56 (Tex. App. 2006, pet. denied). The court agrees for these reasons that the restraint on soliciting Supreme employees by Branch Managers' "affiliates" does not render the Non-Solicitation Agreement unreasonably broad. Accordingly, the court concludes as a matter of law that the Non-Solicitation Agreement is not unreasonable under Texas law, and that the Branch Managers are not entitled to summary judgment dismissing Supreme's breach of contract claim on this basis.

C

The Branch Managers maintain that Fortner is entitled to summary judgment dismissing Supreme's claim that he breached the non-solicitation provisions in the Non-Solicitation Agreement because he never agreed to them. They maintain that, by crossing out the applicable sections in his agreement and later explicitly refusing to sign another

version with the same subject, he did not assent to these terms.   Supreme responds that, because Supreme did not counter-initial or receive notice of Fortner's interlineations, these changes do not form part of the Non-Solicitation Agreement.   Supreme also contends that Fortner fraudulently concealed these changes, preventing them from forming part of the contract.   And it maintains that Fortner's Branch Manager agreement, signed later, incorporates the Non-Solicitation Agreement by reference.

Supreme is not entitled to summary judgment based on its first argument because a reasonable jury could only find that Fortner's actions in crossing out and initialing his changes to the non-solicitation provisions establish his intent not to be bound by them.  *See Hous. Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 470-72 (Tex. 2011) (holding that deletions in printed agreement were indicative of parties' intent).

Supreme's   second   argument—that   Fortner   fraudulently   concealed   his interlineations—also fails.  There is an issue of fact whether Fortner informed Everett of his interlineations at the time he signed the agreement.   But the summary judgment evidence would only permit a reasonable jury to find that, when Fortner was asked again to sign a similar agreement, he declined, explaining that he had deliberately crossed out the provisions related to non-solicitation in the Non-Solicitation Agreement because he did not agree to them.  Supreme continued to employ Fortner for more than a year and a half after he refused for a second time to agree to the non-solicitation terms.

Supreme's third argument—that Fortner's Branch Manager Agreement incorporated the Non-Solicitation Agreement by reference—fails because the summary judgment evidence

establishes that Exhibit B was described as a separate agreement, not as part of the Branch Manager Agreement, and no Exhibit B was attached to the Branch Manager Agreement.

Accordingly, Supreme is not entitled to summary judgment with respect to its breach of contract claim against Fortner.   Instead, Fortner is entitled to summary judgment dismissing Supreme's claim that he breached the non-solicitation provisions of the Non-Solicitation Agreement.

D

Supreme contends that it is entitled to summary judgment establishing that the Branch Managers are liable for breaching the Non-Solicitation Agreement and the Branch Manager Agreement.   Summary judgment is only proper, however, if the Branch Managers cannot establish each element of their affirmative defense of waiver.

1

Under Texas law, waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (per curiam) (quoting *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)).   "The elements of waiver are: (1) an existing right, benefit, or advantage; (2) knowledge, actual or constructive, of its existence; and (3) actual intent to relinquish the right, which can be inferred from conduct." *First Interstate Bank v. Interfund Corp.*, 924 F.2d 588, 595 (5th Cir.1991) (citation omitted).   To effectively waive a right, a party must have knowledge of all material facts.   *Trinet Corporate Realty Trust Inc. v. Microsoft Corp.*, 2004 WL 1217936, at *4 (N.D. Tex. June 2, 2004) (Fitzwater, J.) (citing

*Mo.-Kan.-Tex. R.R. Co. v. Heritage Cablevision of Dall.*, 783 S.W.2d 273, 280 (Tex. App. 1989, no pet.)). "Waiver is ordinarily a question of fact. Where the facts and circumstances are admitted or clearly established, however, the question becomes one of law." *Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996) (citations omitted); *see Jernigan*, 111 S.W.3d at 156–57 (citation omitted).

