IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

EVERETT FINANCIAL, INC. d/b/a §
SUPREME LENDING, §
§
    Plaintiff-counterdefendant, §
§ Civil Action No. 3:14-CV-1028-D
VS. §
§
PRIMARY RESIDENTIAL §
MORTGAGE, INC., §
§ *This memorandum opinion and order was
    Defendant, § originally filed under seal on December 19, 2016.
§ It was filed unsealed on January 10, 2017.
and § after the parties agreed that no part needed
§ to remain under seal.
BARRY G. JONES, JAMES DURHAM, §
and SHANNON FORTNER, §
§
    Defendants-counterplaintiffs. §
§
SCOTT EVERETT, individually, §
§
    Counterdefendant. §

MEMORANDUM OPINION
AND ORDER

    In this memorandum opinion and order, the court addresses six motions to strike

expert testimony.

I

    This is an action by plaintiff-counterdefendant Everett Financial, Inc. d/b/a Supreme

Lending ("Supreme") against defendant Primary Residential Mortgage, Inc. ("PRMI") and

defendants-counterplaintiffs Barry G. Jones ("Jones"), James Durham ("Durham"), and

Shannon Fortner ("Fortner") (collectively, the "Branch Managers"), arising from conduct

related to the Branch Managers' resignations from Supreme and moves to PRMI. Supreme's chief executive officer, Scott Everett ("Everett"), is a counterclaim defendant.[1] The factual background of this case is set out in the court's December 6, 2016 memorandum opinion and order. *Everett Fin. Inc. v. Primary Residential Mortg., Inc.*, 2016 WL _____, No. 3:14-CV-1028-D, slip op. at *1-13 (N.D. Tex. Dec. 6, 2016) (Fitzwater, J.). The court will limit its discussion of the background facts and procedural history to what is pertinent to the court's resolution of the instant motions.

The deadline for Supreme and Everett to designate experts was August 14, 2015. On that date, Supreme and Everett served expert disclosures designating their retained expert, Jeffrey Matthews ("Matthews"), and three nonretained or "Percipient Experts": Everett, Rick Hogle ("Hogle"), and Tony Schmeck ("Schmeck"). PRMI App. [123-1] 5-9. On December 11, 2015 Supreme and Everett disclosed Patrick Flood ("Flood") as a fourth nonretained expert. Flood's designation closely followed his deposition, which was taken on December 2, 2015. Matthews submitted an expert report contemporaneously with his designation.

The following motions are pending for decision: the motions of PRMI and the Branch Managers to strike Everett, Hogle, and Schmeck for insufficient disclosure under Fed. R. Civ. P. 26(a)(2)(C); the motions of PRMI and the Branch Managers to strike Flood for the

---

[1]Everett is more properly characterized as a third-party defendant. But because throughout this litigation the parties have referred to Everett as a counterclaim defendant, the court does so as well in this memorandum opinion and order.

same reason, and for untimely designation under the court's scheduling order; and the motions of PRMI and the Branch Managers to strike Matthews' expert opinions as unreliable under the *Daubert*[2] standard.

## II

The court first examines the motions of PRMI and the Branch Managers to strike nonretained experts Everett, Hogle, and Schmeck.

## A

Rule 26(a)(2) governs disclosures of expert testimony.  Rule 26(a)(2)(C)—which prescribes the disclosure requirements for nonretained experts (i.e., experts who are neither retained or specially employed to provide expert testimony in the case nor ones whose duties as the party's employee regularly involve giving expert testimony)—provides:

> *Witnesses Who Do Not Provide a Written Report.* Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:
>
> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>
> (ii) a summary of the facts and opinions to which the witness is expected to testify.

Nonretained experts are not required to submit reports.  This Rule, adopted in 2010, is intended to ensure that an opposing party has some notice of what the nonretained expert will testify about.  *See* 8A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2031.2,

---

[2]*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

at 92 (3d ed. 2010 & Supp. 2016).

Although the court is not aware of any controlling precedent that governs the level of detail required in disclosures under this Rule, some principles are found in persuasive authority. The court "must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have." Rule 26(a)(2)(C) advisory committee's note. The disclosure must state opinions, not merely topics of testimony. *See Carr v. Montgomery Cty., Tex.*, 2015 WL 5838862, at *3 (S.D. Tex. Oct. 7, 2015) (holding that disclosures at issue were insufficient); *Tolan v. Cotton*, 2015 WL 5332171, at *7 (S.D. Tex. Sept. 14, 2015) (same); *Brown v. Joseph Cory Holdings, LLC*, 2014 WL 12585673, at *1 (N.D. Tex. Apr. 1, 2014) (Means, J.) (same). And the disclosure must contain at least a summary of the facts upon which the opinions are based. *See Carr*, 2015 WL 5838862, at *3; *Tolan*, 2015 WL 5332171, at *7; *Brown*, 2014 WL 12585673, at *1. But the requirement of a "summary" may be satisfied by an "abstract, abridgement, or compendium of the opinion and facts supporting the opinion." *Anders v. Hercules Offshore Servs., LLC*, 311 F.R.D. 161, 164 (E.D. La. 2015) (quoting *Rea v. Wis. Coach Lines, Inc.*, 2014 WL 4981803, at *5 (E.D. La. Oct. 3, 2014)) (holding that disclosures at issue were sufficient).

B

PRMI and the Branch Managers maintain that the testimony of Everett, Hogle, and Schmeck must be excluded because the disclosures of Supreme and Everett do not satisfy the requirements of Rule 26(a)(2)(C).  The disclosures Supreme and Everett regarding Everett, Hogle, and Schmeck state:

> As to the subject matter, facts, and opinions on which the Percipient Experts are expected to testify, Supreme Lending hereby refers the parties to the transcripts of the depositions of each witness, the transcript of the deposition of Supreme Lending's corporate representatives, and other discovery and documents produced.  In conjunction with and/or addition to the foregoing, the Percipient Experts are expected to testify, inter alia, that:
>
> • Supreme Lending's confidential information and trade secrets are not generally known outside of the business;
>
> • Supreme Lending's confidential information and trade secrets are only known by select employees;
>
> • Supreme Lending takes significant measures to safeguard the secrecy of its confidential information and trade secrets;
>
> • Supreme Lending's confidential information and trade secrets would be valuable in the hands of its competitors;
>
> • Supreme Lending has expended significant effort and expense developing its confidential information and trade secrets;
>
> • Supreme Lending's confidential information and trade secrets could not be easily acquired or duplicated by others;
>
> • Supreme Lending sustained lost loan volume, revenues,

- 5 -

and profits and out-of-pocket damages as a result of the defendants' collective actions to harm Supreme Lending;[3] and

• The defendants' recruiting and solicitation tactics violated their duties to Supreme Lending and common practices in the mortgage lending industry.[4]

PRMI App. [123-1] 7-8.

PRMI and the Branch Managers contend, first, that the reference to deposition transcripts and other discovery as a subject of testimony does not satisfy the requirement to summarize the opinions and facts to which the expert witnesses will testify. They posit that the reference is so broad and generic that it extends to the entire universe of the case, which is no limit at all. PRMI and the Branch Managers posit, second, that the list of bullet points likewise does not satisfy Rule 26(a)(2)(C)(ii). They maintain that the bullet-point statements are impermissible legal conclusions rather than specific expert opinions. *See Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) (distinguishing permissible factual conclusions from impermissible legal conclusions in witness testimony). PRMI and the Branch Managers maintain, third, that the seventh bullet point, regarding damages, is merely a topic, not an opinion. *See Carr*, 2015 WL 5838862, at *3; *Tolan*, 2015 WL 5332171, at *7; *Brown*, 2014 WL 12585673, at *1.

---

[3]This point has been limited by agreement of the parties as to Schmeck and Hogle, but remains in dispute as to Everett. *See* PRMI App. [123-1] 50-51.

[4]This point has been limited by agreement of the parties to exclude the legal issue of duty. *See* PRMI App. [123-1] 51.

Supreme and Everett respond that their disclosures are sufficient under Rule 26(a)(2)(C). They maintain that the disclosures state opinions, not merely topics, about Supreme's confidential information and about the types of damages suffered after the Branch Managers' departure. And they posit that the disclosures provide a sufficient factual basis to support the opinions disclosed. According to Supreme and Everett, the disclosures list each expert's position at Supreme (President and Chief Executive Officer, Chief Strategic Officer, and Chief Financial Officer, respectively), and they summarize other factual matters, such as which employees have knowledge of Supreme's confidential information, and that some measures are used to protect it. With regard to the seventh bullet point, which pertains to Everett's opinions on damages, Supreme and Everett contend that this sentence states an opinion: that Supreme suffered damages in the categories listed. And they maintain that, although the disclosure contains only a bare factual basis—in the form of categories of facts that support this opinion—the categories provided ("lost loan volume, revenues, and profits and out-of-pocket damages") help to summarize what kind of facts will be used to support Everett's opinion. PRMI App. [123-1] 8.[5]

Because Supreme and Everett's disclosures of Everett, Hogle and Schmeck as nonretained experts summarize the opinions to which they will testify and the facts underlying the opinions, the court denies the motions of PRMI and the Branch Managers to

---

[5]Supreme and Everett point out that PRMI designated Everett as an expert. And PRMI's disclosure of Everett as an expert is less substantive than Supreme and Everett's disclosure. *See* Supreme App. [153-1] 25-26.

strike these experts.

### III

The court now turns to the motions of PRMI and the Branch Managers to strike Flood. The deadline for Supreme and Everett to designate experts was August 14, 2015. Supreme and Everett did not disclose Flood as an expert until December 11, 2015. They concede that this disclosure was untimely.

### A

The court must strike Flood's expert testimony unless the failure to make a timely disclosure was substantially justified or is harmless. *See* Rule 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). "Rule 37(c)(1) thus does not require witness preclusion for untimely disclosure if missing the deadline is harmless." *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 196 (4th Cir. 2003). "The district court has broad discretion in deciding whether a Rule 26(a) violation is substantially justified or harmless." *Sea Side Villas II Horizontal Prop. Regime v. Single Source Roofing Corp.*, 64 Fed. Appx. 367, 372 (4th Cir. 2003) (citing *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996)).

> In evaluating whether a violation of Rule 26 is harmless, the court examines four factors: (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to

disclose.

*Hoffman v. L&M Arts*, 2013 WL 81578, at *2 (N.D. Tex. Jan. 8, 2013) (Fitzwater, C.J.) (citing *Librado v. M.S. Carriers, Inc.*, 2004 WL 1490304, at *11 (N.D. Tex. June 30, 2004) (Fitzwater, J.)); *accord, e.g.*, *Viera v. Signature Contracting Servs., LLC*, 2014 WL 2893208, at *1 (N.D. Tex. June 26, 2014) (Horan, J.).   "The court considers the four-factor test holistically.   It does not mechanically count the number of factors that favor each side." *Hoffman*, 2013 WL 81578, at *3 n.7 (quoting *EEOC v. Serv. Temps, Inc.*, 2009 WL 3294863, at *3 (N.D. Tex. Oct. 13, 2009) (Fitzwater, C.J.), *aff'd*, 679 F.3d 323 (5th Cir. 2012)) (citations and internal quotation marks omitted).

B

1

Regarding the first factor—the importance of the evidence—Supreme and Everett state that Flood is important because he "can provide similar valuable insight" to that of Everett, Hogle, and Schmeck.   Supreme Br. [152] 11. This comparison appears to signify that Flood will provide insight into confidential information, solicitation, and the damages categories of lost loan volume, revenues, and expenses.   But as PRMI and the Branch Managers point out in reply, this characterization of similarity is actually an admission that Flood's testimony will be cumulative, and therefore not important.

2

The second factor focuses on prejudice to the opposing party. Supreme and Everett maintain that, because defendants were able to depose Flood (albeit before he was designated as an expert), prejudice is minimal. PRMI and the Branch Managers reply that they were prejudiced because they had no opportunity to depose Flood in light of his expert designation. By the time Flood was designated as an expert, no further depositions were possible because discovery had closed. The court concludes that PRMI and the Branch Managers were prejudiced by the late disclosure.

3

The third factor addresses the possibility of curing prejudice with a continuance. Supreme and Everett posit that this factor favors them because, shortly after the instant expert motions were filed, the court ordered the trial continued for a period of seven months. PRMI and the Branch Managers reply that the continuance only extended the time for resolving substantive motions, and, because it did not provide any additional opportunity for discovery, it did nothing to alleviate the prejudice that they identify. The court concludes that a continuance would not cure the prejudice identified under the second factor unless the court also revived the discovery period so that PRMI and the Branch Managers could depose Flood as a designated expert rather than as a fact witness.

4

Under the fourth factor, the court evaluates the explanation for the late disclosure of Flood.   Supreme and Everett maintain that this factor favors them because Flood's designation as an expert was merely a reaction to the questions PRMI and the Branch Managers asked at Flood's deposition about his opinions.   As PRMI and the Branch Managers point out in reply, the motivation for Supreme and Everett to designate Flood as a witness is not a valid basis to circumvent their obligation under the court's scheduling order and Rule 26 to timely disclose an expert witness.

5

Viewing the four-factor test holistically, the court concludes that the motions of PRMI and the Branch Managers to strike Flood as an expert witness should be granted. Flood's testimony appears to be merely cumulative and therefore unimportant.   PRMI and the Branch Managers were prejudiced by the late designation.   And a continuance would not cure the prejudice unless the court also revived the discovery period.   The explanation for the failure of Supreme and Everett to timely designate Floor is not particularly persuasive.   And a significant portion of Flood's proposed expert testimony appears to be factual in nature, which mitigates any harm to Supreme and Everett resulting from striking Flood as an expert.[6] Accordingly, the court grants the motions of PRMI and the Branch Managers to strike Flood

---

[6]Supreme and Everett's disclosure of Flood states, *inter alia*, that he would testify "regarding the manner in which mortgage banks and their associated branches or cost centers generate revenue and profit and incur expenses and debt."   Supreme App. [120-1] 7.

- 11 -

as an expert witness.

## IV

Finally, the court considers the motions of PRMI and the Branch Managers to strike Matthews' expert testimony.

## A

"The court decides these motions in its role as gatekeeper under Fed. R. Evid. 702." *SEC v. Cuban*, 2013 WL 3809654, at *1 (N.D. Tex. July 23, 2013) (Fitzwater, C.J.) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)) (citation omitted). "The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Nunn v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 2540754, at *2 (N.D. Tex. June 22, 2010) (Fitzwater, C.J.) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). In this case, the parties do not challenge Matthews' qualifications.

The expert's testimony must be relevant. To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone*, 288 F.3d at 245 (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Rule 702(d) (requiring that "expert has reliably applied the principles and methods to the facts of the case").

The expert's testimony must also be reliable. "Reliability is determined by assessing

'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Rule 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). Expert testimony "must constitute 'more than subjective belief or unsupported speculation.'" *Nunn*, 2010 WL 2540754, at *2 (quoting *Daubert*, 509 U.S. at 590). The court focuses on the expert's methodology, not the conclusions generated by it. *Id.* at *4 (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997)). If, however, "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998). This review is usually conducted by considering the five nonexclusive *Daubert* factors.[7] But these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Kumho*, 526 U.S. at 150.

The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *see also Johnson*, 685 F.3d at 459. The court's inquiry is flexible in that "[t]he relevance and reliability of

---

[7]The five nonexclusive *Daubert* factors are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94.

expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted).  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration."  *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5.

## B

PRMI and the Branch Managers challenge the reliability of the testimony of Matthews, a forensic accountant.  Matthews calculated a lost profits damages estimate for Supreme's claims against PRMI and the Branch Managers.  To estimate lost profits, he examined 19 Supreme branches that he characterized as affected by the Branch Managers' departure.  According to Matthews, these branches were affected because they were either closed (10 branches) or lost personnel to PRMI (9 branches) after the Branch Managers left Supreme.

Matthews calculated lost profits for these branches for the year 2014 because the Branch Managers' and other employees' moves to PRMI occurred in early 2014, and 2014 was the most recent year of financial data available when he prepared his report.  Matthews' method can be summarized as follows: (1) he began with the 19 branches' actual 2013 loan volume; (2) he used third-party data to project what the branches' growth rates would have

been in 2014, but for the alleged misconduct; (3) he applied these projected growth rates to the 2013 baseline to project their but-for loan volume in 2014; (4) he determined the difference between the but-for 2014 loan volume and the actual 2014 loan volume;[8] and (5) he multiplied this number by historical Supreme coefficients to convert lost loan volume into lost profit. *See* PRMI App. [126-1] 25-26, 38 (Matthews Report).  Besides Supreme's financial reports, Matthews relies on data from third-party vendor RealtyTrac that reported the number of mortgage loans in some counties where the 19 affected branches were located.

## C

PRMI and the Branch Managers contend that Matthews' method is unreliable because it cannot connect the loan *number* data obtained from RealtyTrac to the loan *volume*, in dollars, that he needs to project profits.  Matthews used the RealtyTrac data to calculate a market growth rate, which he then applied to the 19 Supreme branches to find their but-for performance.  According to PRMI and the Branch Managers, the fallacy with this approach is that growth in the *number* of loan transactions in a market is not a true indicator of growth in *dollar volume*.  Other variables, such as types of loans, branch specialization, and branch size distort the relationship between the *number* of loans and the *volume* of loans.  PRMI and the Branch Managers maintain that Matthews' unwarranted assumption creates an

---

[8]Although Matthews never states that he performed this step of subtracting the branches' actual 2014 volume—which is necessary to make his estimate a "lost profit" rather than merely a projected profit—it appears from the calculations submitted that he did. *See* PRMI App. [126-1] 38, 42-43 (Matthews Report).

unacceptable analytical gap between the data and his conclusions.[9]

Supreme responds that Matthews' method is a yardstick analysis, a recognized way to estimate lost profits damages. The yardstick method estimates lost profits by means of analogy to other businesses closely comparable to the plaintiff's. *See Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974); *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F.Supp.2d 776, 793 n.14 (N.D. Tex. 2013) (Fitzwater, C.J.), *appeal docketed*, No. 16-11381 (5th Cir. Sept. 16, 2016). Supreme contends that, in this case, Matthews estimated Supreme's lost profits by comparing the 19 affected branches to the mortgage loan markets in their counties, as represented by the RealtyTrac loan number data. Supreme maintains that Matthews in effect used all mortgage lenders in those counties as a yardstick for how the affected branches would have performed but for the alleged misconduct.

Supreme next contends that Matthews verified the correlation between the RealtyTrac loan number data and Supreme's loan volume growth. Matthews first attempted to verify this correlation by analyzing both sets of data from 2013. He assumed that 2013 was unaffected by alleged misconduct, so both the RealtyTrac loan numbers and Supreme's actual loan volumes are available for comparison and should bear out Matthews' hypothesis of a correlation. According to Supreme, this comparison validates Matthews' method by showing that "over the entire 2013 year, Supreme's month-to-month growth rate was 3% and

---

[9]PRMI and the Branch Managers advance other arguments challenging the reliability of Matthews' testimony, but it is not necessary to resolve them in deciding the instant motions.

the RealtyTrac projected growth rate was -1%."  Supreme Br. [154] 8; *see* PRMI App. [126-3] 181 (Matthews Supplemental Report) (presenting results in chart form).

Supreme also maintains that Matthews attempted to verify the connection between RealtyTrac data and Supreme loan volumes in a second way: by comparing two sets of Supreme data.  He examined the correlation between Supreme loan numbers and Supreme loan volume for 2013, concluding that they were closely correlated.  In 2013 Supreme's annualized growth rate in loan units was 21.2%, and its annualized growth rate in loan volume was 21.3%.  Matthews maintains that the close relationship between Supreme's growth in loan numbers and in loan volume proves that loan number data are reliable to project loan volume growth.

D

None of Supreme's arguments demonstrates an analytical connection between the RealtyTrac loan number data and Supreme loan volume growth.   First, Supreme's characterization of Matthews' method as a yardstick analysis does not save it from exclusion at trial.  As the proponent of a yardstick estimate, Supreme must demonstrate a reasonable similarity between the plaintiff's business and the business to which it is being compared. *See Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 208 (5th Cir. 2000); *Orthoflex*, 986 F.Supp.2d at 793 n.14.  This reasonable similarity may be shown by examining factors such as location, size, market served, and costs of operation. *See Eleven Line*, 213 F.3d at 208; *see also MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 851 (5th Cir. 2015).  Although Matthews used data from comparable locations (the same or

- 17 -

nearby counties as the Supreme branches),[9] Supreme has not attempted to show that the data represent businesses of comparable size, market served, or costs to those of the 19 affected branches.

Furthermore, when using a yardstick method, profitability figures from businesses in the same industry may not simply be averaged without demonstrating their similarity to the plaintiff's business. *See Eleven Line*, 213 F.3d at 208-09. In this case, it is difficult to establish similarity without knowing, for example, the size and margins of the business, what loan products it offered, or its proportion of purchase loans versus refinance loans. Supreme has not met its burden to show that Matthews' yardstick—the RealtyTrac loan numbers for the same or nearby counties—represents businesses reasonably similar to Supreme's affected branches. This conclusion is reinforced by examining Supreme's quantitative analyses.

Matthews' attempt to validate the relationship between RealtyTrac data and Supreme's loan volume growth by testing his projection on 2013 data, for which the projection could be compared to Supreme's historical data, is also ineffective. Matthews found that Supreme's monthly growth rate in 2013 was 3%, and the RealtyTrac projected monthly growth rate for that year would have been -1%. Supreme appears to argue that this 4% difference in monthly growth is an acceptable and known rate of error. But over the

---

[9]Matthews did not obtain RealtyTrac data for all counties containing the affected branches. The 19 affected branches were located in 17 counties (in five states). Matthews had data for 11 of these 17 counties. The remaining six counties, for which Matthews had no data, contained six branches. Matthews based his calculations for these six branches on a simple average of the growth in the other counties that he analyzed.

course of an entire year (the period called for in Matthews' ultimate lost profit calculation), this difference in "month-to-month" growth rates adds up to, on one hand, over 30% positive growth, and, on the other, over 10% negative growth.[10]  This is not an acceptable rate of error.  *See Orthoflex*, 986 F.Supp.2d at 783 n.2 (citing *Daubert*, 509 U.S. at 593-94).  Moreover, taking an average of these numbers exaggerates their correlation.  For the 12 months in 2013, the monthly projected growth and Supreme's actual growth have a difference greater than 10% for 8 of the 12 months, and they are of opposite signs (one positive, the other negative) for 4 of the 12 months.  This is not a known rate of error.  *See id.*

Finally, Supreme's attempt to validate the connection between the RealtyTrac loan number data and Supreme loan volume by comparing Supreme's own loan numbers with its own loan volume for 2013 is inapposite.  Although Matthews found that these indicators appear closely correlated (21.2% annualized growth compared with 21.3%), this comparison holds constant many factors that are variable in the comparison between RealtyTrac market-wide loan numbers and Supreme loan volume. Comparing Supreme's loan numbers to its own loan volume locks in all the factors that are unknown about the businesses that comprise the RealtyTrac data.  *See Eleven Line*, 213 F.3d at 208.  It is not surprising, therefore, that Supreme's loan volume is closely correlated to Supreme's own loan numbers.

---

[10]Because Supreme's 3% and -1% figures appear to be rounded, these figures are approximate.  The underlying values for this comparison are found at Supreme App. [155] 101.

E

PRMI briefly restates its arguments against Matthews under the headings of the five *Daubert* factors.  To the extent that the five *Daubert* factors apply to evaluating Matthews' testimony, PRMI and the Branch Managers argue that Matthews' method was created for the purpose of litigation, and has not been tested, accepted in any scientific community, or peer reviewed.  They also maintain, as illustrated above, that there is no known or potential error rate for Matthews' method.  Supreme only addresses the five *Daubert* factors when it contends that the error rate is known and favors Matthews.  Although most of the *Daubert* factors are not particularly helpful in addressing Matthews' method, *see Librado*, 2004 WL 1490304, at *8, the error rate factor weighs against admitting Matthews' expert testimony. *See supra* § IV(D).

Supreme has not met its burden to show that Matthews' method of calculating lost profits is reliable.  *See Daubert*, 509 U.S. at 592 n.10; *see also Johnson*, 685 F.3d at 459. Because Supreme has not demonstrated a reliable connection between Matthews' underlying data and his conclusions, the court excludes his expert testimony.  *See Joiner*, 522 U.S. at 146; *see also Johnson*, 685 F.3d at 460-61.

\*   \*   \*

Accordingly, for the reasons explained, the motions of PRMI and the Branch Managers to strike Everett, Hogle, and Schmeck as experts are denied; the motions of PRMI and the Branch Managers to strike Flood as an expert are granted; and the motions of PRMI and the Branch Managers to strike Matthews as an expert are granted.

**SO ORDERED**.

December 19, 2016.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE