IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EVERETT FINANCIAL, INC. d/b/a SUPREME LENDING, | § § § | |
| Plaintiff-counterdefendant, | § § | |
| VS. | § § | Civil Action No. 3:14-CV-1028-D |
| PRIMARY RESIDENTIAL MORTGAGE, INC., | § § § § | *This memorandum opinion and order was filed under seal on May 14, 2018. Because the parties do not request that any part remain under seal, this public version is now being filed. |
| Defendant, | § § | |
| and | § § | |
| BARRY G. JONES, JAMES DURHAM, and SHANNON FORTNER, | § § § | |
| Defendants-counterplaintiffs. | § § | |
| SCOTT EVERETT, individually, | § § | |
| Counterdefendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendants' motion to exclude and strike testimony of plaintiff's designated experts presents the question whether testimony regarding projected profits by a company's founder and president, as well as a company's chief financial officer, constitute lay testimony or expert testimony under the Federal Rules of Civil Procedure. Concluding that the testimony at issue qualifies as lay testimony, the court denies the motion.

I

This is an action by plaintiff-counterdefendant Everett Financial, Inc. d/b/a Supreme

Lending ("Supreme") against defendant Primary Residential Mortgage, Inc. ("PRMI") and defendants-counterplaintiffs Barry G. Jones, James Durham, and Shannon Fortner (collectively, the "Branch Managers") arising from conduct related to the Branch Managers' resignations from Supreme and moves to PRMI. Supreme's founder and President, Scott Everett ("Everett"), is a counterclaim defendant.[1] Because this case is the subject of prior memorandum opinions and orders—*see, e.g.*, *Everett Financial, Inc. v. Primary Residential Mortgage., Inc.*, 2017 WL 784766, at *1 (N.D. Tex. Feb. 28, 2017) ("*Everett III*")—the court recounts only the background facts and procedural history that are pertinent to the pending motion.

Under Fed. R. Civ. P. 26(a)(1)(A)(iii), Supreme was required to disclose its damages computations. Supreme's initial disclosure, made in August 2014, briefly listed the categories of damages sought, including lost profits. Supreme supplemented this disclosure in November 2015 with the statement that a computation of its lost profits damages was contained in the expert report of Jeffrey Matthews ("Matthews").

Supreme designated Matthews as a retained expert on lost profits damages. Supreme also designated Everett, Supreme chief financial officer Tony Schmeck ("Schmeck"), and Supreme executive Rick Hogle ("Hogle") as nonretained experts on lost profits. Supreme's nonretained experts were deposed in this case, but their depositions did not focus on lost

---

[1]Everett is more properly characterized as a third-party defendant. But because throughout this litigation the parties have referred to Everett as a counterclaim defendant, the court does so as well in this memorandum opinion and order.

profits damages. Supreme's counsel later agreed to limit the testimony of Schmeck and Hogle, but not Everett, on the subject of lost profits opinions. Discovery in this case closed in December 2015.

In December 2016 the court excluded Matthews' opinion testimony for lack of reliability under the *Daubert*[2] standard. In apparent response to the court's ruling, Supreme supplemented its Rule 26(a)(1) disclosures with a different damages calculation and different expert witnesses who would testify about the calculation. The supplemental disclosure computes lost profits by comparing Supreme's Southeast Region financials before and after the actions complained of in this case. It takes the difference between the region's 2013 and 2014 loan volume and multiplies this difference by Supreme's company-wide profit margin, which is its profit per dollar of loan volume. This formula yields a lost profits figure of approximately $5 million.[3] Supreme sought to introduce evidence of these damages through Everett and Schmeck.

PRMI and the Branch Managers filed motions to exclude evidence of the undisclosed "lost profits" computation. The court denied the motions to exclude, holding that Supreme's lost profits computation had not materially changed because it still computed lost profits by comparing Supreme's Southeast Region loan volumes before and after the Branch Managers' departures. The court also held, however, that because the witnesses testifying to lost profits

---

[2]*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[3]The formula is: (2013 loan volume - 2014 loan volume) * net variable profit margin = lost profits.

were completely different, Supreme was required to make its experts, Everett and Schmeck, available for depositions. Supreme was further required to "reimburse PRMI and the Branch Managers for their reasonable attorney's fees, taxable costs, and nontaxable expenses incurred in taking these depositions and obtaining the transcripts." *Everett III*, 2017 WL 784766, at *4. PRMI has taken the depositions of Everett and Schmeck.

PRMI and the Branch Managers now move to exclude and strike Everett and Schmeck as unreliable expert witnesses under Fed. R. Evid. 702.[4] Supreme opposes the motions and objects to the declaration of PRMI's retained damages expert, Scott W. Carnahan ("Carnahan"), in support of PRMI's motion to exclude and strike Everett and Schmeck. PRMI also objects to and moves to strike the declarations of Everett and Schmeck submitted in support of Supreme's response to PRMI's and the Branch Managers' motions to exclude and strike Everett and Schmeck. Supreme opposes the motion to strike.

II

Because the court's ruling on PRMI's objection to and motion to strike the declarations of Everett and Schmeck determines the evidence the court considers, the court turns first to that motion. PRMI contends that Supreme is improperly attempting to rehabilitate Everett's and Schmeck's lack of reliability by executing sham declarations explaining a new methodology. PRMI points to a number of alleged contradictions between statements in Everett's and Schmeck's declarations and depositions and moves to strike the

---

[4]The Branch Managers' motion incorporates by reference PRMI's motion in its entirety.

declarations filed in support of Supreme's opposition to PRMI's motion to strike experts.

The court disagrees with PRMI's characterization of the declarations. PRMI cites a non-binding case, *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 681 (6th Cir. 2011), in which the Sixth Circuit affirmed the district court's exclusion of expert witness testimony disclosed after the court-imposed deadline. The panel held that the untimely supplemental declaration was a "transparent attempt to reopen the Daubert inquiry after the weaknesses in the expert's prior testimony have been revealed." *Id.* The result and reasoning of *Pluck* are inapplicable here, however, because the declarations of Everett and Schmeck were timely submitted in support of Supreme's response.

Other cases that PRMI cites, *see, e.g.*, *Kennedy v. Allied Mutual Insurance Co.*, 952 F.2d 262, 266 (9th Cir. 1991), address questions in the context of motions for summary judgment. These cases generally hold that a party cannot create an issue of material fact and escape summary judgment by submitting an affidavit that contradicts prior deposition testimony. *See, e.g., Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) ("Virtually every circuit has adopted a form of the so-called 'sham affidavit rule,' which precludes a party from creating an issue of material fact by contradicting prior sworn testimony[.]"). Although the Fifth Circuit has a similar rule, *see, e.g., S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.") (citing Fifth Circuit cases), PRMI has failed to demonstrate that this rule has equal force in the context of a motion such as the instant

motion to exclude.

Accordingly, the court denies PRMI's objections to and motion to strike the declarations of Everett and Schmeck, and it will consider the declarations when deciding PRMI's and the Branch Managers' motions to exclude and strike the expert testimony of Everett and Schmeck.

III

The court now addresses PRMI's and the Branch Managers' motions to exclude.

A

The parties focus on Everett's calculation of lost profits stemming from the Branch Managers' departure from Supreme. Everett and Schmeck calculated lost profits by multiplying the difference in projected 2014 loan volume and actual 2014 loan volume by a net variable profit margin ("NVPM"). Everett defines "loan volume" as the total dollars lent by Supreme to borrowers through loans originated by Supreme loan originators. In a declaration attached to Supreme's response to PRMI's motion, Everett avers that he determined, based on historical Supreme data, that but for the Branch Managers' departure, the Southeast Region would have generated loan volume in 2014 at least equal to the volume generated in 2013. Everett confirmed this projection by comparing it against the 2013 to 2014 change in loan volume for Supreme nationwide as well as the "Flood Region," a neighboring Supreme region.[5] Schmeck avers that he then applied Supreme's nationwide

---

[5]The Flood Region is managed by Patrick Flood and includes small market branches in Florida and Georgia.

NVPM, or the profit per volume of loan dollars generated. The NVPM is equal to the difference between Supreme's revenue and variable expenses divided by the number of dollars loaned by Supreme nationwide.

Supreme maintains that Everett and Schmeck are lay witnesses and that the court should therefore evaluate their testimony under Rule 701, which provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"In particular, the witness must have personalized knowledge of the facts underlying the opinion and the opinion must have a rational connection to those facts." *Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 403 (5th Cir. 2003) (citation omitted). "[A] person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 460 (5th Cir. 1996).

"The Federal Rules of Evidence . . . confirm that [a witness's] position as company president permits [him] a broader range of testimony than a traditional lay witness would possess when testifying to matters concerning [his] business."[6] *Versai Mgmt. Corp. v.*

---

[6]The advisory committee's note to the 2000 amendment states:

> most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant,

*Clarendon Am. Ins. Co.*, 597 F.3d 729, 737 (5th Cir. 2010) (per curiam). The Fifth Circuit recognizes that corporate officers may testify as laypersons based on knowledge and analysis derived from duties held at the company. *See United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2010) (per curiam). Thus business owners or officers may offer lay testimony on lost profits because they have personal knowledge of their business. *See Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002) (collecting cases from other circuits). "The modern trend favors the admission of [lay] opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *Miss. Chem. Corp.*, 287 F.3d at 374 (quoting *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980)). This rule applies to a company's chief financial officer. *See Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 169 (5th Cir. 2010) (holding in suit involving damages to business that trial court did not abuse its discretion when it permitted plaintiff's chief financial officer to testify concerning lost profits because corporate officer who provides projections or opinions about changes in profits is not an expert but a lay witness); *but see DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 686 (5th Cir. 2003) (vacating damages award where plaintiff's witness had little significant actual knowledge about

---

> appraiser, or similar expert. . . . Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Rule 701 advisory committee's note (2000 amendment).

plaintiff and its operations, so witness could not provide lay opinion testimony).

The testimony of Everett and Schmeck is lay testimony under Rule 701 because they have personal knowledge of both the data and the method used to calculate lost profits. In this case, Everett is the founder, President, and sole owner of Supreme. Everett describes his duties as including the following:

> I review loan-volume data relating to the regions and branches within Supreme's network on a regular basis, usually a daily basis and never less than weekly, through SAM*E ("Supreme Accounting Made Easy") reports provided to me by Supreme's financial staff. SAM*E Reports provide branch and region-specific financial performance data, including loan volume originations, profit and loss itemizations, detailed general-ledger account activity, and loan-by-loan reports. In addition, I also review regional and branch loan-volume information through quarter-over-quarter and year-over-year loan-volume reports, which I request from Supreme's CFO on a quarterly and yearly basis. I discuss Supreme's loan volume data with my branch and regional managers as a means of evaluating their productivity and providing them guidance in producing more loans in their branches and regions.

Supreme 2/2/18 Sealed App. 5. Everett's general responsibilities as the President of Supreme afford him sufficient knowledge of Supreme's financials to testify regarding Supreme's projected loan volumes. His duties also familiarize him with the regional breakdown of Supreme's loan volume, which gives him a basis to project the loan volume of the Southeast Region.

Similarly, Schmeck has been the chief financial officer of Supreme since 2009. Schmeck avers:

> During my tenure at Supreme, I developed a proprietary reporting system to facilitate the daily delivery of financial information to corporate level officers and employees and regional and branch managers, called "SAM*E" reports. []The daily SAM*E reports include a year-to-date, monthly, and daily snapshot of detailed, highly-confidential branch and region-specific financial performance, including profit and loss statement itemizations, detailed general-ledger account activity, and detailed loan-by-loan reports on revenue information for each loan funded, including, among other things, specific data concerning each branch's profitability, loan volume, and funded loans, as well as the income, originations, expenses, fees, and overhead. In addition, upon request, I provide detailed financial information to branch and regional managers and corporate level officers and employees.

Supreme 2/2/18 Sealed App. 196. As a result of his regular duties as CFO, Schmeck is very familiar with the financials that the company internally and externally reports. The court thus concludes that he has the requisite personal knowledge to provide lay testimony about the loan volume projections and the NVPM for purposes of the lost profits calculation.

Moreover, Everett and Schmeck have personal knowledge, from their experience as Supreme officers, of the method used to calculate lost profits. *See Metro Hosp. Partners, Ltd. v. Lexington Ins. Co.*, 84 F.Supp.3d 553, 564 (S.D. Tex. 2015) (Rosenthal, J.). They used a widely-accepted and simple method of measuring lost profits (lost loan volume multiplied by a profit margin). *See id.* (citing *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 930 (10th Cir. 2004) ("Under Rule 701, the president could only give a damages opinion generated "using conventional methods based on LifeWise's actual operating history."). Everett and Schmeck relied on "information acquired as business owners and officers, such as [the company's] actual operating history," and did not incorporate "another

party's projected data [or] the unsubstantiated, estimated data of an unrelated third party." *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, 2016 WL 6084179, at *4 (W.D. Tex. May 6, 2016) (holding that officers lacked personal knowledge when relying on unrelated third party data).

Everett and Schmeck's testimony regarding their straightforward, arithmetic damages calculation is distinguishable from corporate officers' testimony based on *specialized* knowledge, which must be offered under Rule 702. *See Metro Hosp. Partners*, 84 F.Supp.3d at 564. In *LifeWise Master Funding*, for example, the Tenth Circuit held that a corporate president could not testify regarding damages under Rule 701. *LifeWise Master Funding*, 374 F.3d at 930. The court stated that "[i]nstead of limiting [the president's] testimony to his experience as a businessperson and president of the company . . . LifeWise had him enter into the realm of rolling averages, S-curves, and compound growth rates that appear to be an amalgam of logic, hope, and economic jargon." *Id.* (alterations, citations, and internal quotation marks omitted). The court held that the president could not testify regarding specialized and technical subjects under Rule 701. *Id.* Furthermore, because the president had no previous experience in his work with such methods, the court concluded that he lacked personal knowledge of the factors used in the damages model. *Id.* Here, by contrast, the lost profits calculation does not require specialized assumptions and is based on the same straightforward arithmetic that Everett and Schmeck employ as part of their routine duties as officers of Supreme. Therefore, Everett and Schmeck may offer their testimony regarding Supreme's lost profits as lay opinion testimony under Rule 701.

PRMI contends that Everett does not have direct knowledge of Supreme's loan volume data and thus cannot testify regarding projected profits based on personal knowledge under Rule 701. Citing portions of Everett's deposition, PRMI maintains that Everett derived the Southeast Region's 2013 loan volume from the audited financial statements, which do not include regional breakdowns. The court disagrees with PRMI's characterization of Everett's deposition testimony.

Although the total volume of the Southeast branches in 2013 ($502,458,541) is not specifically broken out in the audited financials, Everett testified in his deposition that they are included in the total gross revenue number. The court does not understand Everett's testimony to suggest that he projected the Southeast region's 2014 loan volume based solely on Supreme's nationwide 2013 loan volume total, as reported in the audited financial statement.

Everett avers that he mainly relied on historical performance of the Southeast region to project its lost loan volume in 2014:

> My opinion—that Supreme's Southeast Region would have produced as least as much loan volume in 2014 as it did in 2013—is primarily founded on the Southeast Region's historical loan volume data. As stated above, the Southeast Region began operations at the end of 2011. The Southeast Region's 2012 loan volume was $277,790,335. Its 2013 loan volume was $502,458,541. Its 2012 to 2013 change in loan volume originated was a growth of 80%. Based on the Southeast Region's historical loan volume data, I determined, with reasonable certainty, that the Southeast Region would have produced at least as much loan volume in 2014 as it did in 2013.

Sealed Supreme 2/2/18 App. 9. Although Everett did not personally calculate the branch

loan volume numbers, he regularly reviews them to assess business performance and prepare financial statements. Everett states that he confirmed the volume numbers for various branches of the Southeast Region as part of the process of preparing the audited financial statements to the IRS.

Thus even assuming *arguendo* that Everett lacks familiarity with specific numbers, his overall knowledge of Supreme's business affairs through regular review of his company financials gives him the required knowledge to testify regarding the lost damages calculation. *See Merrit Hawkins*, 79 F.Supp.3d at 632 (finding inability of president to explain damages calculations undermined credibility but did not indicate lack of personal knowledge); *cf. DIJO*, 351 F.3d at 686 (holding that outside financial consultant was too far removed from day-to-day operations to have independent knowledge sufficient to qualify as lay witness). Both Everett and Schmeck performed the same analysis that they regularly perform as part of their roles as President and CFO. Forming an opinion and projecting a particular revenue stream for the purpose of this lawsuit do not render Everett and Schmeck experts under Rule 702.[7] *See Valencia*, 600 F.3d at 416.

Accordingly, the court holds that Everett's and Schmeck's testimony is admissible as

---

[7]PRMI makes much of Everett's and Schmeck's statements that they have "specialized knowledge" of Supreme's financials. The court does not give weight to various statements by Everett and Schmeck regarding their expertise and specialized knowledge. Everett and Schmeck are not lawyers and do not understand the rules of evidence; thus their opinion about the type of testimony they are offering is irrelevant to the court's analysis. *Cf. United States v. Espino-Rangel*, 500 F.3d 398, 400 (5th Cir. 2007) ("a non-expert witness may not offer legal conclusions").

Rule 701 lay opinion testimony.

B

PRMI makes a number of objections, in the context of Rule 702, to the reliability of the methodology and assumptions underlying Everett and Schmeck's lost profit calculations. These objections include, *inter alia*, that Everett improperly counted the addition of new branches as loan volume growth; that Everett improperly assumed that the Southeast region is comparable to the Flood region; that Everett failed to consider important factors, such as unemployment, tourism, housing prices, and interest rates in his loan volume projection; that Schmeck improperly considered corporate retail branch revenue when calculating NVPM; and that Schmeck failed to deduct all origination-related "variable" expenses from his calculations. PRMI maintains that such methodological flaws render Everett's and Schmeck's testimony unreliable under Rule 702.

Because Rule 701 applies, the court holds that these critiques of Everett and Schmeck's calculations concern the weight, not the admissibility, of their testimony. The court has already concluded that Everett and Schmeck have sufficient personal knowledge to provide lay testimony regarding lost profits under Rule 701. PRMI does not dispute Supreme's straightforward lost profit calculation (lost loan volume multiplied by NVPM), but rather challenges particular assumptions that support the lost loan volume and NVPM numbers. These objections, which concern the weight of the evidence, are more properly presented during cross-examination. *See Miss. Chem. Corp.*, 287 F.3d at 374 (holding that ability of counsel to challenge actual and expected production figures through cross-

examination supported admission of testimony as lay opinion). Here, Everett and Schmeck have provided a breakdown of loan volume by each branch in the Southeast region, which forms the basis for their 2014 loan volume projection. Supreme has provided the audited financials that contain the inputs for Schmeck's NVPM calculation. PRMI will have the opportunity at trial to deconstruct these numbers and expose the various assumptions on which they rest. Such determinations are matters for the jury, not the court at the motion to exclude stage.

C

PRMI maintains that Supreme's designation of Everett and Schmeck as expert witnesses as part of their Rule 26 disclosures renders their testimony subject to the requirements of Rule 702. The court disagrees.

Under Rule 26(a)(2), "a party must disclose to the other parties the identity of any witness it *may use* at trial to present evidence under Federal Rule of Evidence 702, 703, or 705. *Id.* (emphasis added). Supreme's Rule 26 disclosures designate Everett and Schmeck as both potential expert witnesses and fact witnesses. Supreme offered Everett and Schmeck as persons with discoverable information in its Rule 26(a)(1)(A)(I) disclosure, stating that Everett and Schmeck have relevant knowledge of "Supreme Lending's revenue, expenses, profits, losses, and finances[.]" Supreme 3/16/18 Sealed App. 8-9. Supreme also designated Everett and Schmeck in its expert disclosures:

> Supreme Lending and the other parties to this case will likely elicit testimony from Everett, Hogle, and Schmeck (the "Percipient Experts") based on their personal knowledge of

> relevant facts at issue in this case. By virtue of their knowledge, skill, experience, training, and education, *the Percipient Experts may be qualified to testify to matters considered to be the subject of expert testimony*. However, the Percipient Experts have not been retained by Supreme Lending or Everett and are disclosed herein only because of their knowledge, skill, experience, training, and education.

PRMI 12/20/17 Sealed App. 294 (emphasis added).

In the context of this case, Supreme's Rule 26 disclosures serve merely to put PRMI on notice of the possibility that it will call Everett or Schmeck as expert witnesses at trial. Supreme is not required by the trial setting order to identify whom it will use as expert witnesses until 14 days before the trial setting. Nothing in the language of Rule 26 or Supreme's disclosures restricts Everett and Schmeck's testimony in this case to expert testimony. And the Advisory Committee Notes acknowledge that the same witness can provide both lay and expert testimony in a single case. *See* Rule 701 advisory committee's note (2000 amendment) (citing *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)).

The court therefore declines to preclude Supreme from offering Everett's and Schmeck's testimony as lay witnesses. *See Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F.Supp.3d 625, 631 (N.D. Tex. 2015) (Solis, C.J.), *aff'd sub nom. Merritt Hawkins & Assocs., L.L.C. v. Gresham*, 861 F.3d 143 (5th Cir. 2017) (treating as lay witness president who was both qualified as expert and designated as fact witness when company offered president exclusively as lay witness).

The court denies PRMI's and the Branch Managers' motions to exclude and strike

Everett and Schmeck as unreliable expert witnesses under Rule 702.[8]

* * *

Accordingly, the court denies PRMI's and the Branch Managers' motions to exclude and strike testimony of Scott Everett and Tony Schmeck and denies PRMI's motion to strike the declarations of Everett and Schmeck.

**SO ORDERED**.

May 14, 2018.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[8]Because the court is denying this motion, it denies as moot Supreme's objections to Carnahan's declaration, which challenge the methodology of Everett's and Schmeck's calculations. Supreme primarily objects to Carnahan's declaration as lacking in foundation and as irrelevant to lay opinion testimony.