2

The Branch Managers contend that Supreme, by its conduct both during the Branch Managers' employment and after they had resigned, waived its rights under the Non-Solicitation Agreement and the Branch Manager Agreement. The Branch Managers maintain that the information they disclosed to PRMI had been represented as belonging to them as part of their business within the larger Supreme business. They contend that when they were recruited by Supreme in 2011 from their previous firms, Supreme requested, and they provided, information similar to that which Supreme now characterizes as confidential. And the Branch Managers posit that, in relation to a separate contractual right, Everett told them that, if they left Supreme in the future, they could take their branch employees with them, provided only that a "smooth transition plan" was in place. Branch Managers App. [105-30] 1396.

The Branch Managers also maintain that Everett continued to waive Supreme's rights after he had been informed of their resignations. According to the summary judgment evidence, during the January 31, 2014 conference call, soon after receiving confirmation that the Branch Managers were resigning along with all their employees, Everett told the Branch

Managers that he would encourage all branch employees to stay with the Branch Managers to ensure their success.  During the same call, Everett made plans for the transition of accounts and equipment to the Branch Managers' new business.  Discussion of non-solicitation agreements during this call only addressed their application to Supreme employees outside the Branch Managers' region.  Everett did not object to the departure of employees within the region, even after being informed that the Branch Managers intended their entire region to resign that day, suggesting that Everett was aware that the employees had already been solicited.  That day, and in the ensuing weeks, Everett continued to coordinate details of the Branch Managers' transition via email and text messages.  The Branch Managers contend that these representations and actions show an intent to relinquish Supreme's rights against employee solicitation and disclosure of information about the branches.

Supreme responds that, when the actions in question occurred, it did not have full knowledge of the material facts, such as of the confidential information disclosed, and the extent of solicitation.  Supreme posits that the Branch Managers concealed material facts, limiting their ability to invoke waiver.  The court holds that the summary judgment evidence is sufficient to raise a genuine issue of material fact as to whether Everett had the necessary knowledge of all material aspects of the Branch Managers' actions to support a finding of waiver.[9]

---

[9]"When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact." *Valcho v. Dall.*

- 25 -

Supreme also contends that Everett's statements to the Branch Managers were not a clear and unequivocal waiver, as required by law. But the case that Supreme relies on is about waiving notice of acceleration of a promissory note, and its requirement of "clear and unequivocal" waiver is based on a line of cases about commercial paper that do not apply here. *Schuhardt Consulting Profit Sharing Plan v. Double Knobs Mountain Ranch, Inc.*, 468 S.W.3d 557, 569 (Tex. App. 2014, pet. denied) (citing *Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 893 (Tex. 1991)). Supreme also contends that the Branch Managers could not have reasonably relied on oral representations that contradicted provisions of their written employment contracts. But since reasonable reliance is not an element of waiver, it is not clear how this argument bears on the essential elements of waiver. *See Interfund*, 924 F.2d at 595.

3

Supreme's arguments at best demonstrate that there are genuine fact issues as to some elements of the Branch Managers' waiver defense. *See Tenneco*, 925 S.W.2d at 643; *Alford, Meroney & Co. v. Rowe*, 619 S.W.2d 210, 214-15 (Tex. Civ. App 1981, writ ref'd n.r.e.) (affirming jury's finding that accounting firm waived contractual rights when it acquiesced in partner's departure). Because the Branch Managers have raised genuine issues of material fact as to each element of the affirmative defense of waiver, and Supreme cannot recover for

---

*Cnty. Hosp. Dist.*, 658 F.Supp.2d 802, 812 n.8 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.)).

breach of contract if the Branch Managers prevail at trial on their waiver defense, the court denies Supreme's motion for summary judgment on its breach of contract claims against the Branch Managers.[10]

## V

The court now turns to Supreme's motion for partial summary judgment establishing that the Branch Managers are liable for breach of fiduciary duty.

## A

Employment relationships impose some fiduciary duties. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201-02 (Tex. 2002). And employment contracts protecting the employer's confidential information, in particular, impose a fiduciary duty on the employee. *See Advanced Nano Coatings, Inc. v. Hanafin*, 478 Fed. Appx. 838, 847 (5th Cir. 2012) (per curiam). An employee planning to compete with his employer may not "(1) appropriate the company's trade secrets; (2) solicit his employer's customers while still

---

[10]Supreme's brief contains a footnote stating that it

> also moves for partial summary judgment on the [Branch] Managers' affirmative defenses of equitable estoppel, promissory estoppel, quasi estoppel, ratification, modification, release, implied consent, and acquiescence, novation, and excuse to extent that each presumes or requires proof that Supreme or Everett consented/waived/acquiesced/released/ ratified any of the claims asserted by Plaintiff in this lawsuit.

Supreme Br. [74] 28 n.9. But because this request is not included in Supreme's motion or adequately supported in the text of Supreme's brief, this request is not properly before the court and will not be addressed. *See* N.D. Tex. Civ. R. 56.3(a)(1).

working for his employer; (3) solicit the departure of other employees while still working for his employer, or (4) carry away confidential information, such as customer lists." *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 512 (Tex. App. 2003, no pet.).

Supreme contends that the Branch Managers breached their fiduciary duties by taking Supreme's confidential information, soliciting the departures of their branch employees, and engaging in conduct designed to hurt Supreme. The Branch Managers respond that Supreme authorized their actions, citing Everett's statements similar to those supporting their affirmative defense of waiver. They posit that it is no breach when the principal has authorized the act. *See Curry v. Pickett*, 2010 WL 3353952, at *6 (Tex. App. Aug. 26, 2010, no pet.). The Branch Managers also maintain that, while the common law imposes fiduciary obligations on an employee who plans to compete with his employer, parties are free to define the scope of their fiduciary relationships, including by limiting common-law duties. *See Strebel v. Wimberly*, 371 S.W.3d 267, 284-85 (Tex. App. 2012, pet. denied).

Supreme replies that authorization requires knowledge of all material facts, which it contends it did not have at the time of Everett's statements.

B

As the court has already held above, the summary judgment evidence raises genuine issues of material fact as to whether Everett knew that the Branch Managers' actions were part of a normal departure in the industry. Supreme also argues in reply that Everett did not authorize the Branch Managers' actions because his promises of support for their exit were conditioned on being informed in advance. This argument also turns on a genuine issue of

material fact considering the summary judgment evidence that Everett repeated these assurances after he was informed on January 31 that the entire region would be resigning that day.

Supreme also appears to argue that it is undisputed that the Branch Managers breached their fiduciary duties by engaging in deception and coercion when soliciting employees. Supreme argues that the Branch Managers only respond to this contention with self-serving affidavits. But Supreme has not established beyond peradventure that the Branch Managers breached their fiduciary duties by engaging in deception and coercion of branch employees. For example, the subordinate employee testimony that Supreme cites generally establishes that the Branch Managers touted the move to their employees according to how the move was planned. Under the plan, each branch was to move to PRMI as a unit. Each branch employee would assume some risk of losing his or her job by declining to work for PRMI when the entire branch, as a unit, was otherwise doing so. Supreme's evidence, coupled with the proof on which the Branch Managers rely, does not establish Supreme's breach of fiduciary duty claim under the heavy "beyond peradventure" standard. *See Sowell*, 603 F.Supp.2d at 923-24.[11]   Accordingly, Supreme is not entitled to summary judgment on its claim against the Branch Managers for breach of fiduciary duty.

---

[11]*See supra* note 9.

VI

Supreme next moves for summary judgment on its conspiracy and aiding and abetting claims against the Branch Managers.

Conspiracy is a derivative claim based on an underlying tort. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001). Liability for conspiracy is impossible unless an underlying tort has been proved. *Id.* Likewise, aiding and abetting is also a derivative claim based on an underlying tort. *Id.* For summary judgment purposes, Supreme's conspiracy and aiding and abetting claims are based on the underlying tort of breach of fiduciary duty.[12] Because Supreme is not entitled to summary judgment against the Branch Managers on the underlying tort of breach of fiduciary duty, it has likewise failed to demonstrate beyond peradventure that it is entitled to summary judgment establishing its claims against them for conspiracy and aiding and abetting.

The Branch Managers cross-move for summary judgment on Supreme's claims of conspiracy and aiding and abetting to the extent they are based on a breach of contract, and not on an underlying tort. Because the record shows that Supreme may be able to recover against the Branch Managers on at least one underlying tort, they are not entitled to partial summary judgment on this basis.

---

[12]Supreme's summary judgment brief contains one sentence in which it argues that the Branch Managers are liable for slander per se, and it cites the elements of slander per se. Supreme Br. [74] 21. Because this single sentence does not establish the Branch Managers' liability, and slander per se is not a claim included in Supreme's operative amended complaint, this argument does not affect the question whether Supreme has established an underlying tort.

VII

The court now turns to Supreme's claims against PRMI.  PRMI moves for summary

judgment on Supreme's claims of tortious interference with contract, tortious interference

with prospective business relations, and unjust enrichment.   Supreme moves for partial

summary judgment establishing that PRMI is liable on its claims for conspiracy and aiding

and abetting.

VIII

PRMI moves for summary judgment on Supreme's tortious interference with contract

claim.

A

"The elements of a cause of action for tortious interference with an existing contract

are (1) the existence of a contract subject to interference, (2) a willful and intentional act of

interference, (3) such act was a proximate cause of damage and (4) actual damage or loss

occurred." *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex. 1993).  In addition,

"the interfering party must have 'actual knowledge of the contract or business relation in

question, or knowledge of facts and circumstances that would lead a reasonable person to

believe in existence of the contract or business relationship.'" *Amigo Broad., LP v. Spanish

Broad. Sys., Inc.*, 521 F.3d 472, 490 (5th Cir. 2008) (quoting *Steinmetz & Assocs., Inc. v.

Crow*, 700 S.W.2d 276, 277-78 (Tex. App. 1985, writ ref'd n.r.e.)).  A summary judgment

movant's burden is heavy when arguing a defendant's knowledge of, and intent to interfere

with, a contract, because this element turns, at least in part, on the defendant's credibility.

*Wohlstein v. Aliezer*, 321 S.W.3d 765, 772 (Tex. App. 2010, no pet.).

B

1

PRMI moves for summary judgment as to any tortious interference with contract claim premised on the non-solicitation provisions of Fortner's Non-Solicitation Agreement. Because, as the court explains above, the summary judgment evidence establishes that Fortner did not agree to these provisions, PRMI is entitled to summary judgment dismissing any tortious interference claim premised on PRMI's alleged interference with these provisions of Fortner's Non-Solicitation Agreement with Supreme. *See supra* § IV(C).

2

PRMI moves for summary judgment as to any tortious interference claim based on the Non-Solicitation Agreement, contending that the agreement is unreasonable and overbroad under Texas law. Because, as the court holds above, the Non-Solicitation Agreement is not overbroad or unreasonable as a matter of law, PRMI is not entitled to summary judgment on this basis. *See supra* § IV(B).

3

PRMI moves for summary judgment on any tortious interference claim based on the non-solicitation provisions of the Branch Managers' employment contracts with Supreme, contending that there is no evidence of PRMI's knowledge or intent. PRMI maintains that it did not know of any non-solicitation provisions, or of any facts that would reasonably lead it to believe they existed. Supreme responds that the summary judgment evidence establishes

that PRMI's own standard hiring practices would lead it to know or suspect that non-solicitation provisions existed in the Branch Managers' employment contracts. The court holds that there is a genuine issue of material fact concerning whether PRMI had knowledge of, and intent to interfere with, the non-solicitation provisions in Supreme employment contracts.[13]  *See Wohlstein*, 321 S.W.3d at 772.   Accordingly, the court denies PRMI's motion for partial summary judgment in this respect.

IX

PRMI moves for summary judgment on Supreme's tortious interference with prospective business relations claim.

A

> To prevail on a claim for tortious interference with prospective business relations, the plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

PRMI contends that it is entitled to summary judgment because there is no evidence that it had knowledge of Supreme's prospective business opportunities and no evidence that PRMI interfered with them; that it believed Supreme did not object to transferring some

---

[13]*See supra* note 9.

loans that were currently in its pipeline, in the best interest of the borrower; and that any interference was merely an incidental result of legitimate actions pursued for other reasons, and thus was not intentional.

Supreme responds that PRMI interfered with loans that were in Supreme's pipeline when the Branch Managers departed, with Supreme's condo loan business for the southeast region, and with Supreme's future employee recruiting. In support of the first contention, Supreme cites evidence of loans that originated with Supreme but were closed by PRMI, including some within a few days of the loan officers' moves from Supreme to PRMI. In support of the second contention, Supreme argues that PRMI's acquisition of Supreme's condo loan units was accomplished through the independently unlawful means of using Supreme's confidential information to run tests in advance.

B

Supreme's response and summary judgment evidence are sufficient to raise a genuine issue of material fact as to whether PRMI acted with knowledge or intent of taking Supreme's prospective business, whether PRMI's conduct was independently tortious or unlawful, and the other required elements of Supreme's claim.[14]  *See Coinmach*, 417 S.W.3d at 923. Accordingly, the court denies PRMI's motion for partial summary judgment in this respect.

---

[14]*See supra* note 9.

X

PRMI next moves for summary judgment on Supreme's claim for unjust enrichment.

To the extent that a cause of action for unjust enrichment is recognized in Texas, it requires that the defendant have profited at the plaintiff's expense. *See HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998). PRMI points to the absence of evidence that PRMI profited or was enriched from the Branch Managers' (or their employees') work at PRMI, and it contends that it in fact has lost money as a result of employing them. Supreme has not responded to this ground of PRMI's motion.

Although Supreme's failure to respond to this ground of PRMI's motion does not permit the court to enter a "default" summary judgment on PRMI's unjust enrichment claim, *see, e.g., Tutton v. Garland Independent School District*, 733 F. Supp. 1113, 1117 (N.D. Tex. 1990) (Fitzwater, J.), "[a] summary judgment nonmovant who does not respond to the motion is relegated to [his] unsworn pleadings, which do not constitute summary judgment evidence," *Bookman v. Shubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (Fitzwater, J.) (citing *Solo Serve Corp. v. Westowne Associates*, 929 F.2d 160, 165 (5th Cir. 1991)). Moreover,

> [i]f a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]

Rule 56(e)(2), (3). Accordingly, because Supreme has not raised a genuine issue of material

fact as to its claim for unjust enrichment, the court grants PRMI's motion in this respect and dismisses the unjust enrichment claim.

## XI

Supreme moves for summary judgment as to liability on its claims against PRMI for conspiracy and aiding and abetting.  These derivative claims are based on PRMI's participation in an underlying tort: the Branch Managers' breach of fiduciary duty.  *See Ernst & Young*, 51 S.W.3d at 583. As the court holds above, Supreme is not entitled to summary judgment establishing that the Branch Managers breached their fiduciary duty.  *See supra* § V.  Accordingly, because Supreme has not yet established the underlying tort, Supreme is not entitled to summary judgment against PRMI based on its claim for conspiracy or aiding and abetting.  *See Ernst & Young*, 51 S.W.3d at 583.

PRMI moves for summary judgment on Supreme's claims for conspiracy and aiding and abetting to the extent they are based on a breach of contract, and not on an underlying tort.  Because the record shows that Supreme may be able to recover against PRMI on at least one underlying tort, PRMI is not entitled to partial summary judgment on this basis.

## XII

The court now turns to the Branch Managers' counterclaims against Supreme and Everett.  Supreme and Everett move for summary judgment on eleven of the Branch Managers' counterclaims.

XIII

Supreme and Everett first move for summary judgment on the Branch Managers'

counterclaims for fraudulent inducement, fraud, negligent misrepresentation, and promissory

estoppel.

A

Supreme and Everett maintain that each of these claims fails as a matter of law for

lack of reasonable reliance.  They contend that, under Texas law, a party cannot reasonably

rely on representations directly contradicted by a written contract.

Supreme and Everett argue, and the Branch Managers do not dispute, that actual and

justifiable reliance on representations outside the written contract is an essential element of

fraudulent inducement, fraud, negligent misrepresentation, and promissory estoppel.  *See*

*Ernst & Young*, 51 S.W.3d at 577 (fraud); *TMI, Inc. v. Brooks*, 225 S.W.3d 783, 793 (Tex.

App. 2007, pet. denied) (fraudulent inducement); *Ortiz v. Collins*, 203 S.W.3d 414, 421 (Tex.

App. 2006, no pet.) (fraud, negligent misrepresentation, and promissory estoppel).  Supreme

and Everett also maintain, and the Branch Managers again do not dispute, that the

representations identified in the Branch Managers' counterclaims are each directly

contradicted by terms in the written contracts (i.e., the Non-Solicitation Agreement and the

Branch Manager Agreement).  Finally, Supreme posits that, under Texas law, a party cannot

reasonably rely on representations that are directly contradicted by a written contract.  *See*

*Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424-25 (Tex. 2015).

The Branch Managers respond that the written contracts' merger clauses and clauses

preventing oral modification do not preclude reasonable reliance on Supreme's extrinsic statements. *See Ital. Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011). They also maintain that reliance can only be disclaimed in clear and unequivocal language. *See id.* And they attempt to distinguish *Westergren*, asserting that the plaintiff in that case remained willfully ignorant of the written contract by declining to read it, whereas the Branch Managers read their employment contracts and discussed them with Supreme representatives Everett and Hogle. *See Westergren*, 453 S.W.3d at 425.

B

*Italian Cowboy Partners*, the case on which the Branch Managers primarily rely, is inapposite because it concerns representations about a matter unaddressed in a written lease contract (the condition of the building leased). *See Ital. Cowboy Partners*, 341 S.W.3d at 337. The Branch Managers' counterclaims, in contrast, are about representations that contradicted the terms of the written contract: confidentiality, solicitation, and rights to clients and property. In addition, the Branch Managers cannot circumvent the holding in *Westergren* that "a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Westergren*, 453 S.W.3d at 424. The Branch Managers' choice to rely on Everett's representations, despite the conflicting language in the written contracts, is analogous to the *Westergren* plaintiff's choice not to read the contract. *See id.* at 425. If anything, the Branch Managers' continued reliance on Everett's oral representations after reading the conflicting written contracts was even less justified than the reliance held to be unjustified in *Westergren*.

Because the Branch Managers have failed to adduce legally sufficient evidence of reasonable reliance—a required element of their counterclaims for fraudulent inducement, fraud, negligent misrepresentation, and promissory estoppel—Supreme and Everett are entitled to partial summary judgment dismissing these counterclaims.

XIV

Supreme next moves for summary judgment on the Branch Managers' counterclaim for breach of contract.

A

In this claim, the Branch Managers allege that Supreme orally agreed to pay them any remaining balance in their region's profit and loss ("P&L") and reserve accounts if they decided to leave Supreme.  Supreme moves for partial summary judgment on the basis that the alleged oral agreement is inadmissible parol evidence extrinsic to the Branch Managers' written compensation agreement, which is Exhibit A to the Branch Manager Agreement ("Exhibit A").  *See Rosas v. U.S. Small Bus. Admin.*, 964 F.2d 351, 355 (5th Cir. 1992). Supreme also maintains that the alleged oral agreement is a modification unsupported by consideration.  *See Arthur J. Gallagher & Co. v. Dietrich*, 270 S.W.3d 695, 702 (Tex. App. 2008, no pet.).

The Branch Managers respond that Supreme's promise to pay them the balance of their region's P&L and reserve accounts when they left Supreme was a collateral agreement on a matter not covered by their compensation agreement.  Although Texas law bars parol evidence that contradicts an unambiguous integrated contract, it recognizes an exception for

- 39 -

a collateral agreement that is not inconsistent with the integration. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 875 (Tex. 2010). Such a collateral agreement is not required to be supported by separate consideration if it is "such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written contract." *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32-33 (Tex. 1958) (quoting Restatement of Contracts § 240 (1932)); *see Swinnea*, 318 S.W.3d at 875-76.

In reply, Supreme emphasizes that Exhibit A is the exclusive source of compensation rights, that the P&L and reserve account payments sought by the Branch Managers are a form of compensation, and that Exhibit A by its terms could only be modified in writing. Supreme cites several cases rejecting collateral-agreement arguments in cases with written compensation contracts. *See Hughes v. Sams*, 2008 WL 4724436, at *2-4 (S.D. Tex. Oct. 24, 2008); *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008); *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 179 n.10 (Tex. App. 2006, no pet.).

B

In each of the cases Supreme cites, the proponent of the collateral agreement sought payment (or discharge) of a form of compensation that fell explicitly within the terms of the written contract—not a different interest that might likely have been the subject of a collateral agreement. *See Hughes*, 2008 WL 4724436, at *2-4 (salary); *Haden*, 266 S.W.3d at 451 (legal fees); *Ledig*, 193 S.W.3d at 179 n.10 (bonus). In the instant case, by contrast, Supreme has not shown why the P&L and reserve accounts should be considered "compensation," within Exhibit A's exclusive domain, rather than a separate interest covered

- 40 -

by a collateral agreement.   The Branch Managers have introduced summary judgment evidence, such as the January 31, 2014 conference call with Everett, that would enable a reasonable jury to find that Supreme considered these accounts to be something other than compensation.  A reasonable jury could find that Supreme made an oral agreement, collateral to and consistent with Exhibit A, to pay the Branch Managers any remaining balance in their P&L and reserve accounts upon their departure from Supreme.   Therefore, Supreme is not entitled to summary judgment on the Branch Managers' counterclaim for breach of contract.[15]

## XV

The Branch Managers' brief states that they are withdrawing their counterclaims relating to Supreme's entry on a computer used by Durham.  Branch Managers Br. [104] at 47, n.215.  Accordingly, the Branch Managers' counterclaims under common law invasion of privacy and Tex. Civ. Prac. & Rem. Code Ann. § 143.001 are deemed withdrawn.

## XVI

The Branch Managers' brief acknowledges that unjust enrichment is not a valid cause of action.   Branch Managers Br. [104] at 47.   Accordingly, the Branch Managers'

---

[15]Supreme's reply brief asserts that the Branch Managers have abandoned parts of their breach of contract counterclaim other than as based on the P&L and reserve accounts. But the other parts identified (security deposits, February rents, charges for equipment, commissions for loans) appear to be amounts that the Branch Managers contend should have been applied to the P&L balance, and then paid to them.  *See* Countercl. ¶ 74.  The court therefore declines to hold at this procedural stage that the Branch Managers have abandoned these parts of their breach of contract counterclaim.

counterclaim for unjust enrichment is dismissed with prejudice.

## XVII

Supreme moves for summary judgment on the Branch Managers' counterclaim for money had and received as to the balance of the P&L and reserve accounts. Supreme argues that money had and received is a quasi contractual action that cannot be pursued when a written contract governs the subject matter asserted. *See Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164-65 (Tex. App. 1997, no pet.). Consistent with its theory on the breach of contract counterclaim, Supreme contends that the recovery sought in this counterclaim is a type of compensation, governed exclusively by Exhibit A, and therefore no quasi contractual action can be sustained.

The courts holds that Supreme is not entitled to summary judgment on the Branch Managers' counterclaim for money had and received because the summary judgment evidence would permit a reasonable jury to find that the money sought in this counterclaim is not compensation, but is a separate interest. *See supra* § XIV(B).

## XVIII

Supreme moves for summary judgment on the Branch Managers' counterclaim for declaratory judgment.

### A

The Branch Managers seek a declaratory judgment that (i) any non-solicitation provisions do not apply to the Branch Managers' regional employees or corporate underwriters, (ii) any non-solicitation provisions are unenforceable or ineffective, (iii) the

Branch Managers did not violate contracts or law by soliciting employees, and (iv) the Branch Managers client and customer lists are not property of Supreme. Their declaratory judgment counterclaim is based on the federal Declaratory Judgment Act ("DJA"), which provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.

## B

Federal courts have broad discretion to grant or refuse declaratory judgment. *Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991).  "Since its inception, the [DJA] has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). The DJA is "an authorization, not a command." *Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962).  It gives federal courts the competence to declare rights, but does not impose a duty to do so. *Id.*

Supreme maintains that they are entitled to summary judgment because this counterclaim is a mirror image of the issues that will be resolved in other claims in the lawsuit. *See Redwood Resort Props., LLC v. Holmes Co.*, 2007 WL 1266060, at *2-5 (N.D. Tex. Apr. 30, 2007) (Fitzwater, J.).  The Branch Managers respond that a declaration of the scope of the Non-Solicitation agreement is necessary to define the parties' rights going forward.

This court has often declined in its discretion to adjudicate declaratory judgment actions that are duplicative of other claims in the same case. *See, e.g., Metcalf v. Deutsche Bank Nat'l Trust Co.*, 2012 WL 2399369, at *9 (N.D. Tex. June 26, 2012) (Fitzwater, C.J.) (noting that declaratory judgment action should be dismissed because it duplicated plaintiffs' quiet title claim); *Kougl v. Xspedius Mgmt. Co. of DFW, L.L.C.*, 2005 WL 1421446, at *4 (N.D. Tex. June 1, 2005) (Fitzwater, J.) (denying as redundant a declaratory judgment claim seeking contract interpretation where this would be resolved as part of breach of contract action); 6 Charles Alan Wright, et al., *Federal Practice & Procedure* § 1406, at 30-31 (3d ed. 2010) ("When the request for declaratory relief brings into question issues that already have been presented . . . a party might challenge the counterclaim on the ground that it is redundant and the court should exercise its discretion to dismiss it.").  It has also declined to do so when the declaratory judgment action is merely the mirror image of another claim. *See, e.g., Evanston Ins. Co. v. Graves*, 2013 WL 4505181, at *1 (N.D. Tex. Aug. 23, 2013) (Fitzwater, C.J.).

The court declines in its discretion to entertain the Branch Managers' counterclaim for declaratory judgment because it holds above that the Non-Solicitation Agreement does not require reformation, *see supra* § IV(B); the two-year sunset of this agreement following the Branch Managers' resignation has already passed; the other issues raised in the counterclaim will be resolved in the course of adjudicating other claims in this case; the scope and enforceability of the non-solicitation provisions, as well as the lawfulness of the Branch Managers' solicitation, will be determined in the course of deciding Supreme's

claims for breach of contract; and the ownership of client and customer lists will be determined when deciding Supreme's claims for breach of contract, misappropriation of trade secrets, and breach of fiduciary duty.  Accordingly, Supreme is entitled to summary judgment dismissing the Branch Managers' declaratory judgment counterclaim.

XIX

Supreme moves for summary judgment on the Branch Managers' counterclaim for attorney's fees under Tex. Bus. & Com. Code Ann. § 15.51.  This provision authorizes an award of attorney's fees where an employer knew that a non-compete covenant was unreasonable and sought to enforce the covenant to a greater extent than necessary to protect its goodwill or other business interest.  *Id*. §15.51(c).  The Branch Managers' counterclaim alleges that Supreme's actions fell within this provision when it attempted to enforce the Non-Solicitation Agreement.

Because the court holds above that the non-solicitation provisions of the Non-Solicitation Agreement are not unreasonable as a matter of law, *see supra* § IV(B), the Branch Managers cannot satisfy a required element of their counterclaim for attorney's fees under § 15.51.  Supreme is entitled to summary judgment dismissing this counterclaim.

\*   \*   \*

Accordingly, the parties' motions for partial summary judgment are granted in part and denied in part.

**SO ORDERED**.

December 6, 2016.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE